## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **TEXANS FOR ISRAEL; MICHAEL ISLEY; REGAVIM, A.R.**; **MEIR DEUTSCH**; **YOSEF BEN CHAIM**; and **ARI ABRAMOWITZ**, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> **U.S. DEPARTMENT OF THE TREASURY**; **JANET L. YELLEN**, in her official capacity as Secretary of the Treasury; **U.S. DEPARTMENT OF STATE**; **ANTONY J. BLINKEN**, in his official capacity as Secretary of State; **U.S. DEPARTMENT OF HOMELAND SECURITY**; **ALEJANDRO MAYORKAS**, in his official capacity as Secretary of the Department of Homeland Security; **OFFICE OF FOREIGN ASSETS CONTROL**; **BRADLEY T. SMITH**, in his official capacity as Director of the Office of Foreign Assets Control; **FINANCIAL CRIMES ENFORCEMENT NETWORK**; and **ANDREA GACKI**, in her official capacity as Director of the Financial Crimes Enforcement Network, <br><br> *Defendants.* | Case No. 2:24-cv-167 <br><br> **COMPLAINT** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This litigation challenges the constitutionality and legality of portions of Executive Order 14115 ("EO" or "EO 14115") issued by the President on February 1, 2024, which authorizes the imposition of financial sanctions and

1

immigration restrictions on persons, including U.S. citizens, who take actions that conflict with the Biden Administration's (the "Administration") policy in Judea and Samaria (also known as the West Bank).[1]

2.      EO 14115 authorizes sanctions for two kinds of activities. One focuses on "acts of violence," including intimidation and property destruction. The Administration's public statements about the EO have focused exclusively on this type of activity. Plaintiffs do not challenge that part of the EO.

3.      The other kind of sanctionable activity sweeps much more broadly, however, as it does not require any proof of violent or illegal conduct before finding a violation. The EO makes it sanctionable for a person to "directly or indirectly" harm "peace, security, or stability of the West Bank." This open-ended and vague provision empowers the Office of Foreign Assets Control within the Department of Treasury ("OFAC") to sanction anyone who acts contrary to what the Secretary of the Treasury determines advances the cause of "peace, security, or stability of the West Bank." This violates the First Amendment.

4.      This language is particularly expansive given what the Administration has said it considers detrimental to "peace" in the West Bank. The Administration considers the "two-state solution" essential to peace and has made

---

[1] Judea and Samaria, also known as the "West Bank," has been the home of the Jewish People since biblical times. In modern times, the area was commonly described as Judea and Samaria (by United Nations documents, for example), until 1950, when the Hashemite Kingdom of Jordan sought to buttress its military occupation by renaming the area "West Bank." Plaintiffs strongly oppose use of the term "West Bank," as that term often is used to delegitimize Israel's current claim to the land and the Jewish People's status as indigenous to the land. However, for ease of understanding and to mirror the language of EO 14115, Plaintiffs will use the term "West Bank" at certain intervals for the purposes of this Complaint.

clear that it considers the mere act of Jews residing in or making pilgrimage to sites in the West Bank as an "obstacle to peace."[2] In fact, the Administration has even called visits of Jews to their holy sites "provocative"[3] and thus presumably harmful to the Administration's perception of "stability."

5.      Since the start of the recent Israel–Hamas war, the Administration also views those opposed to providing "humanitarian" aid to Hamas and its allies in Gaza as detrimental to the "peace, security, or stability of the West Bank."

6.      Thus, anyone advocating against the two-state solution or expressing public opposition to the distribution of "humanitarian" aid to Hamas and its allies may be regarded as an obstacle to peace and potentially sanctioned under EO 14115, even when advocating for such positions through purely peaceful and protected means.

7.      Indeed, a memo circulated by the Biden Administration prior to issuing related visa ban sanctions made clear that the relevant conduct encompasses anyone whose conduct would "obstruct, disrupt or prevent efforts to achieve a two-state solution."[4] This is the first and only sanctions regime where an Administration has deemed ordinary, peaceful activities and *reasonable* political positions supported by many Americans as inimical to "peace" and therefore sanctionable.

---

[2] Jacob Magid, *'An obstacle to peace': US lambasts Israeli moves to expand West Bank settlements*, TIMES OF ISRAEL (June 19, 2024), https://bit.ly/3SBRCIa.
[3] Ron Kampeas, *Biden administration slam Itamar Ben-Gvir's 'provocative' visit to Temple Mount,* Jewish Telegraphic Agency (May 22, 2023), https://bit.ly/4ch6suu.
[4] Alexander Ward, *Biden orders top aides to prepare reprimands for violent Israeli settlers in West Bank,* Politico (Nov. 18, 2023), https://bit.ly/46Axvjm.

8.     Activities that can "directly or indirectly" obstruct or disrupt a two-state solution can and do include speech and conduct protected by the First Amendment.

9.     The broad scope of Section 1(a)(i)(A) of the EO means that any Israeli national or private organization that publicly criticizes or peacefully campaigns against the "two-state solution," or provides support to Jews living in the West Bank, is potentially subject to sanctions even though the individual or organization may never have engaged in any violent or destructive activity related to those policies. The EO therefore penalizes political and religious speech protected by the First Amendment.

10.    The enforcement of the EO violates the constitutional rights of American citizens in four ways.

11.    First, as discussed, the government focuses exclusively on, and condemns the religious beliefs of, Jews and those who assist Jews. For instance, the United States Government does not claim the residence of non-Jews in the West Bank constitutes an "obstacle to peace" nor that pilgrimage to non-Jewish religious sites in the West Bank is "provocative." This presents dual First Amendment problems, penalizing only one particular category of speech based upon its content (*i.e.*, support for Jewish settlers in Judea and Samaria) and imposing sanctions upon only one particular category of people, as evidenced by the fact that only Jewish individuals and groups have been sanctioned so far under the EO. In this way, the EO infringes upon the free speech *and* the free exercise rights of affected Jewish citizens, presenting two separate constitutional violations.

12.     Then, the fact that the EO discriminates on the basis of viewpoint presents an equal-protection violation. Because the EO authorizes the Executive Branch to impose financial sanctions on persons and entities simply because they espouse a position contrary to the Administration's Middle East policy, U.S. citizens subject to such enforcement are deprived of the equal protection of federal law guaranteed by the Fifth Amendment. While any infringement on speech rights can violate the First Amendment, a speech infringement targeted at only a specific class of people—namely, individuals engaging in their First Amendment right to practice their religion freely—violates the Fifth Amendment, as well.

13.     Finally, the EO violates the Fifth Amendment Due Process Clause due to the unconstitutional overbreadth and vagueness of its key terms. Actions that "threaten the peace, security, or stability of the West Bank" and are therefore sanctionable under the EO are entirely within the eye of the beholder. While one administration may think it has a clear-cut understanding of what types of conduct those terms implicate, that understanding could change overnight when new decision-makers take office. That lack of adequate notice of the types of speech and conduct that the EO deems sanctionable violates Plaintiffs' right to due process by rendering it impossible for them to conform their conduct to the dictates of law.

14.     Beyond the four separate constitutional violations identified above, enforcement of the EO also impermissibly infringes upon the sincerely held religious beliefs of American citizens, violating the Religious Freedom Restoration Act (RFRA). The EO—which punishes U.S. citizens who wish to exercise their religious beliefs by supporting Israel through monetary and other contributions—

is unaccompanied by any interest sufficiently compelling to justify this infringement.

15.     The EO is also invalid because it lacks an adequate statutory basis. Specifically, the factual predicates upon which the EO purports to be based—relating to what it refers to as "settler violence" (*i.e.*, violence inflicted by Jews who live in the West Bank)—are rare in comparison to documented instances of violence inflicted *against* such Jewish settlers. Rather than perform any independent factual investigation to analyze the true source of the threat to West Bank peace and stability, the Administration's "factfinding" merely involved collecting quotations from avowedly anti-Israel political groups with histories of antisemitic conduct. Such "factfinding" does not provide a sufficient statutory basis for the Administration to authorize sanctions. Using that material to impose serious sanctions on individuals and entities is arbitrary and capricious.

16.     Finally, the EO extends not only to the primary targets mentioned above, but also to third parties who in any way support such targets. Section 3 of the EO expands the scope of § 1 to the "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to" the EO. Thus, donors (including U.S. citizens) could potentially be caught in this dragnet and subjected to sanctions under EO 14115.

17.     The Administration has already used the amorphous "peace, security, and stability" language to target a nonviolent protest group operating outside the West Bank that stages demonstrations against the delivery of aid to Hamas-controlled Gaza—an area clearly not encompassed within the West Bank.

18.     The scope of this sanctioning authority is unprecedented, as it targets beliefs held by many, if not most, Americans. The Administration is within its foreign-policy prerogatives to pursue a two-state solution or oppose Israeli settlements. But that does not make people who take the contrary position fringe or radical—in fact, the Republican Party platform does not support the two-state solution (the Texas Republican Party affirmatively opposes the two-state solution) and does not view Jewish land ownership in the West Bank as contrary to international law or "illegal." Persons engaging in speech or peaceful conduct consistent with the view of a major national party may therefore find themselves sanctioned, without notice, on the ground that their advocacy violates federal law.

19.     Similarly, the manner in which the "violence" sanctions are administered makes it dangerous and difficult for Americans to engage in any kind of First Amendment activity with Jewish persons in the West Bank. Persons can be sanctioned (and have been sanctioned) notwithstanding the absence of criminal convictions or complaints (or documented violent acts), based solely on allegations made by partisan non-governmental organizations. Because the U.S. government has no credible process for verifying allegations against sanctioned persons, it is impossible for third parties, like some of the U.S.-based Plaintiffs, to know whether anyone with whom they interact in the West Bank in exercise of their constitutional rights may suddenly be deemed a sanctioned individual.

20.     In short, the lack of process for making such determinations makes it impossible for third parties to conduct due diligence.

21.     Because of the exceedingly broad scope of sanctions authority with respect to non-violent conduct and the lack of any prior notice to sanctions targets,

any support for or involvement with Israelis that is consistent with Plaintiffs' views could make them subject to sanctions—without notice—under Section 3.

### JURISDICTION AND VENUE

22.     This Court has federal-question jurisdiction under 42 U.S.C. § 1988 and 28 U.S.C. § 1331 because this action arises under the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"); the Immigration and Nationality Act ("INA"); and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a).

23.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) & (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and each Defendant is an officer of the United States sued in his or her official capacity.

### PLAINTIFFS

24.     **Michael Isley**, a longtime resident of Amarillo, Texas, is the President of **Texans for Israel**. He became committed to the importance of Israel as a child after learning about Israel as the land to which Moses led the Jewish people and the land in which Jesus lived.

25.     Mr. Isley started Texans for Israel with friends while in college. Inspired by a historically rich visit to an archaeological dig in Israel, the friends were moved to create an organization that, as its website proclaims, "stands committed to wholeheartedly supporting the Jewish People in their ancestral homeland of Israel."[5] The mission statement notes that "[a]s a registered 501c3

---

[5] TEXANS FOR ISRAEL, https://www.texansforisrael.com (last visited Aug. 2, 2024).

nonprofit organization, [Texans for Israel's] mission is to extend aid to individuals, organizations, and communities, focusing especially on those in the heartland of Israel: Jerusalem, Judea, and Samaria."

26.     As President of Texans for Israel, Mr. Isley first visited Israel in 1980 and has visited over 50 times since. In the last several years, it has been Mr. Isley's habit to visit Israel two to three times per year.

27.     Specifically, as President of Texans for Israel, Mr. Isley has traveled to Judea and Samaria over 40 times. Mr. Isley's understanding of Judea and Samaria as the Jewish homeland is an integral part of his Christian faith. As he has previously stated: "One of our goals is to teach and tell our Christian friends to support Judea and Samaria. It is the road on which the patriarchs walked. It is the Cave of the Patriarchs bought by Abraham."[6]

28.     As a function of his profound appreciation for and religious commitment to Israel, Mr. Isley maintains deep ties to communities throughout Judea and Samaria.

29.     For instance, Mr. Isley has for many years joined HaYovel—an organization that matches interested volunteers with Jewish farmers residing in Judea and Samaria—and picked grapes in Har Bracha, a town on the southern ridge of Mount Gerizim, a mountain located in Samaria.

30.     Acting through Texans for Israel, Mr. Isley has cultivated a strong relationship with the Jewish community in Hebron—a historical Jewish holy city in Judea—as well. He and Texans for Israel have hosted Mr. Yishai Fleischer, the

---

[6] *Mike Isley – A Texan for Israel*, CHRISTIAN FRIENDS OF ISRAELI COMMUNITIES, https://cfoic.com/meet-christian-zionists/mike-isley (last visited Aug. 2, 2024).

international spokesman for the Jewish Community of Hebron, at Mr. Isley's home in Texas many times to educate Americans, particularly religious Christians, about the importance of Jewish sovereignty in Hebron. Mr. Isley has also donated to the Hebron Fund, a 501(c)(3) organization whose principal location is Brooklyn, New York. Likewise, Mr. Isley has traveled to New York for Hebron Fund meetings.

31.    Mr. Isley even assisted in producing a film about one of his trips to Judea and Samaria to educate people about the righteousness of Jewish presence there, and the moral, religious, and historical basis for the Jewish claim to sovereignty over this area.

32.    Through his relationship to communities in Judea and Samaria, Mr. Isley actively works to increase ties between the Israeli and American governments. For instance, acting as President of Texans for Israel, Mr. Isley brought Mr. Tommy Waller and then-Members of Knesset ("MK") Sharon Haskel and Yehuda Glick from the West Bank to President Trump's inauguration in January 2017. In the same capacity, Mr. Isley has invited members of the Israeli Knesset, including Ohad Tal, and others, including Yishai Fleisher and David Wilder, to Washington, D.C., to meet with members of U.S. Congress. Similarly, he brought then-MK's Sharren Hasskel and Yehuda Glick to the 2016 Texas Inaugural Ball for Governor Greg Abbott.

33.    In turn, Ari Abramowitz, a citizen of Israel and resident of Samaria, has stayed at Mr. Isley's home many times as well, and, as Mr. Isley intended, those visits have enabled Mr. Abramowitz to speak with Americans about the

history and current work carried out by the Jewish communities in Judea and Samaria.

34.     Each of the Israelis identified in paragraphs 30, 32, and 33—whom Mr. Isley and Texans for Israel support financially and whom they have invited to the United States for the purposes of education and fundraising—are individuals who hold views and engage in activities, including First Amendment protected speech, that the Biden Administration would regard as "threaten[ing] peace and security" in the Middle East.

35.     Prior to the issuance of EO 14115, Mr. Isley and Texans for Israel had intended to continue inviting the aforementioned individuals to visit the United States in order to assist them in their fundraising efforts and to provide them with a platform for educating Americans on the moral, historical, and religious right of the Jewish people to live and be sovereign in the West Bank.

36.     By virtue of supporting said individuals and organizations, Mr. Isley fears that he himself, as well as his organization Texans for Israel, could be subjected to sanctions without prior notice, and this fear has chilled his ability to continue to support the invitation of the above-mentioned individuals to the United States to enable them to speak to government officials and ordinary citizens about Israel—and specifically, about Judea and Samaria.

37.     Plaintiff **Ari Abramowitz** is a dual U.S.-Israeli citizen, currently residing in the village of Ma'aleh Amos in the Gush Etzion Regional Council municipality of Judea and Samaria.

38.    Mr. Abramowitz is a co-founder of Arugot Farm, an organic farm and retreat center located in southeastern Judea.[7] According to Mr. Abramowitz, the farm is located "in an area critical to the safety and security of Israel and the Jewish people."[8] As described on the website of Arugot Farm:

> Located in the heart of the biblical 'Wilderness of Zif' where King David composed many of the Psalms and hid from King Saul, in just a few years, the Arugot Farm has been transformed from a barren desolate wilderness to a Garden of Eden-like oasis, unlike anything in the Land of Israel.[9]

39.    Mr. Abramowitz actively encourages the establishment of other Jewish owned and operated farming communities on state land in Judea and Samaria. One medium for doing so is the website thelandofisrael.com.

40.    Mr. Abramowitz also assists Jewish farmers and agricultural institutions in Judea and Samaria by peacefully opposing attempts by Palestinian Arabs and anti-Zionist individuals, organizations, and governmental and quasi-governmental bodies to interfere with Jewish agricultural endeavors in Judea and Samaria.

41.    Mr. Abramowitz met Mr. Isley in or around 2001 while the latter was visiting Israel. After meeting, a friendship of shared ideals blossomed.

42.    Because Mr. Isley agrees with the goals of Mr. Abramowitz and wishes to help advance them, Mr. Isley has donated to thelandofisrael.com and has invited Mr. Abramowitz to speak in the United States.

---

[7] ARUGOT FARM, https://arugotfarm.co.il/ (last visited Aug. 2, 2024).
[8] *Id.*
[9] *About,* ARUGOT FARM, https://arugotfarm.co.il/about (last visited Aug. 2, 2024).

43.     In turn, Mr. Abramowitz has invited Mr. Isley to stay with him for up to two months at a time—and Mr. Isley has done so.

44.     Because Mr. Abramowitz lives on an isolated farm and because Palestinian terror groups reject Jews living anywhere in the West Bank—such groups seek to "cleanse" the entire land of Jews—his farm has been repeatedly subjected to violent attacks. For example:

   a.   In an ambush in an olive grove, Palestinian terrorists threw large stones at his car, endangering his life.

   b.   In a separate incident, his wife had her car stoned by Palestinian terrorists, while she was transporting their children.

   c.   A shepherd employed by the farm was ambushed and badly beaten while herding the farm's flock, requiring multiple stitches to his head.

   d.   After suffering a car accident, Mr. Abramowitz's car was stolen by Palestinians while he was waiting for help.

45.     Mr. Abramowitz now fears venturing outside. Should he, his wife, or his children again be attacked by Palestinian terrorists and should he use force to defend himself and his family, Mr. Abramowitz may find himself subject to these harsh sanctions without notice.

46.     Plaintiff **Regavim, A.R.** ("Regavim") is a non-profit organization ("Amuta"), established in 2006 and existing under the laws of the State of Israel. Regavim is a public movement dedicated to protecting Israel's national lands and resources.  Specifically, Regavim actively opposes illegal construction in all sectors as well as other methods of illegal seizure and control of Israel's state lands and

13

other assets by the Palestinian Authority. Regavim has consistently called for equal and universal law enforcement and for government action to halt foreign funding and support for illegal activities that violate Israeli jurisdiction and international law.

47.     In line with its advocacy for the rights of Jews and the State of Israel, Regavim actively opposes the supply of so-called "humanitarian" aid to Hamas, Islamic Jihad, and the myriad of organized crime cartels and other terrorist organizations currently wreaking havoc in the Gaza Strip.

48.     To that end, Regavim supported the grassroots movement known as "Tzav 9," a non-partisan, unincorporated association comprising some 15,000 individuals from diverse backgrounds, religious affiliations, and philosophical orientations, including Jews, Christians and Muslims. Regavim supported Tzav 9 in various ways, including but not limited to the following: (1) providing administrative and other back office services; (2) assisting in the preparation and dissemination of public relations and other materials in the United States, Israel, and around the world, explaining Tzav 9's agenda and activity; (3) at the request of religious and other institutions in the United States and on its own initiative, dispatching spokespersons and activists from Tzav 9 and other organizations to explain the misuse of "humanitarian" aid and U.S. taxpayer monies to the benefit of Hamas, and to the detriment of the non-terrorist Gaza civilian population; (4) appearing before government and non-governmental organizations to educate policy makers, opinion makers and social influencers, regarding the misuse of "humanitarian" aid to support Hamas and its affiliated terrorist organizations and to persuade governmental bodies to cease and desist from delivering

"humanitarian" aid to Hamas in order to protect Israeli citizens and to facilitate the safe return of the hostages brutally taken by Hamas and its terrorist affiliates on October 7, 2023.

49.     From its inception, members of Tzav 9 have engaged in peaceful acts of protest and civil disobedience to prevent the delivery of "humanitarian" aid into the hands of Hamas and its affiliates.

50.     Senior leaders of Regavim include numerous U.S. citizens who currently reside in Israel, including Judea and Samaria, as well as Israeli citizens and other nationals. A significant percentage of Regavim's revenue originates from American donors residing in the United States and in Israel.

51.     Contributions to Regavim are made through the social charity platform known as JGive.com, which is a project funded by the American Society for Overseas Research ("ASOR"), "a non-profit 501(c)(3) organization whose mission is to initiate, encourage, and support research into, and public understanding of, the history and cultures of the Near East and wider Mediterranean world, from the earliest times. ASOR is apolitical and has no religious affiliation."[10]

52.     On June 14, 2024, OFAC placed Tzav 9 on its list of "Specially Designated Nationals and Blocked Persons" ("SDN List"), pursuant to EO 14115. In doing so, OFAC froze Tzav 9's assets in its JGive account and has since prohibited Americans from aiding the group in any manner.

53.     According to the press release issued by the U.S. Department of State, Tzav 9 was sanctioned pursuant to section 1(a)(i)(A) of the EO "for being

---

[10] *About ASOR,* ASOR, https://bit.ly/3Wy3Brh (last visited Aug. 5, 2024).

responsible for or complicit in, or having directly or indirectly engaged or attempted to engage in actions—including directing, enacting, implementing, enforcing, or failing to enforce policies—that threaten the peace, security, or stability of the West Bank."[11] As a result of the sanctions, JGive has frozen approximately 300,000 NIS (approximately $80,000) in donations. A significant portion of that amount was intended to be paid to Regavim for expenditures incurred on behalf of Tzav 9.

54.     Due to the actions already taken by the Biden administration in implementing EO 14115 with the revealed purpose to regulate Jewish settlers, along with the all-encompassing language of the EO that prevents financial contributions and other forms of support, Regavim is in imminent fear of sanctions.

55.     Plaintiff **Meir Deutsch** is the Director General of Regavim. He is a dual U.S.-Israeli citizen who permanently resides in the West Bank. He serves as a major (reserves) in the Israeli Defense Forces ("IDF").

56.     Mr. Deutsch—a staunch opponent of the two-state solution advocated by the Biden Administration—is an orthodox, Zionist Jew who strongly believes in the Jewish People's right to reside in Biblical Israel, including and especially in Judea and Samaria. Mr. Deutsch believes that the exercise of the Jewish People's rights in Judea and Samaria should be anchored and protected in Israeli and international law and achieved through peaceful means.

---

[11] Press Statement, Office of the Spokesperson, U.S. Dep't of State, Sanctioning Israeli Group for Disrupting and Destroying Humanitarian Aid to Civilians (June 14, 2024), https://www.state.gov/sanctioning-israeli-group-for-disrupting-and-destroying-humanitarian-aid-to-civilians/.

57.     Because of his monetary support to projects and organizations (including Tzav 9) that—according to the Biden Administration—threaten the peace and stability of the West Bank, Mr. Deutsch is in imminent threat of sanctions.

58.     Plaintiff **Yosef Ben Chaim** is a dual U.S.–Israeli citizen who permanently resides in Netivot, Israel.  Yosef is the husband of Reut Ben Chaim, who was sanctioned under EO 14115 on July 11, 2024, for her involvement in the Tzav 9 movement and her participation in the peaceful protests against the transfer of "humanitarian" aid to Hamas and the other terrorist organizations in Gaza. Yosef and Reut have eight children, all minors.  Reut maintains a small tour guide business—"Reut Hadrachot v'Proyektim"—and, as an employee of the business and (prior to the sanctions), Yosef received a monthly salary. As we discuss in more detail below, Yosef has been significantly and detrimentally affected by the sanctioning of his wife.  Shortly after being sanctioned, Reut's bank account—including her small business account—in Israel was frozen. Yosef is no longer able to receive any salary from his employer.  On top of all this, Yosef cannot finance basic, day-to-day essential transactions: food, education, medicine, hygiene products (*i.e.*, diapers, etc.), mortgage payments, etc. Yosef actively supported his wife's activities and believed that by protesting the provision of "humanitarian" aid to Hamas, Reut was doing what was right and just. Despite his ongoing work responsibilities and other pressing matters, Yosef would take care of his family of eight while Reut peacefully protested against providing aid to terrorist organizations in Gaza.

**DEFENDANTS**

59.     Defendant **U.S. Department of the Treasury** ("Treasury Department") is a federal agency responsible for implementing sections of EO 14115. The Treasury Department is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

60.     Defendant **Janet L. Yellen** is the U.S. Secretary of the Treasury Department ("Secretary of the Treasury") and was responsible for formulating the policy behind EO 14115 and, subsequently, implementing it in her capacity as the Secretary of the Treasury.

61.     Defendant **U.S. Department of State** ("State Department") is a federal agency responsible for implementing EO 14115. The State Department is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

62.     Defendant **Antony Blinken** is the U.S. Secretary of State and was responsible for formulating the policy behind EO 14115 and, subsequently, implementing it in his capacity as the Secretary of State.

63.     Defendant **U.S. Department of Homeland Security** ("DHS") is a federal agency responsible for implementing and enforcing the Immigration and Nationality Act and EO 14115. DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

64.     Defendant **Alejandro Mayorkas** is the Secretary of DHS and was responsible for formulating the policy behind EO 14115 and, subsequently, implementing it in his capacity as the Secretary of DHS.

65.     Defendant **Office of Foreign Assets Control** ("OFAC") is a component of the Treasury Department and is responsible for implementing sections of EO 14115 pertaining to financial sanctions.

66.     Defendant **Bradley T. Smith** is the current director of OFAC.

67.     Defendant **Financial Crimes Enforcement Network** ("FinCEN") is a component of the Treasury Department and is responsible for implementing sections of EO 14115 vis-à-vis U.S. banking and other financial institutions.

68.     Defendant **Andrea Gacki** is the current director of FinCEN.

## FACTUAL ALLEGATIONS

### A. Issuance of EO 14115

69.     On February 1, 2024, President Biden issued EO 14115 pursuant to the International Emergency Economic Powers Act (50 U.S.C. §1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. §1601 *et seq.*) ("NEA"), section 212(f) and section 215(a) of the Immigration and Nationality Act of 1952 ("INA") (8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a)), and section 301 of Title 3, United States Code.[12] *See* Exhibit A.

---

[12]3 U.S.C. § 300, entitled "General Authorization to Delegate Functions":

The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any

70.     EO 14115 creates a new and unique sanctions regime aimed at persons who are deemed a threat to the stability of the "West Bank."

71.     EO Section 1 lists four potential targets that can be sanctioned:

(a) A foreign person[13] responsible for or complicit in, or that has directly or indirectly engaged or attempted to engage in:

    (1) Actions—including directing, enacting, implementing, enforcing, or failing to enforce policies—that threaten the peace, security, or stability of the West Bank. EO, §1(a)(i)(A).

    (2) planning, ordering, otherwise directing, or participating in any of the following actions affecting the West Bank: (1) acts of violence; (2) placing civilians in reasonable fear of violence; (3) property destruction; (4) seizure of property. EO, §1(a)(i)(B).

(b) A leader or official of an entity, including any government entity, that has engaged in, or whose members have engaged in, any of the activities in sections (a)(1) and (a)(2) or a leader of an entity whose property and interests in property are blocked as a result of activities relating to the leader's or official's tenure. EO, §1(a)(ii)(A)-(B).

---

function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President . . .

[13] The term "person" means an "individual or entity." EO, §7(c). The term "foreign person" is not defined in the EO. For purposes of sanctions under Narcotics Trafficking Sanctions Regulation, 31 C.F.R. §536 *et seq.*, the term "foreign person" includes "any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States)" 31 C.F.R. §536.304. This definition does not expressly apply to the sanctions under EO 14115. *See also* 31 C.F.R. § 536.300, which provides that the definitions apply to the Narcotics Trafficking Sanctions only.

(c) A foreign person who has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person blocked pursuant to the EO. EO, §1(a)(iii).

(d) An entity owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person blocked pursuant to EO. EO, §1(a)(iv).

72.     The imposition of sanctions under Section 1 requires a determination by the Secretary of State, in consultation with the Secretary of the Treasury, or vice versa.

73.     In addition to the sanctions regime, the EO also prohibits (a) making any contribution of funds, goods, or services by, to, or for the benefit of a blocked person, EO, § 3(a); and (b) the receipt of any contribution or provision of funds, goods, or services from any such person, EO, § 3(b).[14] *See also* EO, § 5(a) ("Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited . . . .").

74.     In contrast to the EO's sanctions regime, Section 3's prohibition applies to anyone, including U.S. citizens. *See Background Press Call On Upcoming Measures to Address Actions That Undermine Peace, Security, and Stability in the West Bank* (Feb. 1, 2024) ("Background Press Call") ("It will also prohibit **U.S. persons** making any contribution or provision of funds, goods, or services by, to, or for the benefit of any of these persons, and the receipt of any

---

[14] As noted, making a contribution that *materially* assists a blocked person is also sanctionable under Section 1(a)(iii) of EO 14115.

contribution of provision of funds, goods, or services from those persons . . ."
(emphasis added)).[15]

75.     EO Section 4 imposes sanctions under the INA, barring the entry of
any individual who meets "one or more of the criteria in section 1" of the EO. The
Department of Homeland Security administers immigration sanctions in
consultation with the Department of State.

76.     Notably, EO Section 8 allows for all measures taken pursuant to the
EO to be carried out *without any prior notice to the affected individual or entity*.

77.     The EO does not expressly refer to race or religion. However, the
intent, creation, and implementation of the EO were all directed at the Jewish
settler population, and no other. The Background Press Call discussed only actions
by the Jewish settler community. Moreover, on the same day the EO was issued,
Defendant FinCEN issued a "FinCEN Alert" entitled "Alert on ***Israeli*** Extremist
Settler Violence Against Palestinians in the West Bank" ("FinCEN Alert").[16] The
FinCEN Alert begins with the following statement:

> The Financial Crimes Enforcement Network (FinCEN) is issuing this
> alert to financial institutions related to the financing of ***Israeli
> extremist settler violence against Palestinians*** in the West
> Bank. (emphasis added).

---

[15] Press Release, National Security Council, White House, Background Press
Call On Upcoming Measures to Address Actions That Undermine Peace,
Security, and Stability in the West Bank (Feb. 1. 2024), https://bit.ly/4daOaMP.
[16] Fin. Crimes Enf't Network, FinCEN Alert on Israeli Extremist Settler
Violence Against Palestinians in the West Bank, FIN-2024-Alert001 (Feb. 1,
2024), https://bit.ly/3AbBlmR.

## B. Historical Background

78.    Judea and Samaria have been the home of the Jewish People since biblical times. It is estimated that approximately 92% of all place names mentioned in the Bible are located in Judea and Samaria.[17] The very name by which the Jewish People have been known for millennia is derived from the polity and geographic region known as Judea.

79.    By decision of the Allied Powers at San Remo in 1920 and the League of Nations in the Mandate for Palestine of 1922, Judea and Samaria were included in the parcel of land to be administered by Great Britain. This land was referred to as "Palestine."

80.    In the Palestine Mandate, the League of Nations charged Great Britain with the responsibility of establishing a "Jewish national home" in the mandated territory in recognition of "the historical connection of the Jewish people with Palestine and to the grounds for reconstituting their national home in that country." Article 6 of the Palestine Mandate charged Great Britain with the duty to "facilitate Jewish immigration" and to "encourage … close settlement by Jews on the land, including state lands and waste lands not required for public purposes."

81.    Following the General Assembly's peace proposal involving the creation of a Jewish state in 1947 and the expiration of the Mandate in 1948, the

---

[17] For example, Bethlehem (Old Testament, Genesis 35:19; New Testament, Matthew 2; Luke 2), Hebron (Old Testament, Genesis 13:18); Shilo (Old Testament, Genesis 49:10), Bet-El (Old Testament, Genesis 12 and 13), Shechem (Old Testament, Genesis 12:6), Michmas (Book of Samual I, 13:16), Jericho (Book of Joshua, 6:1-5; New Testament, Matthew, 20: 20-34), Tekoa (Book of Samual II, 14:2), and many others, are all situated in Judea and Samaria.

Arab states and Palestinian Arab irregulars declared war against the Jews residing there and the nascent State of Israel, with the aim of destroying the newly declared Jewish State.

82.     During Israel's War of Independence, the Kingdom of Transjordan managed to occupy significant parts of Mandatory Palestine, including parts of Jerusalem and significant territory in Judea and Samaria. To assert its claim to Judea and Samaria, Transjordan, which previously comprised only territory on the east bank of the Jordan River, changed its name to "Jordan," while referring to Judea and Samaria, which lay on the west bank of the Jordan River as the "West Bank". Thus, the Jordanian occupation is the source of the term "West Bank."

83.     Armistice agreements signed between Jordan and Israel in 1949 put a temporary halt to the hostilities, while specifying that the Armistice Lines would not constitute any final international boundary between the combatants. Hence, Jordan's later claims to have "annexed" the West Bank were never recognized by the international community.[18]

84.     During its occupation of Judea and Samaria from 1948 to 1967, Jordan ethnically cleansed the entire Jewish population from the areas under its control, destroying numerous Jewish communities in the West Bank and Jerusalem.

---

[18] *See generally* Yehuda Blum, *The Missing Reversioner: Reflections on the Status of Judea and Samaria*, 3 ISR. L. REV. 279 (1968). Because the West Bank never formally became a part of Jordan, Jewish settlements in the West Bank do not violate the Geneva Conventions or international law (because the West Bank is not the territory of a signatory party).

85.    In June 1967, during the Six Day War, the West Bank was liberated from Jordanian occupation and reunited with the State of Israel. It has been under continuous Israeli administration to this day.

86.    During the period of Israeli administration of the West Bank, the government of Israel and the people of Israel reestablished Jewish communities throughout biblical Judea and Samaria. The current Jewish population is approximately 600,000 persons, who reside in hundreds of cities, towns, and villages.

87.    Many Jews and Gentiles both in Israel and throughout the world believe that the Jewish People have a legal, historical, and religious right and duty to settle throughout the Land of Israel, including and especially Judea and Samaria.

88.    The final legal status of these areas remains in dispute.

89.    For many years, opponents of a Jewish presence in the West Bank attempted to limit the rights of both American and Israeli citizens to speak, campaign, and fulfill their religious beliefs and obligations regarding Judea and Samaria.

90.    Indeed, the United States Government has engaged in a long line of discriminatory actions against those who support a Jewish presence in Judea and Samaria.

91.    For example, the first lawsuit against the Internal Revenue Service (IRS) alleging viewpoint discrimination concerned a pro-Israel non-profit, Z Street, whose application for non-profit status the IRS allowed to languish. Z Street's support of a Jewish presence in Judea and Samaria in part fueled the IRS's

discriminatory treatment of Z Street.[19] The IRS eventually settled with Z Street, issuing a formal apology.

92.    Yet another example is the federal government's boycott of Jewish higher education institutions located in the West Bank under which federal grant monies were prohibited from being distributed for research and other purposes. This policy was rescinded by the Trump Administration and reinstituted during the Biden Administration.[20]

93.    EO 14115 is the latest step in this effort to curtail Jewish rights in Judea and Samaria. EO 14115 creates a new and unique sanctions regime, purporting to give U.S. agencies the authority to punish persons and entities who take actions or assume religious positions that do not align with the Administration's preferred Middle East policy.

94.    U.S. agencies implementing EO 14115 have focused almost exclusively on alleged Jewish threats to the President's vision, while largely ignoring threats emanating from any other source.

95.    Even though the EO is premised on the proposition that a sanctions regime is necessary to promote peace, stability, and security in the Middle East, it focuses nearly exclusively on peaceful Jewish groups, utterly ignoring the principal source of terror, both in the West Bank and throughout the Land of Israel; namely, Palestinian terror, which has reached epic proportions in the past year, as the world witnessed on October 7, 2023.

---

[19] Lori Lowenthal Marcus, *The IRS Campaign Against Israel—and Us,* WALL ST. J. (Feb. 1, 2018), https://bit.ly/3WxY97Y.
[20] Staff, AFP & Jacob Magid, *US cuts science, tech cooperation with Israeli institutions in the West Bank,* TIMES OF ISRAEL (June 27, 2023), https://bit.ly/3yvSes3.

96.     Worse, the factual predicate upon which the EO rests—so-called "settler violence"—has been accepted by the Biden Administration without any independent research or analysis. Had Defendants properly discharged their duties, they would have realized that the data relied upon is inaccurate and biased. In fact, it was provided by anti-Jewish groups and groups opposed to the very existence of Israel.

97.     To date, the only individuals who have been placed on the EO's sanction list are Jews (*see* immediately below) even though there are, literally, thousands of Palestinians who, in the last several months, have engaged in activities that unquestionably threaten the "peace, security, or stability of the West Bank." EO, §1(a)(i)(A).

98.     For instance, it is the formal and public policy of the Palestinian Authority to funnel millions of dollars per year to terrorists and their families as a reward for the murder of Jews in a program coined "Pay for Slay."[21]  This program unequivocally "threaten[s] the peace, security, or stability of the West Bank."

99.     Although these payments are made monthly, the Biden Administration has not sanctioned *a single person* for making or receiving such payments and has not stated any intention to impose sanctions related to the making or receipt of such payments. Moreover, members of the Palestinian Authority Security Forces—trained, armed and funded by the United States

---

[21] Adam Rasgon & Mohammed Najib, *Israel Cracks Down on Banks Over Payments to Palestinian Inmates,* N.Y. TIMES (May 9, 2020), https://www.nytimes.com/2020/05/09/world/middleeast/israel-palestinian-inmates-banks.html.

government since 1995—have committed acts of terrorism, including murder and attempted murder of Israeli and American citizens.[22] The Palestinian Authority encourages and glorifies these acts of terrorism, uses US-provided resources to memorialize the terrorists and to support their families, and publishes the names of the terrorists from among its ranks, but this has not led to any resulting sanctions on either perpetrators or the leaders of the organizations of which they are members. To date, Palestinian officials who preside over the Palestinian Authority's system of murder for hire, known as "pay for slay," have not been sanctioned.

### C. Defendants' failure to engage in proper fact-finding

100.   Upon information and belief, Defendants have not engaged in any meaningful fact-finding or analysis in support of the factual predicate for EO 14115. Instead, Defendants have adopted indiscriminately false and misleading allegations of misconduct by Jewish residents of the West Bank without making any effort to verify and validate such allegations with *any* of the following parties: the targets of the EO; local government authorities; Israeli police; the Israeli Defense Force ("IDF") (who are the legitimate government authority throughout the West Bank); and Israeli government officials, including the Minister of Defense.

---

[22] *See generally* Regavim (R.A.), OFFICERS BY DAY, TERRORISTS BY NIGHT (2024), *available at* https://www.regavim.org/wp-content/uploads/2024/03/regavimTerrorReportEng1202.pdf. This report, issued by Plaintiff Regavim, exemplifies the arbitrary nature of EO 14115 by underscoring the frequency with which Palestinian authorities, unabashedly and without consequence, engage in terrorism against neighboring Jews.

101.   In addition, Defendants have not published any statistics documenting the so-called "*Israeli* extremist settler violence" that the President cited as authority for declaring a "national emergency" under the IEEPA and the NEA. *See* 50 U.S.C. §1701(a) and 50 U.S.C. §1621.

102.   The FinCEN Alert indicates that Defendants relied upon data from the website of the United Nations Office for the Coordination of Humanitarian Affairs ("OCHA").[23]

103.   With respect to Israel, OCHA has a history of "parroting . . . false and distorted claims, thereby seeking to give credence and credibility to highly misleading accusations."[24] Also, OCHA oversees and facilitates government funding to a host of anti-Israel and even antisemitic organizations.[25]

104.   The degree of such bias is acute and alarming, and the resulting reports and data patently dishonest. For instance, OCHA routinely characterizes acts of self-defense against Palestinian terrorists as a form of "settler violence" to morally equivocate between Palestinian terrorists and Jewish farming communities.

105.   For instance, OCHA reported 856 incidents of "settler violence" in 2022, using the terms "settler-related incidents," "settler violence," and "settler attacks" interchangeably. However, OCHA's definition of "incidents involving Israeli settlers" is deceptively broad and captures the numerous and frequent

---

[23] FINCEN ALERT ON ISRAELI EXTREMIST SETTLER VIOLENCE, *supra* note 17, at n.2 ("For statistics related to ongoing violence and casualties in the West Bank, *see* United Nations Office for the Coordination of Humanitarian Affairs . . .").
[24] *Core Bias in the UN Office for the Coordination of Humanitarian Affairs (OCHA-oPt),* NGO MONITOR (Feb. 1, 2017), https://bit.ly/4d8d9R9.
[25] *Id.*

incidents in which Israelis must *defend* themselves against Palestinian terrorists. Indeed, OCHA includes among Palestinian victims of alleged settler violence, "Palestinians killed or injured during attacks or alleged attacks they perpetrated against Israeli settlers" in addition to various other categories, including "attacks and alleged attacks by Israeli settlers."[26]

106.    Thus, OCHA counts as victims of "settler violence" any Palestinian killed or harmed in any encounter with Israeli nationals, *even where the killed or injured Palestinian was harmed during the course of carrying out a terrorist attack.*

107.    For instance, the OCHA Palestinian casualty dashboard appears to count the wounding of the terrorist who shot David Stern as the wounding of a Palestinian by an Israeli civilian settler.[27] In March 2023, Israeli civilian Mr. Stern had been driving through the Palestinian town of Huwara with his wife when a terrorist opened fire, shooting Mr. Stern in the head. Mr. Stern responded with his own gunfire.[28]

---

[26] *Data on Casualties*, OCHA: UNITED NATIONS OFFICE FOR THE COORDINATION OF HUMAN AFFAIRS, https://www.ochaopt.org/data/casualties (last visited Aug. 2, 2024); Nahal Toosi, *US says Palestinians are close to changing 'pay for slay' program*, POLITICO (Mar. 29, 2024), https://www.politico.com/news/2024/03/29/us-says-palestinians-are-close-to-changing-pay-for-slay-program-00149734.

[27] *Data on Casualties*, *supra* note 26. We arrived at this conclusion based on the fact that only one Palestinian injury by an Israeli settler in the West Bank is recorded for the day of March 17, 2023 (the day of the attack on Mr. Stern). To arrive at this result, (1) select "Palestinian Injuries;" (2) select the proper date range (03/17/2023-3/17/2023); (3) under "Area," select "West Bank"; and (4) under "Perpetrator," select "Israeli civilian settler."

[28] Tzvi Joffre, *'He's like Iron Man': Friends describe David Stern as educator, hero,* Jerusalem Post ((Mar. 20, 2023), https://www.jpost.com/israel-news/article-734897; *see also* Michael Wolfowitz and Esther Salama, *Returning to the Wild West: Jewish Violence, Social Reaction, Self Help and Social Control*, 62 INT. ANNALS OF CRIM. 284 (2024).

108.    This incident is represented by OCHA as *Israeli* violence. Indeed, OCHA alleges that seven Palestinians were murdered by "extremist settlers" in the West Bank from January 1, 2023, to October 7, 2023.[29]

109.    Among the supposed victims of "settler violence" are the following individuals: Abd al-Karim Badi'a Abd al-Karim Sheikh, who was shot by the IDF while trying to infiltrate a farm near the Israeli town of Karnei Shomron while armed with knives and explosives;[30] Tareq Odeh Yusef M'aali, who was shot dead by an Israeli civilian after breaking into his farm and attempting to stab him;[31] and Muhannad Falah Abdallah Shihadah, who was shot dead after opening fire and killing four Israeli civilians, including two minors, outside a hummus restaurant near the town of Eli.[32] These examples underscore the unreliability—and genuinely bad faith nature—of such reports by OCHA and similar organizations of "settler violence."

110.    As a result of OCHA's inherent anti-Jewish and anti-Israel bias, the data on OCHA's website is grossly incomplete and inaccurate—unbefitting of a data set supposedly relied upon by the United States Government when imposing and implementing its sanctions regime.

---

[29] *Data on Casualties*, *supra* note 26. To arrive at this result, (1) select "Palestinian Fatalities;" (2) select the proper date range (01/01/2023-10/07/2023); (3) under "Area," select "West Bank"; and (4) under "Perpetrator," select "Israeli civilian settler."

[30] Emanuel Fabian, *Palestinian shot dead after allegedly entering West Bank farm with knives, IEDs*, TIMES OF ISRAEL (Mar. 10, 2023), https://bit.ly/4fBGMvx.

[31] Emanuel Fabian, *Palestinian shot dead in alleged stabbing attempt at West Bank outpost — IDF*, TIMES OF ISRAEL (Jan. 21, 2023), https://bit.ly/4db1Jfm.

[32] Ammar Awad, *Palestinian gunmen kill four Israelis in West Bank*, REUTERS (June 21, 2023), https://bit.ly/3YwTrd4.

111.    The Administration's reliance on inherently dishonest and antisemitic data is not novel. Repeatedly, the Administration has parroted disproven casualty figures from the Gaza Ministry of Health, despite the fact that this agency is controlled by the terrorist group Hamas.[33] Legislation was passed to halt the Administration from citing such false numbers.[34]

112.    Nevertheless, Defendants have chosen to rely on OCHA as a source to the exclusion of reputable and accurate Israeli and other sources.

113.    The blatant inaccuracies of OCHA and similar anti-Jewish organizations has been widely documented.[35] Yet, upon information and belief, Defendants failed to engage in any form of due diligence, making no effort either to substantiate OCHA's allegations whatsoever or to properly interpret OCHA's data in the context of the definitions provided.

114.    In short, Defendants elect to focus solely on rare ***Israeli*** extremist settler violence, based upon hearsay from extremely biased sources, while ignoring pervasive, chronic, and brutal terror attacks perpetrated by Palestinians.

---

[33] *See, e.g.*, Steven Nelson, *Biden says Israel killed 'too many' civilians as he warns Netanyahu not to quash Hamas in Rafah without new plan*, N.Y. POST (Feb. 12, 2024), https://nypost.com/2024/02/12/news/biden-israel-killed-too-many-gazans-netanyahu-must-not-squash-hamas-in-rafah-without-new-plan/.

[34] *U.S. Legislators Bar State Department From Citing Gaza Health Ministry Fatality Statistics*, FOUNDATION FOR DEFENSE OF DEMOCRACIES (June 28, 2024), https://bit.ly/4dtSWF0.

[35] *See, e.g.,* Regavim, *Settler Violence: The Making of a Modern Blood Libel*, YOUTUBE (Jan. 30, 2024), https://www.youtube.com/watch?v=VI3vNEyJnNM; *see also supra* note 25, *Core Bias in the UN Office for the Coordination of Humanitarian Affairs*.

115.   Indeed, for some time, the West Bank has been the location of large-scale, violent attacks by Palestinians against Jewish civilians and Israeli security forces.

116.   In stark contrast to the undocumented "***Israeli*** extremist settler violence," there is well-documented evidence of an unprecedented increase in Palestinian terrorism, both in the West Bank and in Israel proper:

a.   In January 2024, there were approximately nineteen terror attacks against Israelis in the West Bank alone (14 shootings, two stabbings, and three automobile-ram attacks). In addition, there were 337 rock-throwing occurrences and 79 recorded Molotov cocktail incidents.

b.   In December 2023, there were approximately twenty-seven terror attacks against Israelis in the West Bank alone (19 shootings, five stabbings and three automobile-ram attacks), resulting in 26 individuals injured. In addition, there were 84 recorded Molotov cocktail incidents.

c.   In November 2023, there were approximately twenty-seven terror attacks by Palestinians against Israelis in the West Bank alone (25 shootings, four stabbings, and 1 automobile-ram attack), resulting in 18 injured and seven fatalities. In addition, there were 84 recorded Molotov cocktail incidents.[36]

---

[36] The above statistics are taken from the Israeli Security Agency ("ISA"), better known as the *Sherut haBitaẖon haKlali*, or *Shabak*, or *Shin Bet*. For documentation of the above statistics, please see the following (in Hebrew): *Monthly Terror Attack Report*, ISRAELI SECURITY AGENCY (January 2024), https://shabak.gov.il/media/arjj514v/ינואר-2024-דוח.pdf; *Monthly Terror Attack*

117.   The problem of Palestinian terrorism is not limited to the West Bank. According to Rescuers Without Borders, a volunteer Israeli medical first responder organization, there were 7,386 such attacks in 2022 across Israel, resulting in 31 murdered and 734 wounded. This figure is underinclusive, as it includes only events that required medical response teams—such as shootings, throwing Molotov cocktails, stabbings, and the like—but not property crimes or attempted attacks that did not require medical response teams.

118.   Furthermore, prior to the devastating attacks of October 7, 2023, Rescuers Without Borders reported 3,640 attacks in the first half of 2023 alone, resulting in 28 murdered and 362 wounded.

119.   Using a narrower definition of terrorist attack, the Israeli security service ISA listed 1,032 attempted terror attacks in 2023 and 414 successful attacks in the West Bank and Jerusalem, besides the deadly October 7 massacre. These attempts include 869 shooting attacks, 121 bombings, 21 stabbings, as well as kidnappings, suicide bombings and ramming attacks. According to the ISA, 43 Israelis were killed and 224 wounded in these attacks.

120.   The months following October 7 have shown little improvement in Palestinian violence against Jewish civilians and Israeli security forces.

121.   Instead, the number of Palestinian terror attacks has only risen. Palestinians carried out 515 terror attacks in the West Bank and Israel proper in January 2024, 475 terror attacks in February, 493 attacks in March, and 513

---

*Report*, ISRAELI SECURITY AGENCY (November & December 2023), https://shabak.gov.il/media/rdjinpdh/עברית-דצמבר.pdf.

attacks in April. None of the terrorists involved in these attacks were sanctioned by the United States, despite the widespread Palestinian violence against Jews in the West Bank.

122.   Notably, Israeli security forces reported 16 major terror attacks—involving either the use of firepower, knives, automobile-ram attacks or bombs – in the West Bank in January 2024 alone, while security forces foiled 139 attempted terror attacks.

123.   In February 2024, Palestinians carried out 21 major terror attacks in the West Bank, while security forces foiled 102 attempted terror attacks.

124.   In March 2024, Palestinians carried out 28 major terror attacks in the West Bank, while security forces foiled 89 attempted terror attacks.

125.   These attacks are unspeakably gruesome and inhumane, though they receive little to no reprimand from the Administration.

126.   For instance, in February 2023, Elan Ganeles, a 26-year-old U.S. citizen visited Israel to attend a friend's wedding. Mr. Ganeles was driving on a public highway in the Jordan Valley on February 27, 2023, when a Palestinian terrorist cell, *lying in ambush for vehicles bearing civilian Israeli license plates*, opened fire, killing Ganeles and wounding his friend in the passenger seat. The perpetrators shot two more vehicles before fleeing.

127.   Less than a month later, on March 19, 2023, a Palestinian gunman shot American-Israeli David Stern in the head as he drove with his wife on a West Bank road near Huwara. A former U.S. Marine, Mr. Stern was able to return fire

despite his injuries, warding off the Palestinian terrorist, who was eventually captured. Mr. Stern and his wife thankfully survived. Despite being identified, Mr. Stern's attacker has not been sanctioned.

128.   These acts of Palestinian violence, including both organized terrorist attacks and hate crimes of opportunity, continue unabated.

129.   More specifically, since October 7, 2023, more than 20 Israelis have been murdered in Palestinian terrorist attacks in the West Bank.

130.   For instance, in February 2024, three Palestinian gunmen opened fire at Israelis waiting at a checkpoint between Jerusalem and the city of Ma'ale Adumim in Judea. One Israeli was killed, and eleven other Israelis were wounded, including a pregnant woman, who was listed in serious condition.

131.   That same month, Yitzhak Zeiger, a 57-year-old father of three, and 16-year-old Uria Hartum, were slain at a gas station while filling their tank with gas near the city of Eli. The gunman was a Palestinian Authority policeman.

132.   In April 2024, 14-year-old shepherd Benjamin Achimeir was killed by Palestinian terrorists while tending to his flock of sheep near the city of Hebron.[37]

133.   In June 2024, Amnon Mukhtar, a 67-year-old Jewish resident of the Israeli city of Petah Tikvah, was shot in his car in Qalqilya while buying vegetables. After shooting him, local Palestinians then burned him alive in his car.

---

[37] I24News, *Indictment Filed Against ISIS-Affiliated Terrorist Who Murdered 14-year-old Shepherd,* (June 20, 2024), https://bit.ly/3WOJiY6.

134.   At the same time, Palestinians have engaged in many acts of arson and property destruction directed at Jews in the West Bank.

135.   Indeed, over the past several months, "firefighters have battled well over 1,000 fires in Judea and Samaria, many of them adjacent to Jewish towns and Israeli army bases, almost all of them certainly caused by arson."[38]

136.   West Bank terrorism against Jews is not a sporadic or solely grassroots phenomenon. According to a report released by Palestinian Media Watch on January 31, 2024, the supposedly moderate Palestinian Authority and its Fatah ruling party are deeply involved in terror. Indeed, despite the Palestinian Authority's systematic campaign of terrorism—which includes paying the families of "martyrs" under its infamous "Pay for Slay" program—it is not subject to United States sanctions but is treated as a moderate partner for peace in the pursuit of a "two state solution."[39]

137.   By Fatah's own admission, Fatah members and the PA's security forces carried out more than 1,500 terror attacks against Israelis in 2023. The Fatah movement recently released a video proudly showing 24 "martyrs" from its ranks killed while carrying out attacks against Israel. For example, Fatah hailed Ashraf Muhammad Amin Ibrahim, a Palestinian Authority military intelligence officer, killed after firing shots at Israeli soldiers in Jenin on May 29, 2023.

---

[38] David Weinberg, *Judea and Samaria are literally on fire,* ISRAEL HAYOM (July 8, 2024), https://bit.ly/4fB1QCk.

[39] *See* Taylor Force Act, 22 U.S.C. §2378c–1. The goal of the Taylor Force Act is to stop American economic aid to the Palestinian Authority until the PA ceases paying stipends through the "Palestinian Authority Martyr's Fund" to individuals who commit acts of terrorism and to the families of deceased terrorists.

138.   In contrast to this reality—an unmitigated wave of Palestinian violence explicitly encouraged by the Palestinian Authority—the United States Security Coordinator (USSC) to Israel and the Palestinian Authority regularly provides briefings and reports about "settler violence" to American policymakers. The reports of settler violence suggest a phenomenon that is a mere fraction of Palestinian violence, according to all measures—frequency of incidents, type of incidents, brutality, and scope.

139.   Even when accounting for the lower volume and intensity of such incidents, the reports of settler violence are questionable. For instance, the USSC reports do not correspond with data from Israeli law enforcement. At the same time, there is no evidence of any independent fact-finding or analysis by the USSC or any other U.S. actor or independent investigator; instead, the USSC claims appear to echo statements and figures from highly politicized and biased organizations such as OCHA, discussed previously, and the far-left Israeli NGO B'Tselem.[40]

140.   An examination of OCHA's and B'Tselem's reports reveals that there was not a consistent fact-finding methodology behind the data presented. Moreover, it shows several deceptive methods for inflating the data. These reports are tendentious, inaccurate, and inflammatory and should not form the basis of United States policy.

---

[40] *See, e.g.,* Aryeh Green, *Biden/Blinken's Travesty of Common Sense and Foreign Policy*, TIMES OF ISRAEL (Feb. 6, 2024), https://bit.ly/4cdpIJx.

141.   Other reports appear to be little more than fabrications. In November 2022, for instance, Premiere Urgence Internationale reported "Israeli settlers committed at least 1,049 attacks against Palestinians in the occupied West Bank between January and September 2022."[41] No source or methodology is provided.

142.   Meanwhile, Yesh Din, a pro-Palestinian political organization located in Israel, reported 160 "cases of settler violence or their property" from January 2023 to September 2023, the source apparently being police complaints filed at the urging of Yesh Din.[42] After investigation, nearly all the complaints were closed without charges being filed in court. The differing numbers do not appear reconcilable.

143.   In a Knesset hearing in March 2024, the chief of Israeli police for Judea and Samaria district, Avishai Mualem, reported that half the complaints of settler violence against Palestinians since the beginning of the Gaza War have proven to be false. According to Mr. Mualem, many of these complaints are ideologically motivated by far-left groups that seek to tar Israeli nationals living in Judea and Samaria as extremists.

144.   Additionally, Mr. Mualem stated that there had been a decrease in nationalist violence against Palestinians in comparison with the previous year, a fact that he attributed to increased law enforcement measures.

---

[41] *In West Bank – Violence by Israeli settlers against Palestinians is rising at a straggering[sic] rate*, PREMIERE URGENCE INTERNATIONALE (Nov. 4, 2022), https://bit.ly/3LU1Xvb.

[42] *Data Sheet, December 2023: Law Enforcement on Israeli Civilians in the West Bank (Settler violence) 2005-2023*, YESH DIN (Jan. 21, 2024), https://bit.ly/4dtbdSQ.

**D. Implementation of EO 14115**

145.   Sanctions under Section 1 of EO 14115 are implemented by Defendant OFAC.

146.   On the same day that EO 14115 was issued, OFAC announced that it had placed four Israeli individuals on the SDN List: (1) David Chai Chasdai; (2) Yinon Levi; (3) Einan Tanjil; and (4) Shalom Zicherman.[43]

147.   Immediately following the publication of the sanctions against the four individuals, two Israeli banks froze the bank accounts of two of the individuals. Bank Leumi froze two accounts associated with Mr. Levi, and Bank HaDoar froze an account associated with Mr. Chasdai. The accounts were frozen without any prior notice to the blocked individuals.

148.   On March 14, 2024, OFAC announced that it placed three additional individuals on the SDN List: (1) Zvi Bar Yosef; (2) Nerya Ben Pazi; and (3) Moshe Sharvit. OFAC also placed two entities that are associated with those individuals on the SDN List: (1) Moshe's Farm and (2) Zvi's Farm.[44]

149.   On March 26, 2024, in response to an inquiry from Daniel Hahiashvili, Israel's Supervisor of Banks, concerning the interpretation and scope of EO 14115, Defendant Bradley T. Smith responded by letter clarifying that

---

[43] Recent Action, Office of Foreign Assets Control, U.S. Dep't of the Treasury, Issuance of Executive Order Imposing Certain Sanctions on Persons Undermining Peace, Security, and Stability in the West Bank; West Bank-related Designations (Feb. 1, 2024), https://ofac.treasury.gov/recent-actions/20240201.

[44] Recent Action, Office of Foreign Assets Control, U.S. Dep't of the Treasury, West Bank-related Designations; Russia-related Designation; Counter Narcotics Designation and Designations Updates; Transnational Criminal Organizations Designation Update (Mar. 14, 2024), https://ofac.treasury.gov/recent-actions/20240314.

> Israeli banks can process transactions for individuals designated under E.O. 14115 that are ordinarily incident and necessary to basic human needs or subsistence without exposure to OFAC sanctions risk, provided these transactions do not involve the U.S. financial system or U.S. persons.[45]

150. On May 23, 2024, attorneys representing individuals and entities who engage in or intend to engage in political and charitable activities related to Judea and Samaria contacted OFAC seeking clarification on EO 14115 ("May 23 Letter"). *See* Exhibit C at 3-4. More specifically, the attorneys sought to ascertain, *inter alia*: (1) whether engaging in speech and protests opposing the two-state solution or in support of a Jewish presence in the West Bank was sanctionable; (2) whether residing in the West Bank or supporting the growth of the Jewish communities there was sanctionable; (3) whether donating to a host of charitable causes in the West Bank was sanctionable; (4) whether engaging in self-defense or asserting one's title to land against Palestinian trespassers was sanctionable; (5) whether engaging in social media activity opposing the two-state solution or supporting Jewish sovereignty over the West Bank was sanctionable; and (6) whether advocating or lobbying for either position was sanctionable.

151. On June 5, 2024, OFAC responded, asserting that OFAC "does not administer comprehensive sanctions against the West Bank" and that the "West Bank is not subject to broad, jurisdiction-based sanctions at this time, meaning that not all activity involving the West Bank, or persons located in the West Bank, are necessarily prohibited." *See* Exhibit D (hereafter, the "June 5 Letter"). It then provided a general definition of EO 14115 before directing the attorneys to use

---

[45] *See* Exhibit B at 1.

OFAC's Sanctions List Search tool and to visit the U.S. Department of Treasury's website.

152.    On June 14, 2024, OFAC announced sanctions on Regavim's activist initiative, Tzav 9, pursuant to section 1(a)(i)(A) of EO 14115.[46]

153.    In response to the announcement, Tzav 9 released a statement to the press over Whatsapp describing its membership and mission:

> More than 15,000 citizens from across the Israeli political spectrum are members of the Tzav 9 community. Thousands of citizens, among them families whose loved ones were murdered or are still being held captive by Hamas, participated in the peaceful blockades organized by Tzav 9. Public opinion polls indicate that 79% of the Israeli public supports Tzav 9's objective. In dozens of peaceful civil demonstrations, closely modeled on American civil society protests that President Biden expressly defended as legitimate expressions protected by the First Amendment, participants voiced their objection to sustaining and enriching an enemy that continues to take pride in the torture, rape and murder of Israelis and continues to hold Israeli and American citizens hostage and to use the civilian population of Gaza as a human shield.[47]

154.    Tzav 9 includes among its membership families of victims taken hostage on October 7, as well as bereaved relatives of soldiers.[48]

---

[46] Press Statement, Office of the Spokesperson, U.S. Dep't of State, Sanctioning Violent Palestinian Group in the West Bank (June 6, 2024), https://www.state.gov/sanctioning-violent-palestinian-group-in-the-west-bank/.

[47] The announcement originally appeared in Hebrew, and portions have been translated here into English. Please see the following news sources for selections from the announcement: Elisha Ben Kimon & Ilana Koriel,, תקיפת המשאיות מאבדת, YNETNEWS (May 15, 2024), "שליטה, בתנועה שמאחורי ההפגנות מתרצים" :חוסמים, לא מעבר, https://www.ynet.co.il/news/article/bkygqkzx0; Chaim Golditch, לאחר כמה תקריות אלימות: ארגון צו 9 מקפיא את פעילותו נגד שיירות הסיוע לעזה, Kan News (May 16, 2024), https://www.kan.org.il/content/kan-news/local/749847/.

[48] Bar Peleg & Eden Solomon, *'Spill It Onto the Road': How Right-wing Israeli Activists Are Organizing to Block Aid Trucks to Gaza*, HAARETZ (May 20, 2024), https://bit.ly/3LVNZJg.

155. Tzav 9 applauded instances when humanitarian aid reached Gazan civilians but noted that the majority of aid did not.

156. It acknowledged *one* violent incident on May 13, 2024, that occurred at an Israeli checkpoint near Tarkumiya. According to Tzav 9: "This incident was organized by others who took issue with Tzav 9's peaceful civil disobedience and sought to instigate aggressive and even violent actions."

157. Israeli news similarly reported that a separate group called "Lo Nishkach" was responsible for the incident.[49]

158. Nonetheless, Tzav 9 condemned the incident and took steps to prevent such an occurrence from happening again:

> Tzav 9's leadership immediately condemned this incident and disavowed all connection between the organization and the perpetrators of the violence. In order to prevent a recurrence of the "hijacking" of their legitimate civil protest, Tzav 9 announced that it was temporarily suspending operations in order to regroup in a manner that would prevent violent outsiders from harming the nature and objectives to which the movement is committed. At the same time, the Regavim Movement notified the leadership of Tzav 9 that it would no longer be associated with any actions taken to block supply trucks, and would limit its efforts to public diplomacy and political activism to block supplies to Hamas.

159. Despite Tzav 9's actions to address the incident, the Biden Administration, upon information and belief, swiftly sanctioned the group without further investigating the group or Regavim.

---

[49] *Id.*

160. Tzav's announcement concluded by noting the Regavim Movement's deep commitment "to democratic principles" and to "peaceful protest." It concluded,

> We also believe that Israeli citizens have the right to speak out against the situation that has been imposed by the Biden Administration on the government of Israel, in which the rule of an internationally sanctioned terrorist organization sworn to the eradication of every Jew and the erasure of western values is being propped up by the victims, against their will.

161. On June 17, 2024, the same attorneys who authored the May 23 Letter contacted OFAC again, this time as representatives of Regavim, Mr. Deutsch, current and future donors to Regavim, and entities that "have interacted with, supported, and been addressed by Regavim and its leaders." *See* Exhibit E (hereafter, the "June 17 Letter"). The attorneys explained Regavim's nonviolent activism and requested clarification regarding the EO.

162. More specifically, the June 17 Letter detailed how Regavim's Tzav 9 initiative has engaged in protest activities that "are completely nonviolent, and precisely the kind of public advocacy, and civil disobedience, of which President Biden, and members of his administration, have explicitly approved." Exhibit E at 1.

163. The June 17 Letter noted that such sanctions were put into place *despite* the following circumstances:

> [Tzav 9's] activities are exclusively speech and civil disobedience, which President Biden has declared is protected First Amendment activity; Hamas is, indisputably, capturing aid sent into Gaza; The transfer of any resources to Hamas is a federal crime and directly contrary to the foreign policy interests

of the United States; Tsav[sic] 9 has explicitly and publicly condemned any violence in connection with the delivery of aid to Gaza, and has taken careful and effective steps to ensure that its activities are completely peaceful; Transfer to Hamas, or capture by Hamas, of aid designated for Gaza has occurred repeatedly, as acknowledged by the State Department itself, former US Ambassador David Satterfield, the United Nations Relief and Works Agency, and various Palestinian media and civic and political organizations including Fatah, as well as by the Israeli government and the Israel Defense Forces.[50]

164.   Although officials of Regavim were in regular contact with U.S. officials, the U.S. Government did not contact anyone from Regavim before the issuance of the sanctions against Tzav 9.

165.   The attorneys then asked for clarification regarding (1) whether American citizens may donate to Regavim and whether those funds may be designated for Tzav 9; (2) whether an American citizen may serve as an officer of Regavim; and (3) whether American citizens can legally invite members of Regavim or Tzav 9 to their institutions in the United States to speak and whether American citizens may cover the costs of those speakers or pay them honoraria. Exhibit E at 2.

166.   OFAC responded on July 3, 2024, asserting that OFAC "does not administer comprehensive sanctions against the West Bank" and that "[t]he West Bank is not subject to broad, jurisdiction-based sanctions at this time, meaning that not all activity involving the West Bank, or persons located in the West Bank, are necessarily prohibited." *See* Exhibit F at 1-2.

---

[50] Exhibit E at 1-2.

167.    OFAC then directed the attorneys for Regavim and others to visit OFAC's website and provided general information regarding the implementation of U.S. sanctions. OFAC concluded by asserting that all U.S. persons must comply with OFAC regulations. *Id*. at 2.

168.    On July 11, 2024, OFAC placed additional individuals and entities on the SDN List, including Reut Ben Chaim (wife of Plaintiff Yosef Ben Chaim), Isaschar Manne, Aviad Shlomo Sarid, as well as several Israeli charities and farms.[51]

## E. Effects of EO 14115 on Plaintiffs

### *i. Isley*

169.    As a direct and proximate result of EO 14115, Plaintiff Isley cannot freely exercise his First Amendment rights of free speech and free exercise of religion. Instead, Mr. Isley fears official condemnation of his religious beliefs by his own government.

170.    To carry out his religious mission, Mr. Isley invites Israeli Jews from Judea and Samaria to events in the United States and financially supports Jewish efforts to construct a new Jewish Temple. A core tenet of Mr. Isley's faith is supporting the Jewish people in their ancestral homeland by teaching Christians about Israel.

171.    Due to EO 14115 and its implementation, however, Mr. Isley is unable to invite blocked persons or entities to events in the US, nor is he able to

---

[51] Recent Action, Office of Foreign Assets Control, U.S. Dep't of the Treasury, West Bank-related Designations; Transnational Criminal Organizations Designation (July 11, 2024), https://ofac.treasury.gov/recent-actions/20240711.

contribute financially to Jews who reside in Judea and Samaria for fear of them being sanctioned under the EO, given the vast scope of the EO and the wide range of non-violent conduct it covers.

172.   In particular, Jews from the West Bank that Mr. Isley regularly interacts with as part of his organization's religious mission and faith are those that, like Plaintiff Ari Abramowitz, live on isolated farms that are more likely to be targeted by Palestinian terrorism.

173.   Because self-defense against such terrorism has been counted by the Administration as "settler violence" and sanctionable, Mr. Isley cannot properly plan for or conduct activities with these Jewish people because they may, at a moment's notice, be sanctioned. No amount of due diligence can cure this.

174.   Both the inability of an individual to invite speakers to events in the United States related to his religious mission and the related uncertainty in organizing such events are cognizable injuries in the context of unlawful visa restrictions.  *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 598 (D. Md. 2017), *aff'd,* 883 F.3d 233 (4th Cir. 2018), *as amended* (Feb. 28, 2018), *cert. granted, judgment vacated,* 138 S. Ct. 2710, 201 L. Ed. 2d 1094 (2018), and *cert. granted, judgment vacated,* 138 S. Ct. 2710, 201 L. Ed. 2d 1094 (2018) ("Even without identifying specific individuals who will definitely be barred from entry into the United States to attend its events, [plaintiff] has alleged that the Proclamation presently constrains their efforts to recruit attendees for their upcoming meetings and conferences and to secure their arrival in time for the event.")

175.   Since Mr. Isley is unable to bring speakers from the West Bank who oppose the two-state solution without risking sanctions, he will be unable to fully transmit his organization's values to Christians on this important issue. *See State v. Trump*, 265 F. Supp. 3d 1140, 1152 (D. Haw.), *aff'd in part, vacated in part,* 878 F.3d 662 (9th Cir. 2017), *rev'd and remanded,* 585 U.S. 667, 138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018) (association of Muslims has standing to challenge visa restrictions because they would make it more difficult to be Muslim).

176.   Mr. Isley also accurately perceives that EO 14115 targets him, as well as other Christians and Jews who share his religious views, and as a result, he will not be able to freely associate with those of other faiths who will be warded off by EO 14115's imprimatur of government condemnation of his beliefs.

### ii.   Regavim

144.   As a direct and proximate result of EO 14115, and the sanctions imposed under it, the donation platform JGive froze Plaintiff Regavim's online fundraising site for accepting donations in U.S. dollars. In addition, Regavim has suffered and will continue to suffer significant economic loss due to the sanctions against Tzav 9 and the imminently threatened sanctions against Regavim and its officers, as many potential donors fear that they will be subject to future sanctions without prior notice should they donate or otherwise support Israeli civil society organizations that oppose a two-state solution or oppose aid to Hamas and its allies.

### iv.   Deutsch

145.   As a direct and proximate result of EO 14115, Plaintiff Deutsch has suffered and will continue to suffer actual injury because he is unable to carry out his duties, both in his capacity as Director General of Regavim and in his individual capacity. Mr. Deutsch's right of free expression, guaranteed by the First Amendment, has been chilled, if not outright barred.

146.   Mr. Deutsch now must expend significant resources in the form of his own time and finances to continue engaging in the types of speech in which he has engaged for years.

### v. Ben Chaim

146.   As a direct and proximate result of the EO, Mr. Ben Chaim has suffered and will continue to suffer. Because his wife has been placed on the SDN List, Mr. Ben Chaim is unable to receive any salary from his wife's small business. Mr. Ben Chaim is also unable to support his family of eight because his wife cannot receive any salary or other payments to her business account or any other account. Lastly, Mr. Ben Chaim is unable to support his wife—both financially and vis-à-vis her political activities—as a direct result of the sanctions.

### v. Abramowitz

147.   As a direct and proximate result of the EO, Plaintiff Abramowitz has suffered and will continue to suffer actual injury, as his ability to finance and develop Arugot Farm in the West Bank has been significantly impaired.

148.   Plaintiff Abramowitz is also put in direct fear of death or bodily harm as result of the Administration's imposition of sanctions on Jews in the West Bank for their exercise of self-defense against the massive wave of Palestinian terrorist

violence. Because the Administration relies on and adopts, without independent verification, the conclusions of radical, ideological anti-settler groups about violent incidents in the West Bank, Jews like Mr. Abramowitz who are under constant threat of violence face a stark choice: refrain from defending themselves if attacked or face debilitating sanctions.

149.   The Biden administration is aware that its program to impose sanctions under EO 14115 is, in reality, focused solely on Jews and ignores almost all violent acts committed by Arab or other Muslim actors.

150.   For example, the Palestinian Authority is a formal legal organization that maintains bank accounts susceptible of being sanctioned under EO 14115.

151.   The Palestinian Authority indisputably engages in actions which threaten the cause of peace in the Middle East—even as the Biden Administration defines that concept—because of its infamous "Pay for Slay" program.

152.   Yet, upon information and belief, no steps have been taken to sanction the Palestinian Authority for its "Pay for Slay" program. For that matter, no steps have been taken to sanction any Arab or Muslim individual pursuant to EO 14415.

153.   In an effort to conceal this reality, the Biden Administration announced on June 6, 2024, that it would exercise the authority conferred by EO 14115 to sanction the Lion's Den terror group.

154.   But this announcement was nothing more than political theater. In reality, the action taken by the United States Government sanctioned no one and had absolutely no tangible or lasting effect on any person, organization, or bank account.

155.    The announcement also cited April 2024 Palestinian media reports of Lions' Den fighters targeting Israeli forces with small arms at an Israeli checkpoint in Nablus.[52] However, these reports were never confirmed, the group never claimed responsibility for that attack, and it could well have been perpetrated by Palestinian Islamic Jihad fighters.

156.    In contrast to the Administration's sanctioning of Jewish persons and entities, the sanctioning of Lion's Den represents the quintessential "smoke and mirrors."

157.    The Lion's Den group is, quite obviously, not an incorporated entity. It maintains no bank account in any financial institution anywhere in the world.

158.    No natural person identified with the Lion's Den was sanctioned or even named as part of the sanctions imposed on the Lion's Den entity itself.

159.    Since June 6, 2024, no person identified or associated with the Lion's Den has been the object of sanctions imposed pursuant to EO 14115.

160.    As a result, there has never been any effect or impact of the sanctions purportedly imposed on the Lion's Den group pursuant to EO 14115.

161.    The sanctioning of the Lion's Den was an empty gesture by the Biden Administration to create the illusion of evenhandedness without sanctioning a single individual Palestinian terrorist.

---

[52] Press Statement, Office of the Spokesperson, U.S. Dep't of State, Sanctioning Violent Palestinian Group in the West Bank (June 6, 2024), https://www.state.gov/sanctioning-violent-palestinian-group-in-the-west-bank/

## CAUSES OF ACTION

### <u>COUNT I</u>

**Violation of Plaintiffs' Rights under the Religious Freedom Restoration Act,
42 U.S.C. §2000bb *et seq.***

145.    Plaintiffs repeat all the allegations as alleged above and incorporate them herein.

146.   The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §2000bb-1(a), prohibits the government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability, unless the government can show the burden is the least restrictive means of accomplishing a compelling government interest.

147.   EO 14115 substantially burdens the exercise of Plaintiffs' religion.

148.   Plaintiffs Isley, Deutsch, Ben Chaim, and Abramowitz hold sincere religious beliefs that the Jewish People have a right and obligation to live in Judea and Samaria. EO 14115 renders sanctionable any activity that threatens peace, stability and security in the "West Bank," *i.e.,* Judea and Samaria. That vague, overreaching statement has the direct effect of preventing these Plaintiffs from advocating for their religious beliefs.

149.   The EO also prevents Mr. Isley from furthering his religious beliefs by prohibiting contributions to blocked individuals and disallowing blocked individuals from entering the United States. As a result, they cannot share and discuss their religious beliefs regarding Jewish settlement in Judea and Samaria.

150.   The only interest that the Administration has cited in support of the EO is its concern that the targeted activity might "undermine the foreign policy

52

objectives of the United States," but this is an insufficiently compelling interest to justify the imposition of sanctions on Plaintiffs for engaging in First Amendment-protected speech. The idea that First Amendment-protected speech can be suppressed any time it causes friction with an administration's foreign policy objectives was the rationale underlying the Sedition Act of 1798, and this is a view that has not "carried the day in the court of history." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964).

151.  Furthermore, the Administration has not shown that enforcing the EO against Plaintiffs and similarly situated persons is the least restrictive means to further any alleged compelling interest, even if one exists.

152.  As such, EO 14115 and its implementation fail to conform with RFRA and must not be enforced against Plaintiffs and similarly situated persons.

## COUNT II

### Violation of Plaintiffs' First Amendment Rights to Freedom of Speech, U.S. Const. amend. I

153.  Plaintiffs repeat all their allegations as alleged above and incorporate them herein.

154.  The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I.  Content-based restrictions on speech are subject to strict scrutiny, which means they will be stricken as unconstitutional as applied to a speaker unless the government can prove that the restriction is necessary to further a compelling governmental interest. *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

155.  EO 14115 imposes content-based restrictions on Plaintiffs.

156.   As alleged above, EO 14115 prevents Plaintiff Isley from exercising his First Amendment right to hear the views and philosophies of blocked persons and other like-minded individuals in Israel.

157.   Mr. Isley is also chilled from exercising his free speech rights by making charitable contributions that further his protected religious values.

158.   In addition, EO 14115 prevents Plaintiffs Deutsch, Ben Chaim, and Abramowitz from exercising their First Amendment right of free expression. Plaintiffs Deutsch and Abramowitz, as alleged above, are prevented from advocating their views that oppose the two-state solution and advocate for the Jewish presence and land ownership/control in Judea and Samaria or the "West Bank" for fear that such speech and conduct will subject them to the quasi-criminal sanctions regime of EO 14115. Plaintiff Ben Chaim can no longer support his wife's advocacy of Israel and, in particular, her peaceful protests against the provision of "humanitarian" aid to Hamas and its allies.

159.   Inasmuch as the EO and its implementation contravene the First Amendment free speech guarantee, it is unconstitutional and invalid because it is not *necessary* to further a *compelling* governmental interest.

160.   There is no compelling governmental interest to regulate or otherwise restrict Plaintiffs' right of free expression. Preventing Plaintiffs from exercising First Amendment rights is not necessary to achieve the United States Government's alleged foreign policy goals and utterly fails to accomplish what Defendants set out to do in issuing and implementing EO 14115.

161. Because the EO's restrictions on Plaintiffs' speech and expression are not necessary to further a compelling governmental interest, it must not be enforced against Plaintiffs.

162. Furthermore, the First Amendment prohibits the U.S. Government from enacting laws that are overbroad. "Because First Amendment freedoms need breathing space to survive," the U.S. Government "may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

163. "If the overbreadth is 'substantial,' the law may not be enforced against anyone, including the party before the court, until it is narrowed to reach only unprotected activity, whether by legislative action or by judicial construction or partial invalidation." *Brockett v. Spokane Arcades*, 472 U.S. 491, 503-04, 105 S. Ct. 2794, 2802 (1985).

164. The Supreme Court "provide[s] this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech--especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

165. Many similarly situated as Plaintiffs, "rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (internal citations removed).

166. Because EO 14115 chills the protected speech and expression of Plaintiffs, it is unconstitutional and must not be enforced against Plaintiffs.

## COUNT III

**Violation of Plaintiffs' First Amendment Rights to Free Exercise of
Religion,
U.S. Const. amend. I**

167.   Plaintiffs repeat all their allegations as alleged above and incorporate them herein.

168.   The Free Exercise Clause of the First Amendment protects the right of American citizens to believe and exercise their religious beliefs without targeting or undue burdening by the federal government.

169.   Mr. Isley's free exercise of his sincerely held beliefs motivating his monetary and other support is burdened because he is prevented from contributing to blocked persons and/or having blocked persons enter the United States to discuss and advocate these religious ideas. Moreover, Mr. Isley is prevented from making religious contributions to charities that further his religious philosophy of increasing the Jewish population in Judea and Samaria or the "West Bank." As a result of EO 14115, Mr. Isley can no longer make any contributions that may be perceived as threatening the peace, stability, or security of Judea and Samaria for fear that the money will ultimately be frozen under EO 14115. These charities serve as part and parcel of Mr. Isley's core religious beliefs and Defendants have improperly interfered with those beliefs. Isley's religious exercise is burdened in the territory of Texas, where he wishes to host persons potentially under sanction.

170.   Plaintiffs Deutsch, Ben Chaim, and Abramowitz, as U.S. Citizens, are precluded from engaging in actions to advance their fundamental religious belief that the Land of Israel, especially Judea and Samaria, has been promised

by God to the Jewish People in perpetuity and that the Jewish People have a religious right and obligation to return to, settle, and develop Judea and Samaria. EO 14115 prescribes quasi-criminal sanctions on Plaintiffs Deutsch and Abramowitz because of their deeply rooted religious convictions.

171. Because of their deeply rooted religious convictions, Plaintiffs Deutsch and Abramowitz are prohibited from working with American partners, such as Mr. Isley, to advance Jewish interests in a *nonviolent manner* in Judea and Samaria. Similarly, Plaintiff Ben Chaim is prevented from supporting his wife's sincere religious belief that Israel has a *Jewish-religious* right to defend itself from existential threats such as Hamas.

172. The EO cannot be considered to impose "generally applicable" burdens on religious practice because it vests complete discretion in the Secretaries of State and Treasury to determine what constitutes a sanctionable violation. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude—here, at the [Secretaries'] 'sole discretion.'" *Fulton v. City of Phila.*, 593 U.S. 522, 537 (2021). The intent underlying EO 14115 is illuminated by the ways in which that discretion has been exercised so far.

173. EO 14115 was intended to target a particular subset of religious belief; namely, to target Jewish individuals and those who hold to the religious belief that Jews have a right to settle in Judea and Samaria.

174.   In both public and private statements, the drafters of the EO have evinced religious animus against Jews and those holding to religious beliefs concerning the land. During the drafting of the EO, the drafters evinced religious animus by relying exclusively on anti-Jewish sources of evidence.

175.   Since its promulgation, the Secretaries of State and Treasury have exercised their discretion by applying EO 14115 disparately to Jews and those holding religious beliefs concerning the land.

176.   EO 14115 therefore violates the Free Exercise Clause by creating a formal mechanism by which the Secretary is directed to evaluate a person's religious beliefs and decide which beliefs are conducive to "peace" (and therefore worthy of an exception) and which are not (and therefore worthy of punishment).

177. Consequently, the EO, both facially and as applied, is unconstitutional as it improperly interferes with Plaintiffs' right to exercise their religious beliefs.

## <u>COUNT IV</u>

### Violation of Plaintiffs' Fifth Amendment Rights to Equal Protection
### U.S. Const. amend. V

178.   Plaintiffs Deutsch, Ben Chaim, and Abramowitz repeat all their allegations as alleged above and incorporate them herein.

179. The Fifth Amendment's Due Process Clause includes an equal protection component. *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

180.  Government action that implicates an equal protection right will be subject to strict scrutiny if the action targets a suspect class (like race or alienage) or burdens the exercise of a fundamental right.

181.  EO 14115 is subject to strict scrutiny because the creation, purpose, and implementation of the EO is targeted at the Jewish People and their religious beliefs. Although Defendants avoided making express references to race or religion in the EO, the purpose and motivation behind EO 14115 is clear.  The *Background Press Call*, *supra* paragraph 74, discusses only actions by the ***Jewish*** community in the West Bank. It is clear that the content and structure of the EO is aimed at Jewish individuals and entities, not Palestinians or persons of any other national origin, religion, or ethnicity. Moreover, the only individuals who have been placed on the EO's sanction list are Jews, even though there are thousands of Palestinians who have engaged in terrorist attacks on Jewish civilians that unquestionably threaten the "peace, security, or stability of the West Bank." EO, §1(a)(i)(A).

182. FinCEN's "Alert on Israeli Extremist Settler Violence Against Palestinians in the West Bank" does not even attempt to conceal the fact that the EO and its implementation is aimed at the Jewish people and only the Jewish people. The Alert addresses only "Israeli" individuals and entities with no reference to any other race. In instructing financial institutions concerning the EO's sanction regime, FinCEN listed potential "red flag indicators" that can assist a financial institution to identify "suspicious activity related to the financing of Israeli extremist settler violence against Palestinians in the West Bank":

(a) Payments to any organizations or groups, including nonprofit organizations . . . linked to ***Israeli*** violent extremist groups in the West Bank.

(b) Information included in a transaction between customers, such as references in the memo field, that indicate support for ***Israeli*** violent extremist groups or campaigns.

(c) Transactions with no apparent economic, business, or lawful purpose associated with a rapid movement of funds and linked to NPOs active in supporting violent extremist ***Israeli*** settlers in the West Bank, particularly if the NPO has advocated for, or solicited donations on social media in support of, ***Israeli*** violent extremist groups or campaigns. (emphasis added)[53]

183. In short, despite the EO's facially neutral language, the Administration has made clear by its words and enforcement actions that only Jewish people are at risk at being sanctioned under EO 14115.

184. The EO constitutes a denial of Equal Protection of the laws because it threatens to sanction Jewish individuals who act in self-defense.

185. Jewish American citizens, such as Plaintiffs Deutsch and Abramowitz, are at significant risk of terrorist violence. Indeed, they both have been subject to numerous instances of unprovoked violence by neighboring Palestinians. The EO threatens them with life-shattering sanctions if they use force in self-defense, and such acts are falsely dubbed "settler violence" by the anti-Jewish groups that report to the U.N., as the Defendants adopt OCHA reports without independent verification. Yet no such penalties are imposed on non-Jewish U.S. citizens in the West Bank who act in self-defense.

---

[53] FINCEN ALERT ON ISRAELI EXTREMIST SETTLER VIOLENCE, *supra* note 17.

186.  In addition, under *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), a *prima facie* race-neutral law "administered by public authority with an evil eye and an unequal hand" infringes upon the right to equal protection. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). The EO has the effect of treating Israeli officials enforcing Israeli property law and land use law against Palestinians as wrongful; it views Jews defending their property and/or their lives against Palestinian theft/terrorism as wrongful; and it views Jewish assertion and public promotion of property rights within the West Bank as wrongful.

187.  Because the EO is targeted against Jews, it is subject to strict scrutiny, and it is the government's burden to prove that the EO is necessary to further a compelling governmental interest. Failing that, the EO must be vacated under the Fifth Amendment.

188.  The EO does not withstand strict scrutiny because there was no compelling governmental interest to declare a national emergency or to impose a sanctions regime due to the alleged activities of a miniscule sector of an already small population in a geographically limited area under legitimate and effective control by the Israeli government. Even assuming the stability of Judea and Samaria is a compelling governmental interest, the issuance of the EO was not *necessary* to further that interest (and it is certainly not narrowly tailored to infringe upon no more protected activity than is necessary). This is evident, first and foremost (and among other factors), from the fact that no Palestinian terrorists or officials have been considered for placement on the SDN list.

## COUNT V

### Violation of Plaintiffs' Fifth Amendment Rights to Due Process
### U.S. Const. amend. V

189.   Plaintiffs Deutsch, Ben Chaim, and Abramowitz repeat all their allegations as alleged above and incorporate them herein.

190.   The EO Notice allows for sanctions when anyone in any manner ("directly or indirectly") harms "peace, security, or stability in the West Bank." The U.S. Secretary of the Treasury is empowered to define these key terms.

191.   The Fifth Amendment requires that a law give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited.

192.   The EO violates the Fifth Amendment's requirement of fair notice because it does not sufficiently describe what conduct constitutes sanctionable activity.

193.   The EO is also unconstitutionally overbroad because it "(1) prohibits a substantial amount of constitutionally protected freedoms, when judged in relation to the regulation's 'plainly legitimate sweep' . . . and (2) is not susceptible to a limiting construction that avoids constitutional problems." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1012 (5th Cir. 2023).

194.   The EO violates the Due Process Clause because it prohibits Plaintiffs and others similarly situated from exercising their constitutionally protected speech rights in support of the rights of Jewish settlers residing in the West Bank, and there is no way to read the key terms "peace, security, or stability" narrowly to avoid this effect.

195.   Further, the EO is unconstitutionally vague because it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland.*, 63 F.4th at 1013.

196.   The EO is so vague that regulated parties cannot possibly guess what types of speech are affected, as evidenced by the multiple requests for clarification that have already been received by OFAC. This lack of precision also vests those responsible for enforcing the EO with impermissible discretion to act in an arbitrary and discriminatory manner, discretion which they have so far wielded to sanction exclusively Jewish individuals under EO 14115.

197.   Such vagueness is only exacerbated by the fact that regulated parties do not know what constitutes a violation of the EO. Many terrorists have committed attacks and arson in the West Bank but have not faced sanctions under EO 14115.

198.   Therefore, the arbitrary nature of the Administration's enforcement of EO 14115 contributes to the vagueness of the EO, rendering it void.

## <u>COUNT VI</u>
**Violation of Plaintiffs' Rights under the Administrative Procedure Act
5 U.S.C. § 500, *et seq.***

143.   Plaintiffs repeat the allegations as alleged above and incorporate them herein.

144.   The IEEPA authorizes the president to declare the existence of an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" that originates "in whole or substantial part outside the United States." 50 U.S.C. §1701(a). It further authorizes the President, after

such a declaration, to block transactions and freeze assets to deal with the threat. Section 1701(b) states that:

> the authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose.

145.   The President lacked the statutory authority to issue the EO in the first place because the alleged settler violence in Judea and Samaria is not an "unusual and extraordinary threat" as a matter of fact and law. 50 U.S.C. §1701(b).

146.   The number of incidents referred to in the preamble of the EO is negligible compared with the number of terrorist attacks against Jewish residents of the region.

147.   Moreover, the veracity of the information relied upon in the EO is highly doubtful. In fact, there is reason to believe that the American authorities relied exclusively upon information relayed by extremist groups without making any effort to corroborate with Israeli authorities and the individuals in question. Accordingly, EO 14115 was issued with no statutory authority under the IEEPA.

148.   Section 1182(f) of the INA provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

149.   The prerequisite set forth in §1182(f) is that the President must make a finding that the entry of the covered aliens "would be detrimental to the interests of the United States." 50 U.S.C. §1182(f).

150.  With regards to Section 4 of EO 14115, however, the President did not make the statutorily required finding. There is no evidence that the Biden Administration conducted any significant evaluation or study concerning the effect of the entry into the United States of Jewish residents in Judea and Samaria or other Jews who allegedly "threaten the peace, security or stability of the West Bank." Instead, the Biden Administration relied on unverified hearsay and biased, inaccurate data from extremist groups to reach the unfounded conclusion that the entry of these settlers constituted a threat to U.S. national security.

151.  Section 4 of EO 14115 is not based on any finding that the entry of the covered aliens "would be detrimental to the interests of the United States" [8 U.S.C. 1182(f)] and, therefore, was issued without statutory authority.

152.  Under the APA, a court must "hold unlawful and set aside" agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), "contrary to constitutional right, power, privilege, or immunity" (5 U.S.C. § 706(2)(B)), or "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

153.  Defendants' implementation of Section 1 of the EO is arbitrary and capricious because there is no evidence that Jewish-Israeli settler violence is a threat to the stability of the West Bank or a threat to U.S. national security. Moreover, the arbitrary and capricious nature of OFAC's determination of which entities to place on the SDN List in implementing the EO is further demonstrated by the fact that OFAC has exclusively targeted Israeli Jews, despite the overwhelming evidence that Israeli Jews in Judea and Samaria pose no threat to stability or peace.

154. Defendants failed to perform any basic fact-finding prior to implementing and enforcing the EO in such a one-sided and draconian manner.

155. EO 14115 also violates the APA because it was issued lacking any statutory authority, either under the IEEPA, NEA or the INA, as discussed above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare that EO 14115 and Defendants' enforcement of EO 14115 against Plaintiffs violates the Religious Freedom Restoration Act;

b. Declare that EO 14115 and Defendants' enforcement of EO 14115 against Plaintiffs violates the First and Fifth Amendments to the United States Constitution;

c. Declare that EO 14115 was issued without statutory authority under the IEEPA and INA and issued in violation of the Administrative Procedure Act's provisions, 5 U.S.C. §706.

d. Issue an order preliminarily and permanently setting aside the agency action and enjoining Defendants from implementing and enforcing EO 14115 both as to Plaintiffs and as to any similarly situated persons who likewise object to EO 14115 on religious or speech grounds;

e. Grant the appropriate attorneys' fees and litigation costs under the Equal Access to Justice Act, 28 U.S.C. §2412(b);

f. Grant the appropriate attorneys' fees and litigation costs under 42 U.S.C. §1988(b) as to the RFRA claim;

g. Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Date: August 6, 2024.

**MITCHELL LAW PLLC**
Jonathan Mitchell
jonathan@mitchell.law
111 Congress Avenue, Suite 400
Austin, Texas 78701
T. (512) 686-3940
F. (512) 686-3941

**ZELL, ARON & CO.**

L. Marc Zell*
mzell@fandz.com
34 Ben Yehuda St.
14th Floor
Jerusalem, Israel 9423001
T. 011-972-2-633-6300

and

Noam Schreiber*
noam.schreiber@fandz.com
Binyamin Tech
Habanai 2
East Binyamin, Israel
T. 011-972-2-633-6300

**LEWIN & LEWIN, LLP**
Nathan Lewin*
nat@lewinlewin.com
888 17th Street NW, 4th Floor
Washington, DC 2006
T. (202) 828-1000

*Attorneys for Plaintiffs*

**\*Pro Hac Vice Forthcoming**

**MARCUS & MARCUS LLC**
Jerome M. Marcus*
jmarcus@marcuslaw.us
P.O. Box 212
Merion Station, PA. 19066
T. (610) 664 1184

Professor Abraham Bell*
avibell@sandiego.edu
University of San Diego School of Law
5998 Alcala Park
San Diego, CA 92110
T. (619) 260 7519

**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC**

Jason B. Torchinsky*
jtorchinsky@holtzmanvogel.com
Erielle Davidson*
edavidson@holtzmanvogel.com
2300 N Street NW, Suite 643
Washington, DC 20037
T. (202) 737-8808
F. (540) 341-8809

and

Andrew Pardue*
apardue@holtzmanvogel.com
15405 John Marshall Highway
Haymarket, VA 20169
T. (540) 341-8808
F. (540) 341-8809