# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| TEXANS FOR ISRAEL, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:24-CV-00167-Z |
| U.S. DEPARTMENT OF THE TREASURY, *et al.*, | |
| Defendants. | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................3

I.      LEGAL BACKGROUND ...............................................................................................3

      A.      The International Emergency Economic Powers Act (IEEPA) ......................3

      B.      Immigration and Nationality Act .....................................................................6

      C.      Executive Order 14115....................................................................................6

      D.      Sanctions Procedures .......................................................................................9

II.     DESIGNATIONS PURSUANT TO EXECUTIVE ORDER 14115 ...................................10

III.    THIS CASE .................................................................................................................12

STANDARD OF REVIEW ..........................................................................................................13

ARGUMENT .............................................................................................................................13

I.      PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS.........................................13

      A.      Elements of Standing.......................................................................................14

      B.      Isley and Texans for Israel Fail to Plead a Non-Speculative Injury ............14

      C.      The Other Plaintiffs Have Not Established a Certainly Impending Future
            Injury As to Every Element of the Relief Sought...........................................18

      D.      None of the Plaintiffs Have Standing to Seek Relief Against DHS or with
            Respect to Section 4 of the EO........................................................................22

      E.      None of the Plaintiffs Have Standing to Seek Relief Against FinCEN. .......23

      F.      Any Remaining Claims Are Unripe.................................................................24

II.     THIS CASE IS NOT JUSTICIABLE, AND THE COURT SHOULD DISMISS. ..............25

III.    EACH COUNT OF THE COMPLAINT SHOULD BE DISMISSED FOR
         FAILURE TO STATE A CLAIM. ...................................................................................31

      A.      The Court Should Dismiss Plaintiffs' Free Speech Claim (Count II).........................31

            1.      EO 14115 Does Not Regulate Speech. .............................................31

2.      EO 14115 Satisfies Any Applicable Level of Scrutiny. .....................................33

3.      EO 14115 Does Not Violate Isley's Right to Hear ...........................................34

4.      Restricting Monetary Contributions to SDNs Does Not Violate the First Amendment. ...............................................................................................35

5.      EO 14115 is Not Overbroad. ............................................................................37

B.   The Court Should Dismiss Plaintiffs' RFRA Claim (Count I). ....................................39

C.   The Court Should Dismiss Plaintiffs' Free Exercise Claim (Count III)......................42

D.   The Court Should Dismiss Plaintiffs' Equal Protection Claim (Count IV)................46

E.   The Court Should Dismiss the Due Process Vagueness Claim (Count V)..................50

F.   The Court Should Dismiss the APA Claim (Count VI). ..............................................52

CONCLUSION...................................................................................................................................54

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama,*
　742 F.3d 1023 (D.C. Cir. 2014) ............................................................................31

*Abdullah v. Paxton,*
　65 F.4th 204 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 188 (2023) .........................14

*Adkin v. Kaspar,*
　393 F.3d 559 (5th Cir. 2004) ................................................................................41

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
　591 U.S. 430 (2020) ........................................................................................ 31, 38

*Alaska v. U.S. Dep't of Agric.,*
　17 F.4th 1224 (D.C. Cir. 2021) ............................................................................15

*Al-Aulaqi v. Obama,*
　727 F. Supp. 2d 1 (D.D.C. 2010) .........................................................................30

*Al-Tamimi v. Adelson,*
　916 F.3d 1 (D.C. Cir. 2019) ........................................................................... 27, 30

*Alexander v. Trump,*
　753 F. App'x 201 (5th Cir. 2018) ........................................................................53

*Ameziane v. Obama,*
　699 F.3d 488 (D.C. Cir. 2012) .............................................................................29

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.,*
　801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ...............53

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009) ......................................................................................*passim*

*Babbitt v. United Farm Workers Nat'l Union,*
　442 U.S. 289 (1979) .............................................................................................16

*Baker v. Carr,*
　369 U.S. 186 (1962) ....................................................................................... 26, 29

*Bancoult v. McNamara,*
　445 F.3d 427 (D.C. Cir. 2006) .............................................................................27

*Bell Atl. Corp. v. Twombly,*
　550 U.S. 544 (2007) .............................................................................................13

*Bowen v. Roy,*
   476 U.S. 693 (1986) ........................................................................................................40

*Brown v. Collier,*
   929 F.3d 218 (5th Cir. 2019), *as revised* (July 5, 2019) ..............................................41

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ................................................................................................28, 29

*Chichakli v. Szubin,*
   546 F.3d 315 (5th Cir. 2008) ........................................................................................44

*Choice Inc. of Tex. v. Greenstein,*
   691 F.3d 710 (5th Cir. 2012) ..................................................................................24, 25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ......................................................................................................43

*City of L.A. v. Lyons,*
   461 U.S. 95 (1983) ........................................................................................................14

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................14, 16, 22

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11 (D.D.C. 2020) ....................................................................27, 28, 30

*Ctr. for Individual Freedom v. Carmouche,*
   449 F.3d 655 (5th Cir. 2006) ..................................................................................16, 22

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ......................................................................................................13

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ................................................................................................28, 30

*Defs. for Children Int'l-Palestine v. Biden,*
   107 F.4th 926 (9th Cir. 2024)........................................................................................27

*Dep't of State v. Munoz,*
   144 S. Ct. 1812 (2024) ............................................................................................34, 35

*Dickson v. Ford,*
   521 F.2d 234 (5th Cir. 1975) ........................................................................................26

*Elhady v. Piehota,*
   303 F. Supp. 3d 453 (E.D. Va. 2017) ...........................................................................48

*El-Shifa Pharm. Indus. Co. v. United States,*
　　607 F.3d 836 (D.C. Cir. 2010) ....................................................................28

*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury,*
　　545 F.3d 4 (D.C. Cir. 2008)........................................................................34

*Emp. Div., Dep't of Human Res. of Oregon v. Smith,*
　　494 U.S. 872 (1990) ....................................................................................42

*FDA v. Alliance for Hippocratic Med.,*
　　602 U.S. 367 (2024) ...........................................................................14, 19

*Fiallo v. Bell,*
　　430 U.S. 787 (1977) ....................................................................................34

*Franklin v. Massachusetts,*
　　505 U.S. 788 (1992) ....................................................................................53

*Fulton v. City of Phila., Pennsylvania,*
　　593 U.S. 522 (2021) .............................................................................42, 43

*Garner v. Kennedy,*
　　713 F.3d 237 (5th Cir. 2013) ....................................................................41

*Glob. Relief Found., Inc. v. O'Neill,*
　　207 F. Supp. 2d 779 (N.D. Ill. 2002), *aff'd,* 315 F.3d 748 (7th Cir. 2002) ...........................39

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
　　546 U.S. 418 (2006) ....................................................................................39

*Grayned v. City of Rockford,*
　　408 U.S. 104 (1972) ....................................................................................50

*Haig v. Agee,*
　　453 U.S. 280 (1981) .............................................................................29, 34

*Heckler v. Chaney,*
　　470 U.S. 821 (1985) ....................................................................................54

*Hernandez v. Comm'r.,*
　　490 U.S. 680 (1989) ....................................................................................44

*Hersh v. U.S. ex rel. Mukasey,*
　　553 F.3d 743 (5th Cir. 2008) ....................................................................39

*Holder v. Humanitarian L. Project,*
　　561 U.S. 1 (2010) .................................................................................*passim*

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............................37

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ........................................................... 37, 42, 43, 46

*Humanitarian L. Project v. Reno,*
  205 F.3d 1130 (9th Cir. 2000) ........................................................................37

*Humanitarian L. Project v. U.S. Treasury Dep't,*
  578 F.3d 1133 (9th Cir. 2009) ........................................................................37

*In re Compl. of RLB Contracting, Inc.,*
  773 F.3d 596 (5th Cir. 2014) ..........................................................................13

*In re Navy Chaplaincy,*
  738 F.3d 425 (D.C. Cir. 2013) ........................................................................48

*Int'l Refugee Assistance Project v. Trump,*
  265 F. Supp. 3d 570 (D. Md. 2017) ..................................................................18

*Islamic Am. Relief Agency (IARA-USA) v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007) .................................................................*passim*

*Kadi v. Geithner,*
  42 F. Supp. 3d 1 (D.D.C. 2012), *appeal dismissed*, 2012 WL 3243996 (D.C. Cir. 2012).........37, 39, 52

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ........................................................................40

*Karadzic v. Gacki,*
  602 F. Supp. 3d 103 (D.D.C. 2022) ..................................................................44

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) .....................................................................................35

*Kovac v. Wray,*
  363 F. Supp. 3d 721 (N.D. Tex. 2019) .......................................................46, 47, 48

*L.A. Police Dep't v. United Reporting Pub. Corp.,*
  528 U.S. 32 (1999) .......................................................................................39

*Lane v. Halliburton,*
  529 F.3d 548 (5th Cir. 2008) ...................................................................25, 26, 30

*Lewis v. Ascension Par. School Bd.,*
  72 F. Supp. 3d 648 (M.D. La. 2014), *aff'd*, 662 F.3d 343 (5th Cir. 2011) ...........................46

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................*passim*

*Lujan v. Nat'l Wildlife Found.,*
  497 U.S. 871 (1990) ................................................................................................53

*Machete Prods., LLC v. Page,*
  809 F.3d 281 (5th Cir. 2015) ................................................................................13

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ................................................................................................49

*McClelland v. Katy Indep. Sch. Dist.,*
  63 F.4th 996 (5th Cir.), *cert. denied,* 144 S. Ct. 348 (2023) ...............................50

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) ................................................................................................46

*Moody v. NetChoice, LLC,*
  144 S. Ct. 2383 (2024) ................................................................................................38

*Narenji v. Civiletti,*
  617 F.2d 745 (D.C. Cir. 1979) ...............................................................................49

*Nat'l Park Hospitality Ass'n v. DOI,*
  538 U.S. 803 (2003) ................................................................................................24

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ................................................................................................53

*OCA-Greater Houst. v. Texas,*
  867 F.3d 604 (5th Cir. 2017) ................................................................................18

*Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis,*
  577 F.2d 1196 (5th Cir. 1978) ...............................................................................25, 26

*Orvis v. Brownell,*
  345 U.S. 183 (1953) ................................................................................................4

*Paradissiotis v. United States,*
  304 F.3d 1271 (Fed. Cir. 2002) .............................................................................34

*Parker v. Levy,*
  417 U.S. 733 (1974) ................................................................................................51

*People's Mojahedin Org. of Iran v. Dep't of State,*
  327 F.3d 1238 (D.C. Cir. 2003) .............................................................................37

*Phillips v. Collin Cmty. Coll. Dist.*,
  701 F. Supp. 3d 525 (E.D. Tex. 2023).................................................................. 50, 52

*Qureshi v. Holder*,
  663 F.3d 778 (5th Cir. 2011)..................................................................................53

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001)..................................................................................13

*Regan v. Wald*,
  468 U.S. 222 (1984).......................................................................................... 4, 37

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008)..................................................................................24

*Roy v. City of Monroe*,
  950 F.3d 245 (5th Cir. 2020).............................................................................. 50, 52

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006)................................................................................................31

*Sanchez-Espinoza v. Reagan*,
  568 F. Supp. 596 (D.D.C. 1983), *aff'd*, 770 F.2d 202 (D.C. Cir. 1985) ...........................30

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) ......................................................................... 27, 29

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000)..................................................................................54

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..............................................................................................31

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..............................................................................................14

*Sylvia Dev. Corp. v. Calvert Cnty.*,
  48 F.3d 810 (4th Cir. 1995)...................................................................................46

*Taylor v. Books a Million, Inc.*,
  296 F.3d 376 (5th Cir. 2002)..................................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)......................................................................................... 47, 49

*Tenth St. Residential Ass'n v. Dallas*,
  968 F.3d 492 (5th Cir. 2020)..................................................................................18

*Tex. Ent. Ass'n v. Hegar,*
  10 F.4th 495 (5th Cir. 2021) ........................................................................................ 33

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 70 (2023) ............................... 18

*Texas v. Biden,*
  694 F. Supp. 3d 851 (S.D. Tex. 2023), *appeal filed*, No. 23-40671 (5th Cir. Nov. 24, 2023) ............. 53

*Texas v. United States,*
  523 U.S. 296 (1998) ...................................................................................................... 25

*Thomas v. Union Carbide Agr. Prod. Co.,*
  473 U.S. 568 (1985) ...................................................................................................... 14

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ...................................................................................................... 14

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ................................................................................................*passim*

*Trump v. IRAP,*
  582 U.S. 571 (2017) ...................................................................................................... 22

*Tulare Cnty. v. Bush,*
  306 F.3d 1138 (D.C. Cir. 2002) ................................................................................... 53

*Turner v. Collier,*
  Civ. A. No. 4:19-cv-04124, 2022 WL 4734828 (S.D. Tex. Sept. 30, 2022) ................ 41

*U.S. Navy Seals 1-26 v. Biden,*
  27 F.4th 336 (5th Cir. 2022) ........................................................................................ 40

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ...................................................................................................... 29

*United States v. Dhafir,*
  No. 5:03-CR-64, 2003 WL 27383007 (N.D.N.Y. July 3, 2003) ................................... 43

*United States v. Hansen,*
  599 U.S. 762 (2023) ...................................................................................................... 38

*United States v. Islamic Am. Relief Agency,*
  No. 07-00087-CR-W-NKL, 2009 WL 4016478 (W.D. Mo. Nov. 18, 2009) ................. 43

*United States v. Lanier,*
  520 U.S. 259 (1997) ...................................................................................................... 50

*United States v. Mirza,*
　　CR No. H-06-421, 2010 WL 1427220 (S.D. Tex. Apr. 7, 2010), *aff'd,*
　　454 F. App'x 249 (5th Cir. 2011) ...................................................................37

*United States v. O'Brien,*
　　391 U.S. 367 (1968) ......................................................................................33

*United States v. Powell,*
　　423 U.S. 87 (1975) ........................................................................................50

*United States v. Shih,*
　　74 F.4th 1077 (9th Cir. 2024) ......................................................................27

*United States v. Texas,*
　　599 U.S. 670 (2023) ......................................................................................54

*United States v. Verdugo-Urquidez,*
　　494 U.S. 259 (1990) ......................................................................................31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
　　454 U.S. 464 (1982) ......................................................................................20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
　　455 U.S. 489 (1982) ......................................................................................52

*Virginia v. Hicks,*
　　539 U.S. 113, (2003) .....................................................................................38

*Washington v. Davis,*
　　426 U.S. 229 (1976) ................................................................................46, 49

*Williams v. Bramer,*
　　180 F.3d 699 (5th Cir. 1999) ........................................................................48

*Williamson v. Tucker,*
　　645 F.2d 404 (5th Cir. 1981) ........................................................................13

*Yick Wo v. Hopkins,*
　　118 U.S. 356 (1886) ......................................................................................48

*Zimmerman v. City of Austin,*
　　881 F.3d 378 (5th Cir. 2018) ........................................................................16

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
　　576 U.S. 1 (2015) ..........................................................................................27

## STATUTES

5 U.S.C. § 701 ................................................................................................54

5 U.S.C. § 704 ................................................................................................52

8 U.S.C. § 1182 ................................................................................................6

8 U.S.C. § 1185 ................................................................................................6

31 U.S.C. § 310 ..............................................................................................24

42 U.S.C. § 2000bb-1 ............................................................................... 39, 40

42 U.S.C. § 2000bb-2 ....................................................................................40

42 U.S.C. §§ 2000cc *et seq.* .........................................................................40

42 U.S.C. § 2000cc-5 .....................................................................................40

50 U.S.C. § 1622 ............................................................................................30

50 U.S.C. §§ 1701-1708 ...................................................................................1

50 U.S.C. § 1701 ...................................................................................... 4, 28

50 U.S.C. § 1702 ................................................................................. 4, 17, 28

50 U.S.C. § 1703 ..................................................................................... 28, 30

50 U.S.C. § 4305 ..............................................................................................4

Trading with the Enemy Act,
  65th Cong., 40 Stat. 411 (1917) .................................................................3

## REGULATIONS

31 C.F.R. § 501.801 ........................................................................................10

31 C.F.R. § 501.807 ..........................................................................................9

Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans,
  Exec. Order No. 13219, 66 Fed. Reg. 34,777 (June 26, 2001) .............. 5, 6

Exec. Order No. 13,323, 69 Fed. Reg. 241 (Dec. 30, 2003) ..........................6

Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the
Democratic Republic of the Congo,
Exec. Order No. 13671, 79 Fed. Reg. 39,949 (July 8, 2014) .................................................5

Blocking Property of Certain Persons and Prohibiting Certain Transactions with Respect to the
Crimea Region of Ukraine,
Exec. Order No. 13685, 79 Fed. Reg. 77357 (Dec. 19, 2014) ..............................................5

Blocking Property of Certain Persons Contributing to the Situation in Nicaragua,
Exec. Order No. 13851, 83 Fed. Reg. 61505 (November 27, 2018) ......................................5

Blocking the Property and Suspending Entry of Certain Persons Contributing to the Situation
in Mali,
Exec. Order No. 13882, 84 Fed. Reg. 37055 (July 26, 2019) ...............................................5

Blocking Property with Respect to the Situation in Burma,
Exec. Order No. 14014, 86 Fed. Reg. 9429 (Feb. 10, 2021) .................................................5

Imposing Sanctions on Certain Persons With Respect to the Humanitarian and Human Rights
Crisis in Ethiopia,
Exec. Order No. 14046, 86 Fed. Reg. 52389 (September 17, 2021) ......................................5

Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade,
Exec. Order No. 14059, 86 Fed. Reg. 71549 (Dec. 15, 2021) ..............................................5

Executive Order 14115,
89 Fed. Reg. 7605 (Feb. 1, 2024).................................................................................*passim*

## OTHER AUTHORITIES

David Brennan, *Exclusive: Israeli Extremists Deplatformed Over Gaza Aid Attacks,*
Newsweek (May 17, 2024),
https://perma.cc/E3ZA-6CCG ...........................................................................................21

Dep't of the Treasury, OFAC Letter to Bank of Israel (Mar. 26, 2024),
https://perma.cc/9MH5-HA4G ...........................................................................................19

Fin. Crimes Enf't Network, *FinCEN Alert on Israeli Extremist Settler Violence Against Palestinians
in the West Bank*, FIN-2024-Alert001 (Feb. 1, 2024),
https://perma.cc/WY64-UBKH................................................................................... 23, 49

Fin. Crimes Enf't Network, *What We Do*, https://www.fincen.gov/what-we-do...............................24

https://perma.cc/2GEV-6AAE .....................................................................................................47

https://perma.cc/KHJ9-FX56 .......................................................................................................12

https://perma.cc/WST4-JMBM ....................................................................................................12

New Year Campaign,
    https://perma.cc/XK23-F77R ................................................................................21

Office of Foreign Assets Control, *Basic Information on OFAC & Sanctions*,
    https://ofac.treasury.gov/faqs/1190 ....................................................10, 17, 32

Regavim profile,
    https://perma.cc/B2D6-4RJY ..............................................................................21

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540 ..................................4

U.S. Dep't of State, *Learn More About the Department of State's Delisting Process*,
    https://perma.cc/QME4-E24D ............................................................................10

**INTRODUCTION**

Pursuant to Article II of the Constitution, as well as powers conferred by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708 ("IEEPA"), the President has broad authority to attend to the foreign affairs of the nation, including by imposing economic sanctions on persons and entities in response to declared national emergencies.

The United States, across multiple administrations, has long supported a negotiated two-state solution to the Israeli-Palestinian conflict, and has sought to address threats to the security and stability of the region (which also compromise our national security), including through diplomacy, security assistance, and imposition of targeted economic sanctions, such as sanctions imposed on terrorist groups and their supporters. The United States strongly supports Israel's right to defend itself following the horrific terrorist attacks that occurred on October 7, 2023 and supports Israel's effort to defeat Hamas to make sure that such an attack never happens again. This includes taking steps to cut off Hamas' access to the international financial system. Since those attacks, the United States has issued multiple rounds of sanctions against Hamas and other terrorist actors, most recently targeting a significant international Hamas fundraising network on October 7, 2024.

The United States also has long had grave concerns about the rise in violence in the West Bank from extremist actors—including the rise in extremist settler violence, which reached record levels in 2023. Such violence threatens the peace, security, and stability of Israel, the West Bank and Gaza, and the broader Middle East Region, undermines the national security interests of the United States, harms and displaces Palestinian communities, destabilizes the West Bank, and threatens Israel's security.

In accordance with this foreign policy judgment and acting pursuant to statutory authority, in February 2024, the President declared a national emergency and issued Executive Order 14115, 89 Fed. Reg. 7605 (Feb. 1, 2024) ("EO 14115" or "the EO"), to confront the threat—including to the United States—posed by the rise in violence and instability in the West Bank. The President declared as a national emergency the situation in the West Bank, explaining that "in particular[,] high levels of

1

extremist settler violence, forced displacement of people and villages, and property destruction" have "reached intolerable levels." *Id.* The President found that "[t]hese actions constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," because they "undermine the foreign policy objectives of the United States, including the viability of a two-state solution" and "undermine the security of Israel and have the potential to lead to broader regional destabilization across the Middle East, threatening United States personnel and interests." *Id.*

Acting in accordance with this authority, either the Secretary of State or the Secretary of the Treasury may determine that certain foreign persons have engaged in certain types of actions that threaten the peace, security, and stability of the West Bank and designate such persons for sanctions. In addition, either the Secretary of State or Secretary of the Treasury can designate certain leaders and officials of entities engaged in such actions, as well as those foreign persons who act as agents of, or provide material support to, designated persons. Consistent with the implementation of the sanctions program generally, the designated persons are then added to the list of Specially Designated Nationals and Blocked Persons ("SDNs"), thereby blocking all of their property and interests in property in the United States or in the possession or control of a U.S. person. Section 4 of EO 14115 further prohibits the entry of designated noncitizens into the country unless a waiver is appropriate. U.S. persons are generally prohibited from dealing in blocked property or conducting transactions with SDNs.

Plaintiffs are entitled to disagree with the foreign policy judgment of the United States, and the United States imposes no legal consequences on them for that disagreement. Plaintiffs are not, however, entitled to rewrite U.S. foreign policy, nor to substitute their opinions for the national security determinations of the President, nor to demand that this Court do so. To the extent Plaintiffs challenge the President's declaration of emergency or choice of criteria to implement his foreign policy and national security judgment in issuing EO 14115, that judgment is not reviewable.

As to the remainder, Plaintiffs bring a variety of claims related to EO 14115, but none of the Plaintiffs can show standing for the broad-based injunction sought here. Plaintiffs Isley and Texans

for Israel are the only Plaintiffs with any connection to this venue and fall well short of demonstrating standing sufficient to demonstrate an Article III controversy.  Because they lack standing, this action must either be dismissed or transferred.  But in fact, none of the other Plaintiffs have stated a cognizable injury either.  They have not been the subject of, nor have they been found to be violating, sanctions by the United States.  They claim to fear the imposition of sanctions based on their advocacy in opposition to a two-state solution, their advocacy in opposition to humanitarian aid for Palestinians, and their defense when attacked.  In fact, the Executive Order does not target any of those things, but even if it did, allegations that Plaintiffs potentially could suffer some future impact by unspecified future agency actions are too speculative to support standing.  At a minimum, this challenge is not ripe in the absence of a specific agency decision being challenged.  Standing must be shown for each form of relief requested, and not one Plaintiff has shown concrete injury that would support the broad relief requested here.  This is particularly true with respect to Defendants FinCEN and DHS, who have taken no action that arguably injures Plaintiffs.

In any event, Plaintiffs fail to state a claim as to each count of the Complaint.  Plaintiffs are not subject to designation under the EO for advocacy or speech or religious beliefs, and there is no other infirmity with the Order, which was issued by the President exercising his foreign policy and national security judgment pursuant to his constitutional authorities and a valid statutory delegation of authority.

## BACKGROUND

### I.   LEGAL BACKGROUND

#### A.  *The International Emergency Economic Powers Act (IEEPA)*

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading with the Enemy Act ("TWEA"), enacted in 1917.  *See* 65th Cong. ch. 106, 40 Stat. 411, 411-16 (1917).  As amended in 1933, TWEA

3

granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  50 U.S.C. § 4305(b)(1)(A).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze a person or an entity's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187–88 (1953).

In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 1–2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declared national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227–28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency in order "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).  There are limited exceptions to the broad authority under IEEPA, applicable to "personal communication[s]" and, under the so-called Berman Amendments, to "information and informational material[s]," and "transactions ordinarily incident to travel to or from any country."  *See Id.* § 1702(b)(1), (3), (4).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed jurisdiction-based sanctions, including on Iran, Crimea, and North Korea, as well as on individuals and entities engaged in certain conduct, such as narcotics

trafficking, terrorism, and serious human rights abuse or corruption. *See, e.g.*, Blocking Property of Certain Persons and Prohibiting Certain Transactions with Respect to the Crimea Region of Ukraine, Exec. Order No. 13685, 79 Fed. Reg. 77357 (Dec. 19, 2014); Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade, Exec. Order No. 14059, 86 Fed. Reg. 71549 (Dec. 15, 2021). *See generally* Ex. 1, Declaration of Lisa M. Palluconi ¶¶ 4-10 ("OFAC Decl."), App.0003-06. As relevant to the present case, Presidents have frequently determined that activities undermining peace, security, or stability in particular geographic regions have in turn constituted national emergencies for the purposes of IEEPA, and have promulgated Executive Orders designed to counter these threats. *See, e.g.*, Imposing Sanctions on Certain Persons With Respect to the Humanitarian and Human Rights Crisis in Ethiopia, Exec. Order No. 14046, 86 Fed. Reg. 52389 (September 17, 2021) (imposing sanctions on persons "responsible for or complicit in …actions or policies that threaten the peace, security, or stability of Ethiopia"); Blocking Property with Respect to the Situation in Burma, Exec. Order No. 14014, 86 Fed. Reg. 9429 (Feb. 10, 2021) (imposing sanctions for "actions or policies that threaten the peace, security, or stability of Burma" following that country's February 1, 2021, military coup); Blocking the Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali, Exec. Order No. 13882, 84 Fed. Reg. 37055 (July 26, 2019) (imposing sanctions on persons "responsible for or complicit in…actions or policies that threaten the peace, security, or stability of Mali"); Blocking Property of Certain Persons Contributing to the Situation in Nicaragua, Exec. Order No. 13851, 83 Fed. Reg. 61505 (November 27, 2018) (imposing sanctions on persons "responsible for or complicit in… "actions or policies that undermine the peace, security, or stability of Nicaragua"); Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo, Exec. Order No. 13671, 79 Fed. Reg. 39,949 (July 8, 2014) (imposing sanctions on persons "responsible for or complicit in . . . actions or policies that threaten the peace, security, or stability of the Democratic Republic of the Congo"); Blocking Property

5

of Persons Who Threaten International Stabilization Efforts in the Western Balkans, Exec. Order No.

13219, 66 Fed. Reg. 34,777, 34,777 (June 26, 2001) (similar).

### B.  Immigration and Nationality Act

The Immigration and Nationality Act ("the INA") "vests the President with authority to

restrict the entry of aliens whenever he finds that their entry 'would be detrimental to the interests of

the United States.'" 8 U. S. C. § 1182(f); *Trump v. Hawaii*, 585 U.S. 667, 674-75 (2018).  A separate

section grants the President authority to adopt "reasonable rules, regulations, and orders" governing

entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C.

§1185(a); *see* Exec. Order No. 13,323, 69 FR 241 (Dec. 30, 2003) (delegating authorities under §

1185(a)).

### C.  Executive Order 14115

The United States is concerned about the escalation of violence and instability in and affecting

the West Bank.  The United States has long been committed to supporting a comprehensive and

durable peace agreement that would permanently resolve the Israeli-Palestinian conflict and the final

status of the West Bank and Gaza.  For many years, U.S. policy has maintained that a two-state solution

is essential to ensuring both Israelis and Palestinians alike can attain equal measures of security,

prosperity, and freedom.  It has also been a longstanding U.S. foreign policy priority to maintain

regional security and stability in the Middle East.  Violence and instability in the West Bank undermine

the prospect of a two-State solution, create insecurity for Israelis and Palestinians alike, and contribute

to broader regional destabilization across the Middle East, threatening United States personnel and

interests.

Extremist violence against civilians, whatever their national origin, ethnicity, or religion,

cannot be justified, nor can other acts of property destruction, displacement of civilians, or harassment

that threaten peace, security, or stability in the West Bank.  Those who are responsible for such actions

must be held to account.  The Government of the United States has continued to call on the

6

Government of Israel and relevant Palestinian authorities to bring relevant actors to justice and to take necessary preventive measures.  High levels of violence, forced displacement of people and villages, and property destruction in the West Bank cause intense human suffering, harm Israel's security, and seriously undermine peace and stability in the West Bank and Gaza, Israel, and the broader Middle East region.  Additionally, this harm to Israel's security and the potential for broader regional destabilization presents a threat to U.S. personnel and interests.  For these reasons, the President has determined that these activities constitute an "unusual and extraordinary" threat to the national security and foreign policy of the United States.  *See* Ex. 2, Declaration of Amy Holman ("State Decl.") ¶¶ 4-5, App.0015-16.

In line with this foreign policy context, the President promulgated Executive Order No. 14115 ("Imposing Certain Sanctions on Persons Undermining Peace, Security, and Stability in the West Bank") on February 1, 2024.  *See* EO 14115.  The Preamble to EO 14115 announces a Presidential finding that "high levels of extremist settler violence, forced displacement of people and villages, and property destruction-has reached intolerable levels and constitutes a serious threat to the peace, security, and stability of the West Bank and Gaza, Israel, and the broader Middle East region," and that "[t]hese actions undermine the foreign policy objectives of the United States, including the viability of a two-state solution and ensuring Israelis and Palestinians can attain equal measures of security, prosperity, and freedom."  *Id.*  The situation in the West Bank "also undermine[s] the security of Israel" itself; has "the potential to lead to broader regional destabilization across the Middle East, threatening United States personnel and interests"; and therefore "constitute[s] an unusual and extraordinary threat to the national security and foreign policy of the United States."  *Id.*

Consistent with these concerns, the EO vests the Secretaries of State and the Treasury with the discretion to block the assets of foreign persons they have determine have engaged in certain actions affecting the West Bank.  EO 14115 provides that for such persons, "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that

7

are or hereafter come within the possession or control of any United States person . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." EO 14115. § 1.  Section 3(a) of EO 14115 specifies that this prohibition includes the making or receipt of "any contribution or provision of funds, goods, or services by, to, or for the benefit of any" or from "any person whose property and interests in property are blocked pursuant to this order." *Id.* § 3(a), (b).  Accordingly, absent an applicable exemption or authorization, U.S. persons are prohibited from providing funds, goods, or services to, or for the benefit of, a person designated under EO 14115, but the EO itself does not designate anyone.

Section 1 of the EO lists the various reasons a foreign person may be sanctioned.  Under Section 1(a)(i)(A), the Secretary of State or the Secretary of the Treasury, in consultation with the other, can sanction foreign persons determined "to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in . . .  actions—including directing, enacting, implementing, enforcing, or failing to enforce policies—that threaten the peace, security, or stability of the West Bank." *Id.* § 1(a)(i)(A).  The EO also allows the Secretaries to sanction those "planning, ordering, otherwise directing, or participating in" certain malign acts, including violence, affecting the West Bank, along with those determined to be a leader or official of an entity that is engaging in such conduct, related to the leader's or official's tenure.  *See id.* § 1(a)(i)(B), 1(a)(ii).  It also authorizes the Secretary of State, in consultation with the Secretary of the Treasury, to sanction those determined to "have committed or have attempted to commit, to pose a significant risk of committing, or to have participated in training to commit acts of terrorism affecting the West Bank," along with certain leaders or officials of such entities.  *See id.* § 1(b)(i)-(ii).  Further, under Section 1(a)(iii), foreign persons who "have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" persons blocked pursuant to the EO can be sanctioned.  *Id.* § 1(a)(iv).  And finally, the Secretaries can sanction those foreign persons found "to be owned or

controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person blocked pursuant" to the EO.  *Id.* § 1(a)(iv).

In Section 4 of the EO, the President found that the "unrestricted immigrant and nonimmigrant entry into the United States of noncitizens" designated under Section 1 of the EO "would be detrimental to the interests of the United States."  *Id.* § 4(a).  He thus suspended entry of such persons.  *Id.*  The EO creates an exception, however, where "the Secretary of State or the Secretary of Homeland Security, as appropriate, determines that the person's entry would not be contrary to the interests of the United States."  *Id.*  The EO gives the Secretaries of State and Homeland Security authority to implement the Section.  *Id.* § 4(b)-(c); *see also* State Decl. ¶¶ 22-24, App.0021-22.

### D.  Sanctions Procedures

Persons designated based on a determination by the Secretary of the Treasury or the Secretary of State pursuant to EO 14115 (as well as other authorities) are referred to as "Specially Designated Nationals or Blocked Persons" ("SDNs").  The Department of the Treasury Office of Foreign Assets Control ("OFAC") maintains a list of such individuals or entities whose assets are blocked; this list is known as the SDN List.  *See* OFAC Decl. ¶ 6, App.0004.  Once designated, an SDN may at any time seek "administrative reconsideration" of the designation, or may assert "that the circumstances resulting in the sanction no longer apply."  31 C.F.R. § 501.807(a); *see* OFAC Decl. ¶ 14, App.0007.  In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the sanction," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for the sanction."  31 C.F.R. § 501.807(a).  Additionally, the individual may request a meeting with OFAC.  *Id.* § 501.807(b)(2).  After conducting a review, OFAC will "provide a written decision" to the SDN.  *Id.* § 501.807(b)(3).  OFAC's regulations do not limit the number of times a SDN may seek to challenge his designation administratively.  *See generally id.* § 501.807.  The State Department follows similar procedures for SDNs

9

seeking delisting.  *See* State Decl. ¶¶ 19-21, App.0020-21; U.S. Dep't of State, *Learn More About the Department of State's Delisting Process*, https://perma.cc/QME4-E24D.

OFAC also issues specific licenses for individuals to engage in transactions that would otherwise be prohibited by EO 14115.  *See* OFAC Dec. ¶ 15, App.0007-08.  A specific license may be issued when a person requests authorization to conduct an otherwise prohibited transaction or service not already covered by a general license.  *See* 31 C.F.R. § 501.801(b).  OFAC's blocking authority under IEEPA and implementing Executive Orders grant the agency the discretion to issue or withhold specific licenses based on national security and foreign policy considerations.  *See* OFAC Dec. ¶ 15, App.0008.

Additionally, as a matter of general guidance applicable to all sanction programs, OFAC has clarified that it "does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech or religious practice or for their religious beliefs; nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity." *See* Office of Foreign Assets Control, *Basic Information on OFAC & Sanctions*, Office of Foreign Assets Control, https://ofac.treasury.gov/faqs/1190 (last visited Oct. 9, 2024).  It also reinforced that "limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication."  *Id; see also* OFAC Decl. ¶¶ 20-22, App.0011-12; State Decl. ¶¶ 13, App.0018-19.

## II.    DESIGNATIONS PURSUANT TO EXECUTIVE ORDER 14115

Since February 1, 2024, the Department of State and Treasury Department have designated twenty-seven individuals and entities pursuant to EO 14115.  *See* State Decl. ¶ 7, App.0016 (24 designations); Treasury Decl. ¶ 17, App.0009 (3 designations).  None of the Plaintiffs have been designated.  Only six of these designations were made, at least in part, directly under the prong of the EO related to actions that undermine the "peace, security, or stability" (or "PSS") of the West Bank. State Decl. ¶ 7, App.0016 (4 PSS designations); OFAC Decl. ¶ 17, App.0009-10 (2 PSS designations).

And of these, only one individual and one entity were sanctioned solely under that PSS prong. State Decl. ¶¶ 7, 10-11, App.0016-18 (describing PSS-only designations of Tsav 9 and David Chai Chasdai, and noting that all four of the PSS designees by the Department of State "had engaged in violent activities affecting the West Bank, which, in many instances, resulted in the deaths of Palestinian or Israeli civilians"); OFAC Decl. ¶ 17, App.0009-10 (both OFAC PSS designees had other bases as well, and were supporting violent activities).[1]

No individual or entity designated under the "peace, security, or stability" prong was sanctioned for speech or expressive conduct. OFAC Decl. ¶¶ 17-18, 20, App.0009-10; State Decl. ¶¶ 7-13, App.0016-19. Tzav 9 was one Israeli entity designated under the "peace, security, or stability" prong. The Department of State determined that Tzav 9 had been blocking, harassing, and damaging convoys carrying lifesaving humanitarian assistance to Palestinian civilians in Gaza. It also found that it had damaged aid trucks and dumped life-saving humanitarian aid onto the road. Additionally on May 13, 2024, Tzav 9 members looted and then set fire to two trucks near Hebron in the West Bank carrying humanitarian aid destined for men, women, and children in Gaza. Thus, the Department of State sanctioned Tzav 9 under section 1(a)(i)(A) of EO 14115.[2] *See* State Decl. ¶ 10, App.0018; *see also* https://perma.cc/PJ7Y-D4RR. Similarly, the Department of State sanctioned David Chai Chasdai under the "peace, security, or stability" prong. The Department of State determined that he had

---

[1] There are also a handful of designations that are derivative in whole or in part of a "peace security or stability" designation, e.g., for providing material support to an entity designated under Section 1(a)(i)(A) or for being a leader of such an entity. A total of nine designations currently relate back to Section 1(a)(i)(A) in whole or in part (including those described above).

[2] The Complaint admits that Tzav 9 was involved in one violent incident, but blamed others for the violence, and the Complaint appears to admit Tzav 9 was physically blocking the delivery of humanitarian aid. Compl. at 15 ¶ 49, 43 ¶¶ 155-56. Accordingly, Plaintiffs concede that Tzav 9 was not designated for peaceful protest. Plaintiffs also argue that Tzav 9 has taken steps to prevent such incidents in the future, but it does not appear that Tzav 9 has submitted such information to the State Department or sought delisting in accordance with relevant procedures. *See id.* at 43 ¶ 158; State Decl. ¶ 7, App.0016-17.

11

initiated and led a riot, which involved setting vehicles and buildings on fire, assaulting Palestinian civilians, and causing damage to property in Huwara. This incident caused the death of a Palestinian civilian. *See* State Decl. ¶ 11, App.0018; *see also* https://perma.cc/KHJ9-FX56. Neither Tsav 9 nor Chasdai have sought delisting. *See* State Decl. ¶ 7, App.0016-17.

Reut Ben Haim, a leader and co-founder of Tzav 9, was also sanctioned, but not directly under the "peace, security, or stability" prong. The Department of State determined that she is a leader, co-founder, and chairperson of Tzav 9. The Department of State thus sanctioned her under Section 1(a)(ii)(A) for being or having been a leader or official of U.S.-designated Tzav 9. Reut Ben Haim has not sought delisting. *See* State Decl. ¶ 10n.5, App.0018; *see also* https://perma.cc/WST4-JMBM.

## III.   THIS CASE

Plaintiffs are a group of U.S. and U.S.-Israeli citizens, along with U.S. and foreign organizations. *See* Compl. at 8-17 ¶¶ 24-58.[3] They filed their Complaint on August 6, 2024, and challenge EO 14115 under the Religious Freedom Restoration Act ("RFRA") (Count I), the First Amendment (Counts II and III), the Fifth Amendment (Counts IV and V), and the Administrative Procedure Act ("APA") (Count VI). Plaintiffs name the Treasury Department, the Secretary of the Treasury, the State Department, the Secretary of State, the Department of Homeland Security ("DHS"), the Secretary of Homeland Security, the Office of Foreign Assert Control ("OFAC"), the Director of OFAC, the Financial Crimes Enforcement Network ("FinCEN") and the Director of FinCEN all as defendants. *See id.* at 18-19 ¶¶ 59-68. They seek a declaration that the EO, and Defendants' enforcement of the EO, violates RFRA, the Constitution, and the APA, and request, *inter alia*, that the Court enjoin "Defendants from implementing and enforcing EO 14115 both as to

---

[3] The Complaint does not have correctly, sequentially numbered paragraphs, and there are several paragraphs with the same number. For clarity, this memorandum will cite the Complaint by both page and paragraph number.

Plaintiffs and as to any similarly situated persons who likewise object to EO 14115 on religious or speech grounds." *See id.* at 66 (Prayer for Relief ¶ d).

## STANDARD OF REVIEW

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To survive a Rule 12(b)(1) motion, a plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted). "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (on a Rule 12(b)(1) motion, a district court is "free to weigh the evidence and satisfy itself . . . of its power to hear the case") (citation omitted)).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept factual allegations as true and draw reasonable inferences in plaintiff's favor but need not credit "conclusory allegations or legal conclusions masquerading as factual conclusions." *Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS.

Plaintiffs Isley and Texans for Israel lack standing to bring any claims described in the Complaint because they have described no injury at all stemming from EO 14115. All Plaintiffs lack

standing for the broad-based relief sought here, and against several of the Defendants.

### A. Elements of Standing.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. "The irreducible constitutional minimum of standing contains three elements." *Id.* A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Article III injury must be both "concrete" and "particularized" to the Plaintiff. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.*

Importantly, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A plaintiff who seeks prospective declaratory or injunctive relief must show that he is in imminent danger of being injured because of the opposing party's conduct and that the danger is "real and immediate," *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983), and the claimed injury "cannot be speculative, conjectural, or hypothetical." *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 188 (2023). "[A]llegations of *possible* future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Rather, a threat of future injury to support prospective relief must be "certainly impending." *Id.* at 401-02; *see also Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580-81 (1985) (observing that courts dismiss cases based on "contingent future events that may not occur as anticipated, or indeed may not occur at all").

### B. Isley and Texans for Israel Fail to Plead a Non-Speculative Injury

Isley and Texans for Israel have not been sanctioned, nor threatened with sanctions. They nonetheless allege that they fear that they will be subjected to sanctions "[b]y virtue of supporting"

several individuals and organizations who are not on the SDN list.  *See* Compl. at 9-11 ¶¶ 30, 32-36; *id.* at 56-58 ¶¶ 169-76.  Such an attenuated, hypothetical chain is insufficient to demonstrate standing.

First, Isley's purported fear of being subject to U.S. sanctions is foreclosed by the plain text of the Executive Order.  Only "foreign persons" are subject to designation under Section 1 of EO 14115.  Based on the allegations in the Complaint, Isley is a wholly U.S. person who does not claim dual citizenship, and Texans for Israel is a wholly U.S. entity.  *See generally* Compl.  Neither is therefore even arguably subject to designation under the EO, even if one credited Plaintiffs' speculation about future events.  His subjective claim of fear is not plausible, and any chilling effect is self-imposed.

Second, even if he had identified some other effect of U.S. sanctions imposed on others, Isley does not allege that the individuals and entities he supports are on OFAC's SDN List.  *See generally* Compl.  Rather, he alleges that these individuals hold "views and engage in activities" that Defendants *may* "regard as threaten[ing] peace and security in the Middle East."  *Id.* at 11 ¶ 34, 47 ¶ 173 ("Mr. Isley cannot properly plan for or conduct activities with these Jewish people because they may, at a moment's notice, be sanctioned.").  He further alleges that, by "virtue of supporting said individuals," Isley—and therefore Texans for Israel—fear that they could be subjected to sanctions.  *Id.* at 11 ¶ 36.  Thus, any possible future injury relies on a chain of speculative assumptions: (1) that the individuals Isley supports will be sanctioned under EO 11415; (2) that after such a designation, Isley will continue wanting to provide funds to these individuals; (3) that Isley will not seek a license to make such payments, or such a license request will get denied; and (4) Isley *may* therefore be sanctioned or violate sanctions.  Any one of these contingencies, by itself, demonstrates that this theory is too speculative to satisfy Article III, particularly in the face of ample precedent recognizing that Plaintiffs cannot establish injury from hypothetical future agency action.  *See, e.g.*, *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (declining to "speculate about future actions by policymakers," particularly where the policy is "controversial" and "[i]ntervening events . . . are unpredictable" such that "[t]he

15

content of any future regulation is currently unknowable"); *see also* OFAC Decl. ¶ 15, App.0008 (no Plaintiff has sought a license).

Nor can Isley satisfy Article III from a claimed "chill" of activities. Although Isley alleges that Defendants have "chilled his ability to continue to support the invitation of [Israelis and Israeli organizations that are not on the SDN list] to the United States to enable them to speak to government officials and ordinary citizens about Israel," Compl. at 11 ¶ 36, standing cannot be fabricated from a self-inflicted injury. *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *see Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). And allegations of "chill" or self-censorship can only give rise to a constitutionally cognizable injury "from a fear of prosecution that is not 'imaginary or wholly speculative.'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). Here, the purported risk that Isley and his organization will be sanctioned or penalized for supporting persons and organizations—for whom it is speculative whether they themselves will be sanctioned— is entirely speculative and cannot support standing. *See Clapper*, 568 U.S. at 406-07 (concluding that a claimed chill in speech was insufficient to confer standing where the plaintiffs declined to talk to various individuals under a fear that these persons were likely targeted persons under the Foreign Intelligence Surveillance Act which would allow the government to surveil such conversations).

The notion that Plaintiffs are constraining their speech to avoid sanctions risk is particularly far-fetched here, where the plain text of EO 14115 would not apply to pure speech or advocacy activities; rather it explicitly applies only to "*actions*— including directing, enacting, implementing, enforcing or failing to enforce policies – that threaten the peace, security or stability of the West Bank." EO 14115 § 1(a)(i)(A) (emphasis added). In addition to the text's clear focus on "actions," the U.S. Government has re-affirmed that it "does not sanction persons for their engagement in activities subject to U.S. constitutional protection . . . ; nor do U.S. persons violate OFAC sanctions

for engaging in such constitutionally protected activity." *See Basic Information on OFAC & Sanctions*; OFAC Decl. ¶¶ 18, 20-22, App.0010-12; State Decl. ¶¶ 12-13, App.0018-19. This guidance is likewise consistent with the plain text of IEEPA, which does not permit the agencies to regulate personal communications, nor the import or export of informational materials. EO 14115 does not penalize pure speech.

Isley also claims that, because of a fear of sanctions, "Mr. Isley is unable to invite blocked persons or entities to events in the US," Compl. at 46-47 ¶ 171, and that the "inability of an individual to invite speakers to events in the United States related to his religious mission and the related uncertainty in organizing such events are cognizable injuries," *id.* at 47 ¶ 174. But Plaintiffs do not identify any blocked person whom they wish to invite to the United States. Nor do they identify any upcoming events. *See generally* Compl. Without "concrete plans," Plaintiffs fail to plead an injury-in-fact. *See Lujan*, 504 U.S. at 563-64 (holding that "some day intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury that our cases require"). And even if Isley did have concrete plans to invite a specific, designated Israeli speaker to visit the United States, the EO allows for exceptions to its bar on noncitizen entry "when the Secretary of State or the Secretary of Homeland Security, as appropriate, determines that the person's entry would not be contrary to the interests of the United States." EO 14115 § 4(a). Moreover, IEEPA does not restrict the exchange of information or informational materials; so there is no reason to think that it would be applied in such a way. 50 U.S.C. § 1702(b)(3). Isley cannot show a "certainly impending" future injury when he has identified no SDN he plans to invite, nor that such a person has been denied a visa.

Because Isley does not have standing, Texans for Israel cannot establish standing as his representative. *Lujan*, 504 U.S. at 563 (stating that a single member with standing in his or her own right is sufficient to establish that an organization has standing). Nor does Texans for Israel have standing in its own right. An organization "can establish standing in its own name if it meets the same

17

standing test that applies to individuals," *OCA-Greater Houst. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017), and therefore must plead a concrete injury-in-fact. "The Supreme Court has recognized that when an organization's ability to pursue its mission is perceptibly impaired because it has diverted significant resources to counteract the defendant's conduct, it has suffered an injury under Article III." *Tenth St. Residential Ass'n v. Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). This is referred to as a "diversionary injury." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 70 (2023).

Texans for Israel alleges that its mission "is to extend aid to individuals, organizations, and communities, focusing especially on those in the heartland of Israel." Compl. at 8-9 ¶ 25. Texans for Israel claims it "had intended to continue inviting . . . individuals to visit the United States in order to assist them in their fundraising efforts and to provide them with a platform for educating Americans on the moral, historical, and religious right of the Jewish people to live and be sovereign in the West Bank" before EO 14115. *Id.* at 11 ¶ 35. But, like Isley, Texans for Israel fails to identify any specific individuals on the SDN list that it cannot invite to the United States, nor any specific fundraising events it cannot hold since the issuance of EO 14115. *See Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 597-98 (D. Md. 2017). Nor has it claimed a diversionary injury by alleging specific projects that it put on hold to respond to the Executive Order. *See Tex. State LULAC*, 52 F.4th at 253. Without an injury, Texans for Israel does not have standing. *Id.* The Court should therefore dismiss its claims.

## C. The Other Plaintiffs Have Not Established a Certainly Impending Future Injury As to Every Element of the Relief Sought.

While the other Plaintiffs (Abramowitz, Ben Chaim, Deutsch, and Regavim) do not claim to be wholly U.S. persons, their injuries are similarly noncognizable insofar as they are premised on the highly speculative fear of future sanctions. None of these Plaintiffs has been sanctioned or penalized.

Plaintiff Abramowitz, for example, claims that "his ability to finance and develop Arugot Farm in the West Bank has been significantly impaired" and that he fears "death or bodily harm as [a] result of . . . sanctions on Jews in the West Bank for their exercise of self-defense." Compl. at 49-50 ¶¶ 147-48. He does not, however, support his claim that he cannot finance his farm with factual allegations explaining how such financing and development is impaired. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (at the motion to dismiss stage, "mere conclusory statements[] do not suffice"). He does not claim to be doing business with an SDN, much less that there are no non-SDNs with whom he can do business. And indeed, OFAC has specifically made clear that not all settlers are subject to sanctions, and Israeli banks are permitted to process subsistence transactions even for individuals and entities designated under EO 14115. *See* Dep't of the Treasury, OFAC Letter to Bank of Israel (Mar. 26, 2024), https://perma.cc/9MH5-HA4G; Ex. B, Compl. ECF No. 1-2. The Complaint provides no basis to conclude that banks would be unable or unwilling to process financial transactions related to the farm of a non-designated individual or farm in the West Bank. And Defendants have clarified that not all activity in the West Bank is prohibited or sanctionable. *See* Compl. at 41-42 ¶ 151, 45 ¶ 166. He does not identify any transaction he wishes to undertake that has been prohibited, and he does not claim to have sought and been denied a license. *See* OFAC Decl. ¶ 15, App.0008 (no license request). In other words, Plaintiff Abramowitz does not identify any tangible way in which he has been or will be affected financially by sanctions.

Abramowitz's alternative argument rests on an even more speculative chain of future events. He claims that he will be sanctioned for future hypothetical acts of "self-defense"– that he might be attacked, that he might successfully defend himself, that the U.S. Government might *incorrectly* conclude that his acts of self-defense are a threat to peace, security and stability in the West Bank, and that the U.S. Government might decide to impose sanctions on him as a result to further U.S. foreign policy goals. *See All. for Hippocratic Med.,* 602 U.S. at 381 (observing that an Article III injury cannot rely on speculation). Even assuming, for the purposes of this motion, Plaintiffs' factual allegations

19

about certain other acts of settler violence being "self-defense," there is no reason (beyond pure conjecture) to think that the U.S. Government views all acts of self-defense as threats to peace and stability, or even all acts of violence. Use of the peace, security, or stability prong of the EO has been sparing. Moreover, if this unlikely chain of events transpired, and the USG was convinced that Abramowitz's as-yet hypothetical acts of future self-defense were unjustified acts of violence, the USG could also designate Abramowitz under Section 1(a)(i)(B) for "an act of violence or threat of violence targeting civilians." Plaintiffs explicitly do not challenge that part of the EO. *See* Compl. at 2 ¶ 2. Accordingly, there is no requested relief that would redress the hypothetical future injury. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (concluding that an injury is not redressable where a judgment would not right the claimed wrong).

Plaintiff Yosef Ben Chaim – unlike Isley, Texans for Israel, or Abramowitz – claims some connection to an SDN; the Complaint alleges that his wife is Reut Ben Chaim, designated by the State Department in July 2024 "for her involvement in the Tzav 9 movement." *See* Compl. at 17 ¶ 58. He himself is not designated and does not claim any such action is imminent. Rather, he claims to be harmed by her designation because he "cannot finance basic, day-to-day essential transactions" for the household, and because he can no longer receive a salary from her business. *Id.* at 17 ¶ 58, 49 ¶ 146. He has not submitted a license request to OFAC, OFAC Decl. ¶ 15, App.0008, and he provides no details as to how these injuries occurred, or what injuries persist after the letter to the Bank of Israel cited above. Accordingly, his allegations are also insufficient to support standing. *See Iqbal*, 556 U.S. at 670 (noting that factual "amplification is needed to render the claim plausible"). Moreover, Yosef Ben Chaim's claimed injuries are not fairly traceable to the challenged conduct. *Lujan*, 504 U.S. at 560 (holding that traceability requires "a causal connection between the injury and the conduct complained of"). Although his alleged injuries stem from the designation of his wife and her support of Tzav 9, the Complaint does not challenge or seek relief with respect to the designation of Tzav 9 or Reut Ben Haim, nor does it directly challenge the prong of the EO under which Reut Ben Haim

20

was designated (for being a leader of a designated entity).  *See generally* Compl.  Accordingly, Yosef Ben Chaim also lacks standing to bring this challenge to EO 14115.

Plaintiffs Meir Deutsch (a dual citizen) and Regavim (an Israeli entity) also lack standing for the relief sought here.  They claim to support Tzav 9 – the same violent extremist organization to which Reut Ben Chaim is connected.  State Decl. ¶¶ 10, 12, App.0018.  The Complaint alleges that Deutsch is the "Director General" of Regavim, and that Regavim "supported" Tzav 9.  Compl. at 13-17 ¶¶ 46-57, *id.* at 48-49 ¶¶ 144-46; *see also id.* at 42 ¶ 152 (also referring to Tzav 9 as "Regavim's activist initiative").  The Complaint does not purport to challenge directly the designation of Tzav 9 or any specific blocking action, and does not directly challenge the "material support" provisions of EO 14115.[4]  Section 1(a)(iii) (authorizing the blocking of individuals who "have materially assisted, sponsored, or provided financial, material or technological support for, or goods or services to or in support of" anyone blocked under the Order) is mentioned once in the Complaint, and not in the context of a claim or legal argument.  Compl. at 20-21 ¶ 71.  And any particular hypothetical future designations based on national security and foreign policy considerations are too speculative to support standing.

Deutsch also claims that his speech is "chilled" or "barred" in part because he "must expend significant resources . . . to continue engaging in the types of speech in which he has engaged for years."  *Id.* at 49 ¶ 146.  He does not identify what resources are expended.  And such a "chilling"

---

[4] Regavim claims that its account with an online fundraising platform (JGive.com) was frozen as a result of Tzav 9 sanctions, *see* Compl. at 16 ¶ 53, but it appears that Regavim still has an active account and recent fundraising with JGive.  *See* Regavim profile, https://perma.cc/B2D6-4RJY; New Year Campaign, https://perma.cc/XK23-F77R.  Moreover, media reporting indicates that Tzav 9 accounts in Israel were frozen as a result of an Israeli investigation into Tzav 9's violent and illegal actions.  *See* David Brennan, *Exclusive: Israeli Extremists Deplatformed Over Gaza Aid Attacks,* Newsweek (May 17, 2024), https://perma.cc/E3ZA-6CCG.  Accordingly, even if Plaintiff is correct that some funds at a U.S. institution were frozen as a result of U.S. sanctions on Tzav 9, that action did not otherwise harm Regavim and in any event is not redressable by this Court because Tzav 9 cannot access JGive funds in Israel either.

claim is too speculative to support standing here, *see Clapper*, 568 U.S. at 416; *Ctr. for Individual Freedom*, 449 F.3d at 660, particularly because there is no threat of Deutsch being sanctioned for pure speech or advocacy.  *See supra* pp.16-17.

### D. None of the Plaintiffs Have Standing to Seek Relief Against DHS or with Respect to Section 4 of the EO.

None of the Plaintiffs have standing to sue the Department of Homeland Security ("DHS") and Secretary of Homeland Security Alejandro Mayorkas because they have not identified any injury fairly traceable to these Defendants.  Though Plaintiffs allege that Secretary Mayorkas is "responsible for . . . implementing [EO 14115] in his capacity as the Secretary of DHS," Compl. at 18-19 ¶¶ 63-64, and point to Section 4 of EO 14115, Plaintiffs fail to allege any redressable injury they have suffered under Section 4.  The Supreme Court has held that "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact." *See, e.g.*, *Trump v. Hawaii*, 585 U.S. at 698.  But that holding applies where there is "a bona fide relationship with a particular person seeking to enter the country" resulting in "concrete hardship if that person is excluded."  *Id.* (*citing Trump v. IRAP*, 582 U.S. 571, 583 (2017)).  Here, no such injury has been identified by *any* Plaintiff.  DHS and State are responsible for suspending entry to the United States of noncitizens designated under section 1 of the EO. EO 14115 § 4(c).  But, just as Isley has not identified any particular SDN he plans to invite to the United States, none of the Plaintiffs allege that either agency has acted to deny entry of someone with whom they have a bona fide relationship, or whose exclusion has caused or will imminently cause them a concrete injury.  The sole suggestion of harm caused by Section 4 or DHS was Isley's allegation, discussed above, which cannot suffice.  *See Iqbal*, 556 U.S. at 678.  The other plaintiffs allege no harm whatsoever due to DHS's role in implementing the EO.  Plaintiffs lack standing to sue DHS and Secretary Mayorkas, and the Court should dismiss their claims against these defendants, and all claims with respect to Section 4.

### E. *None of the Plaintiffs Have Standing to Seek Relief Against FinCEN.*

The Court lacks jurisdiction over claims against FinCEN or its Director. Plaintiffs' sole claim against FinCEN and Director Gacki stems from FinCEN's issuance of an alert on "Israeli extremist settler violence" against Palestinians in the West Bank ("Alert"). *See* Compl. at 22 ¶ 77; Fin. Crimes Enf't Network, *FinCEN Alert on Israeli Extremist Settler Violence Against Palestinians in the West Bank*, FIN-2024-Alert001 (Feb. 1, 2024), https://perma.cc/WY64-UBKH ("FinCEN Alert" or "the Alert"). Plaintiffs' allegation appears to be that FinCEN, in issuing the Alert, violated their Fifth Amendment equal protection rights.

First, Plaintiffs fail to allege an injury in fact related to the Alert, let alone one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). Plaintiffs have alleged no facts about any injury related to FinCEN's Alert. In general, FinCEN advisories, alerts, and notices provide information to assist financial institutions in identifying and reporting suspicious activity, but they do not impose any legal or regulatory obligations or prohibitions on any individuals, organizations, or entities. Ex. 3, Declaration of James Martinelli ("FINCEN Decl.") ¶ 8, App.0027. On its face, FinCEN's Alert aims "to protect the U.S. financial system from abuse" by providing information that will equip financial institutions to "help detect, prevent, and report potential suspicious activity related to the financing of Israeli extremist settler violence against Palestinians in the West Bank." Alert at 1, 2. The Alert does not identify Plaintiffs and does not discriminate against Plaintiffs—or encourage financial institutions to do so. The FinCEN Alert did not impose any legal penalties or regulatory obligations at all. FINCEN Decl. ¶¶ 8-9, App.0027-28. Indeed, Plaintiffs plead no facts demonstrating that the Alert currently affects them at all, nor a "certainly impending" future injury.

Second, Plaintiffs cannot fulfill the causation prong of the standing inquiry: that any alleged injury is fairly traceable to action by FinCEN and redressable by the sought relief. *See Lujan*, 504 U.S. at 560. Plaintiffs have no relationship of any kind with FinCEN, nor do they claim to have ever

interacted with FinCEN, directly or indirectly.  To the extent that Plaintiffs have suffered any injury—which they have not—FinCEN and Director Gacki are not even arguably the cause of such injury and the requested order would not affect FinCEN's actions.

Plaintiffs claim that FinCEN "is responsible for implementing sections of EO 14115 vis-à-vis U.S. banking and other financial institutions." Compl. at 19 ¶ 67.  This characterization of FinCEN's function is incorrect.  FinCEN is responsible for "safeguard[ing] the financial system from illicit use," "combat[ing] money laundering," and "promot[ing] national security" by "receiving and maintaining financial transactions data; analyzing and disseminating that data for law enforcement purposes; and building global cooperation with counterpart organizations in other countries and with international bodies."  Fin. Crimes Enf't Network, *What We Do*, https://www.fincen.gov/what-we-do (last accessed Oct. 10, 2024); *see* 31 U.S.C. § 310; *see also* FINCEN Decl. ¶¶ 5-6, App.0025-26 (describing FinCEN's mission and functions).  FinCEN is not responsible for imposing sanctions or implementing EO 14115 and therefore cannot redress any alleged harms Plaintiffs may have experienced from the promulgation of EO 14115.  *See* FINCEN Decl. ¶ 7, App.0026-27.  Indeed, Plaintiffs implicitly acknowledge this fact by failing to mention FinCEN, Director Gacki, or the Alert in their prayer for relief.  *See* Compl. at 66-67 (Prayer for Relief).

The Court should dismiss all claims against FinCEN and Director Gacki.

### F.  *Any Remaining Claims Are Unripe*

To the extent any Plaintiff has a redressable injury regarding future enforcement or implementation decisions with respect to EO 14115, such a claim is not ripe for judicial review.

"[A] ripeness inquiry is often required when a party is seeking pre-enforcement review of a law or regulation." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008).  The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012); *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807 (2003).  "A court should dismiss

24

a case for lack of 'ripeness' when the case is abstract or hypothetical," and "the key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Choice Inc. of Tex*, 691 F.3d at 715. A claim is not ripe if it is "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted).

Here, Plaintiffs explicitly ask the Court not for a review of past agency actions but to enjoin future agency actions, such as hypothetical decisions to sanction the Plaintiffs or others based on the Defendants' future assessment of what behavior poses a threat and what agency actions would serve U.S. foreign policy goals. *See, e.g.*, Compl. at 66 (Prayer for Relief ¶ d) (seeking to enjoin Defendants "from implementing and enforcing EO 14115 both as to Plaintiffs and as to any similarly situated persons"). Such future events "may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300. The Court should not entangle itself in abstract disagreements over the President's foreign policy judgment and how it might be applied in the future. Any such claims should be dismissed.

## II.    THIS CASE IS NOT JUSTICIABLE, AND THE COURT SHOULD DISMISS.

If the Court decides that one or more Plaintiffs have standing, it should nonetheless dismiss the case for lack of jurisdiction. Plaintiffs' Complaint, both implicitly and explicitly, challenges the Executive Branch's foreign policy regarding the Israeli-Palestinian conflict and the West Bank, the President's assessment of a national emergency and national security, and the President's selection of designation criteria under the EO. Compl. at 52-53 ¶ 150, 54 ¶ 160, 57 ¶ 172, 59 ¶ 181, at 63 ¶ 196, 64 ¶ 145. These are each political questions, which are nonjusticiable, and the Court should dismiss the Complaint.

The political question doctrine "reflects the principle that, under our Constitution, there are some questions that cannot be answered by the judicial branch." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *see also Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard*

25

*Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1203 (5th Cir. 1978). In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court held that the political question doctrine bars a court from considering a claim when:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. "[T]he inextricable presence of one or more of these factors will render the case nonjusticiable under the Article III 'case or controversy' requirement.'" *Lane*, 529 F.3d at 558. Finally, "among the areas which the courts have traditionally deemed to involve political questions is the conduct of foreign relations, which is committed by the Constitution to the executive and legislative the political departments of the government." *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975).

This case presents a non-justiciable political question, for six reasons. *First*, the Complaint invites the court to weigh in on sensitive issues of foreign policy toward the Israeli-Palestinian conflict. *See, e.g.*, Compl. at 1 ¶ 1 n. 1 (alleging that Plaintiffs "strongly oppose use of the term 'West Bank' as that term often is used to delegitimize Israel's current claim to the land"); *id.* at 52 ¶ 148 (alleging that Plaintiffs have the "religious beliefs that the Jewish People have a right and obligation to live in Judea and Samaria"); *id.* at 56-57 ¶ 170 (asking that the Court to conclude Defendants are precluding Plaintiffs "from engaging in actions to advance their fundamental religious belief that the Land of Israel, especially Judea and Samaria, has been promised by God to the Jewish People in perpetuity and that the Jewish People have a religious right and obligation to return to, settle, and develop Judea and Samaria"). While these arguments wholly miss the nature of a sanctions program focused on acts of extremist violence and instability and are not material to the claims in this case, to the extent that Plaintiffs ask this Court to recognize that Plaintiffs have a right to settle and develop the West Bank,

this is a nonjusticiable political question.  *See Def. for Children Int'l-Palestine v. Biden*, 107 F.4th 926, 929 (9th Cir. 2024) (affirming that plaintiffs lawsuit seeking to enjoin the United States from providing military, diplomatic, and financial support to Israel in its operations in Gaza was not justiciable under the political question doctrine); *Al-Tamimi v. Adelson*, 916 F.3d 1, 11(D.C. Cir. 2019) (concluding that the question of sovereignty over the West Bank, Gaza, and East Jerusalem was a political question over which the court lacked jurisdiction and explaining that a question regarding sovereignty over a disputed territory "plainly implicates foreign policy and thus is reserved to the political branches," ); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 12 (2015) (holding that the power to recognize (or not recognize) particular territories belongs exclusively to the President).

*Second,* it is well-settled that the President's decision to declare a national emergency with respect to the situation in the West Bank presents an unreviewable political question.  *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (emphasizing that "*no* court has ever reviewed the merits of such a declaration"); *see also United States v. Shih*, 74 F.4th 1077, 1091-92 (9th Cir. 2024); *see, e.g.*, Compl. at 64 ¶ 145 ("The President lacked the statutory authority to issue the EO in the first place because the alleged settler violence in Judea and Samaria is not an 'unusual and extraordinary threat' as a matter of fact and law.").  For similar reasons, the Court cannot review the President's determination of how to address that emergency—that is, his selection of which criteria may be considered by the Secretary of the Treasury, in consultation with the Secretary of State, in making designation decisions.  *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions [] entrusted foreign affairs and national security powers to the political branches[.]"); *see also Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("*IARA*").  Indeed, the President expressly relied on his Constitutional powers—in addition to

27

those conferred by statute—in issuing EO 14115.  *See* EO 14115.  Thus, under the first *Baker* factor, this case presents an unreviewable political question.

*Third,* there are no judicially manageable standards to evaluate the President's selection of designation criteria to address the situation in the West Bank and Gaza.  IEEPA grants broad discretion to the President.  *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981) (IEEPA "indicat[es] congressional acceptance of a broad scope for executive action" and "delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country").  Congress chose not to define the terms "national emergency" or "unusual and extraordinary threat," nor limit the types of conduct or status that the President may deem to be sanctionable in order to address emergencies and threats.  *See* 50 U.S.C. §§ 1701-1702.  Such determinations are left to the President's discretion, *id.*, subject only to oversight from Congress, *id.* § 1703.[5]  IEEPA thus sets forth no standards from which the Court could judge the President's selection of designation criteria or determine whether specific criteria effectively address an unusual and extraordinary threat to the United States' interests, and "[t]he judiciary lacks the capacity for such a task.  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 845 (D.C. Cir. 2010); *see Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (explaining that foreign policy decisions "are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil[,]" and that "[t]hey are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry"); *cf. Ctr. for Biological Diversity*, 453 F. Supp. 3d at 32 ("[T]he statute simply allows the President to declare an emergency to activate special emergency powers created by Congress. Nothing else guides how the President should make this decision.").

---

[5] It bears repeating, however, that although Plaintiffs maintain that the designation criteria are based on religion and nationality, it does not. *See* EO 14115; *see also supra* at pp.8-9 (explaining the designation criteria.

*Fourth*, Plaintiffs' Complaint implicates the third *Baker* factor—"the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Plaintiff challenges the Executive Order as improper under IEEPA because "the alleged settler violence in [the West Bank] is not an 'unusual and extraordinary threat.'" Compl. at 64 ¶ 145. In Plaintiffs' view, "there is no evidence that Jewish-Israeli settler violence is a threat to the stability of the West Bank or a threat to U.S. national security." *Id.* at 65 ¶ 153. But "[t]o determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking." *Schneider*, 412 F.3d at 197. And in any event, Plaintiffs description of the threat mischaracterizes the EO as only a response to Jewish-Israeli violence. Because the Court would necessarily have to make an initial policy determination on whether such violence threatened national security, Plaintiffs' Complaint is unreviewable. *See id.*

*Fifth*, under the fourth *Baker* factor, the Court cannot "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government[.]" *Baker*, 369 U.S. at 217. Judicial review of the President's choice of designation criteria is inconsistent with the well-established principle of deferring to the President in matters pertaining to national security and foreign affairs. *E.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010); *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Chicago & S. Air Lines*, 333 U.S. at 111; *Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012). Thus, the fourth Baker factor also weighs against review here. *See Schneider*, 412 F.3d at 198.

And finally, Plaintiffs' claim implicates the sixth *Baker* factor, or "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. In issuing executive orders pursuant to IEEPA, the President is not merely declaring a national emergency and defining criteria for designation; as "the sole organ of the nation in its external relations, and its sole representative with foreign nations[,]" *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936), he is also sending an important message to the international community about the United States' foreign policy positions and national security imperatives. EO

29

14115 is no exception, emphasizing the United States' commitment to stability across the Middle East, and furthering the United States' foreign policy objective of creating "a two-state solution and ensuring Israelis and Palestinians can attain equal measures of security, prosperity, and freedom."  EO 14115. Congress—the branch of government responsible for overseeing the President's use of discretionary IEEPA authorities, 50 U.S.C. § 1703—has not terminated the emergency declared by the President, *see id.* § 1622(a)(1) (provision of National Emergencies Act allowing Congress to determine whether to terminate declared national emergency).  If the Court were to exercise jurisdiction over Plaintiff's claim, it would thus unduly undermine the President's efforts to address an unusual and extraordinary foreign threat.  *See Al-Tamimi*, 916 F.3d at 13 ("The Executive is institutionally well-positioned to understand the foreign policy ramifications of the court's resolution of a potential political question. Accordingly, an Executive Branch opinion regarding these ramifications is owed deference, no matter what form it takes."); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 48 (D.D.C. 2010) (sixth Baker factor present in case requesting "after-the-fact judicial review of the Executive's decision to employ military force abroad"); *Sanchez-Espinoza v. Reagan*, 568 F. Supp. 596, 600 (D.D.C. 1983) (expressing concern about "rattl[ing] the delicate diplomatic balance that is required in the foreign affairs arena"), *aff'd*, 770 F.2d 202 (D.C. Cir. 1985); *cf. Dames & Moore*, 453 U.S. at 673.

Because this case presents several political questions, the Court must consider whether those questions are "inextricable" from the case.  *Lane*, 529 F.3d at 558.  Here, much of (if not all of) Plaintiff's Complaint "hinges on whether the Court agrees with the President or [Plaintiff's] assessment" of national security concerns, designation criteria in EO 14115, and claims to the West Bank.[6]  *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 33.  Because these questions are inseparable from

---

[6] For example, Count I, II, and VI challenge the sufficiency of the Government's interest in promulgating the EO, Compl. at 52-53 ¶ 150, 54 ¶ 160, 64 ¶ 145; Count III, IV, and V challenge the discretion of the Secretaries of State and Treasury to determine what conduct is sanctionable and whom to sanction, *id.* at 57 ¶ 172, 59 ¶ 181, at 63 ¶ 196.

Plaintiffs' claims, the Court should therefore dismiss the Complaint pursuant to Rule 12(b)(1).

### III.   EACH COUNT OF THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

#### A.   *The Court Should Dismiss Plaintiffs' Free Speech Claim (Count II).*

Count II of the Complaint purports to raise a First Amendment free speech claim on behalf of at least some of the Plaintiffs under a variety of theories, each of which fails.[7]

1.   <u>EO 14115 Does Not Regulate Speech</u>.  Each of the "free speech" arguments, as well as much of the rest of the Complaint, is premised on the fundamentally mistaken notion that Plaintiffs might be subjected to sanctions or penalties for constitutionally protected "speech" or "advocacy." For example, the Complaint argues that Plaintiffs Deutsch, Ben Chaim and Abramowitz "are prevented from advocating their views that oppose the two-state solution . . . for fear that such speech and conduct will subject them to the quasi-criminal sanctions regime of EO 14115." Compl. at 54 ¶ 158.  If a law regulates only *conduct*, the First Amendment is generally not implicated, and that remains true even if the law has an incidental burden on speech.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (noting that the First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech"); *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (holding that First Amendment does not prohibit a restriction that "does not dictate the content of the speech at all.").  On its face, the Order does not authorize sanctions for or impose penalties on speech.  It blocks property and prohibits "transactions" with "foreign persons"

---

[7] It is not always entirely clear which Plaintiffs are bringing which claims.  Some paragraphs in Count II reference "Plaintiffs" generally in regard to this free speech claim.  To the extent Plaintiff Regavim (or any other noncitizen outside the United States) brings any constitutional claims, the Court should dismiss such claims because Regavim is a foreign corporation outside the United States and cannot assert constitutional rights.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020) (holding that foreign corporation cannot make First Amendment claim because "foreign citizens outside U. S. territory do not possess rights under the U.S. Constitution"); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  The protections of RFRA likewise do not extend to nonresident noncitizens.  *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).

designated for meeting certain criteria.  *See generally* EO 14115 §§1(a), (b); 3.  Those criteria are not based on speech.  *See, e.g., id.* § 1(a)(i)(B) ("planning, ordering, otherwise directing or participating in" various acts "affecting the West Bank" including, inter alia, "an act of violence or threat of violence targeting civilians" and "property destruction"); *id.* § 1(a)(iii) ("to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" a person designated under this Order); *id.* § 1(b)(i) ("to have committed or have attempted to commit . . . acts of terrorism affecting the West Bank").

Plaintiffs rely primarily on Section 1(a)(i)(A), which permits the agencies to block the property of "foreign persons" determined "to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in . . . *actions* — including directing, enacting, implementing, enforcing or failing to enforce policies—that threaten the peace security, or stability of the West Bank."  *Id.* § 1(a)(i).  No reasonable interpretation of "*actions* . . . that threaten the peace, security, or stability of the West Bank" includes plain "advocacy," and the EO is not aimed at advocacy.  *Id.* § 1(a)(i)(A) (emphasis added).  The agencies' authority is limited by the text to people engaging in certain "actions" and thus excludes pure speech or independent advocacy.  And the example given ("directing, enacting, implementing, enforcing or failing to enforce policies") is not speech nor expressive activity.  Nor do Plaintiffs point to any example in which someone has been sanctioned for pure speech in any context, much less in the context of EO 14115.[8]  In fact, both OFAC and the Department of State have affirmed that the U.S. Government does not impose sanctions for "activities subject to U.S. constitutional protection" and U.S. persons do not "violate OFAC sanctions for engaging in such constitutionally protected activity."  *See Basic Information on OFAC & Sanctions. See also* State Decl. ¶ 13, App.0018-19; OFAC Decl. ¶¶ 20-22, App.0011-12.  Moreover, IEEPA specifically exempts from

---

[8] Of the six existing designations on the basis of this section, four are also based on other sections, and none are based on pure speech.  *See* State Decl. ¶¶ 7-13, App.0016-18; Treasury Decl. ¶¶ 17-18, 20-22, App.0009-12.

Presidential authority the regulation of "personal communications" and the import or export of informational materials.  Accordingly, there is no reason to believe that the agencies would interpret the EO inconsistently with those statutory limitations.  For each of these reasons, Plaintiffs' proposed activities – advocating against a two-state solution – are not even arguably going to subject Plaintiffs to sanctions.  The types of activities that are sanctionable – like foreign entity Tzav 9's past violent destruction of humanitarian aid and aid trucks in the West Bank – are not even arguably protected by the First Amendment.

2.   <u>EO 14115 Satisfies Any Applicable Level of Scrutiny</u>.  Even if EO 14115 had some impact on speech or advocacy, Plaintiffs' argument still fails.  Content neutral restrictions—where the governmental *purpose* in enacting the regulation is unrelated to the suppression of expression—are generally subject only to intermediate scrutiny.  *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022).  "[A] sufficiently important governmental interest in regulating the nonspeech element can justify [such] incidental limitations." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  The Complaint argues that EO 14115 "imposes content-based restrictions" on Plaintiffs.  Compl. at 53 ¶ 155.  But even if there were some restriction on speech here, the purported restriction is content neutral – being subject to sanctions depends not on the content of any speech but on one's actions and the external impact of those actions.

Moreover, although it is impossible to undertake the relevant scrutiny without knowing what specific speech or expressive activity is at issue, it bears noting that the judgment of the President in assessing the relevant risks, and the judgment of the Executive Branch agencies charged with applying those standards are entitled to considerable deference. *Cf. Humanitarian L. Project*, 561 U.S. at 33; *IARA*, 477 F.3d at 734 ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential.").  And courts have repeatedly rejected First Amendment challenges to sanctions and similar prohibitions, even where the relevant prohibition did encompass expressive conduct.  *See, e.g., Humanitarian L. Project*, 561 U.S. at 31; *IARA*, 477 F.3d at

33

736; *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13 (D.C. Cir. 2008); *see also Haig,* 453 U.S. at 307 ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation" and "[p]rotection of the foreign policy of the United States is a governmental interest of great importance."); *Paradissiotis v. United States*, 304 F.3d 1271, 1275 (Fed. Cir. 2002) (explaining that sanctions deny foreign nationals access to funds "which might be used to promote activities inimical to the interests of the United States," and "put economic pressure on the target" by "preventing its representatives from engaging in profitable economic activity in this country and elsewhere").

3.  <u>EO 14115 Does Not Violate Isley's Right to Hear</u>.  Next, the Complaint argues that Plaintiff Isley specifically is prevented "from exercising his First Amendment right to hear the views and philosophies of blocked persons and other like-minded individuals in Israel."  Compl. at 54 ¶ 156. As noted above, Plaintiff Isley has not actually been blocked from inviting anyone to the United States. But even if in the future he attempted to invite an SDN to the United States and the SDN was unable to travel, Isley still would be able to communicate or associate with that person and receive their views, and thus his First Amendment rights are not impaired.

Moreover, even if this hypothetical future action could somehow impair his ability to receive information, that allegation still would not make out a claim under the First Amendment.  "For more than a century," the Supreme Court has consistently held that separation-of-powers principles firmly commit to Congress and the Executive "the admission and exclusion of foreign nationals."  *Trump v. Hawaii*, 585 U.S. at 702 (citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Dep't of State v. Munoz,* 144 S. Ct. 1812, 1820 (2024) (finding no fundamental right for noncitizen spouse to enter the country). "[T]he United States can, as a matter of public policy . . . forbid aliens or classes of aliens from coming within their borders, and no limits can be put by the courts upon" that power.  *Munoz,* 144 S. Ct. at 1824 (cleaned up).  In *Mandel*, the Supreme Court considered a First Amendment claim in the context of a decision to deny entry to a Belgian journalist, and while it assumed that the U.S.-citizen professor

34

plaintiffs might have some First Amendment interest in listening to the journalist deliver speeches at conferences, it held that when the Executive exercises its statutory authority to exclude a noncitizen "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *Trump v. Hawaii*, 585 U.S. at 703. The Supreme Court has since opined that *Mandel*'s rationale for a narrow standard of review "has particular force" in admission and immigration cases that overlap with "the area of national security." *Trump v. Hawaii*, 585 U.S. at 704 (applying rational basis review to Executive Order excluding classes of noncitizens of particular nationalities), and even more recently, declined to review a U.S. citizen's challenge to the denial of a visa even under *Mandel*'s exceedingly deferential "facially legitimate and bona fide" standard, *see Munoz*, 144 S. Ct. at 1821 (refusing to find any fundamental right in noncitizen spouse's visa).

Here, if a hypothetical future visa denial decision were reviewable at all, the standard would readily be met. The President declared a national emergency related to the situation in the West Bank, finding that "extremist settler violence, forced displacement of people and villages, and property destruction" was a "serious threat to the peace security and stability of the West Bank and Gaza, Israel, and the broader Middle East region." EO 14115. He then relied on explicit Congressional authority in the INA and found, based on a declared national emergency, that it would be "detrimental to the interests of the United States" to permit "unrestricted immigrant and nonimmigrant entry into the United States of noncitizens determined to meet one or more of the criteria in [S]ection 1." *Id.* § 4. That is more than sufficient to satisfy the pre-*Munoz* "facially legitimate and bona fide" standard set out in *Mandel* or the rational basis standard in *Trump v. Hawaii*.

    4.    <u>Restricting Monetary Contributions to SDNs Does Not Violate the First Amendment</u>.

The Complaint argues that Plaintiff Isley is "chilled from exercising his free speech rights by making charitable contributions that further his protected religious values." Comp. at 54 ¶ 157.

Plaintiff Ben Chaim similarly complains that he "can no longer support his wife's advocacy of Israel." *Id.* at 54 ¶ 158. While the EO has not prohibited charitable contributions in support of Israeli settlements in general, it has at least two effects on contributions to SDNs. First, foreign persons can be subject to sanctions for providing financial support to an SDN. *See* EO 14115 § 1(a)(iii). Second, U.S. persons are prohibited from dealing in blocked property and from providing or receiving funds, goods, or services with respect to an SDN. *See id.* §§ 1, 3. The President specifically prohibited humanitarian donations as well, finding that excepting such donations "would seriously impair [his] ability to deal with the national emergency declared in this order." *Id.* § 6.

First, on the face of the complaint, none of these provisions appear to affect Isley's proposed donations to non-SDNs – he is not a foreign person potentially subject to sanctions, and the Complaint does not indicate that he has proposed or made donations to an SDN nor any violent extremist organization. So, his allegedly protected First Amendment activities are not arguably restricted at all.

Second, although Ben Chaim here mentions "support [for] his wife's advocacy," Compl. at 54 ¶ 158, based on the public record, Reut Ben Haim's "advocacy" was not the basis for her designation—she was designated for being a leader of Tzav 9 and participating in Tzav 9's violent protests intercepting humanitarian aid. *See supra* pp. 11-12. Moreover, he never actually claims to have provided financial support for her advocacy. Rather, in the injury section, he claims that he "cannot finance basic, day-to-day essential transactions" for the household, and that he can no longer receive a salary from her business. Compl. at 17 ¶ 58, 49 ¶ 146. None of those are arguably speech activities.

Third, to the extent any Plaintiffs are proposing to make monetary contributions to a foreign person subject to sanctions, such transactions are generally conduct, not protected speech. That is why the U.S. Government can prohibit support to Hamas and Hezbollah, even when donations are religiously or politically motivated and even if donations are not intended to support terrorism. For example, in *IARA*, the DC Circuit rejected a First Amendment challenge to the designation of a U.S.

36

organization as a branch of a foreign organization that was providing financial support to designated terrorists, even though there was no showing of intent to aid terrorism. *IARA,* 477 F.3d at 736. And in *Holder v. Humanitarian Law Project*, the Supreme Court upheld a criminal prohibition in AEDPA on knowing provision of material support to certain designated terrorist organizations, even where the proposed material support could include expressive conduct and even where the proposed support was intended to promote peaceful solutions. *See* 561 U.S. at 31.[9] And in *Regan v. Wald,* 468 U.S. 222, 243 (1984), the Court upheld the President's decision to impose a ban on travel to Cuba "to curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism". Here, the President found that these restrictions were necessary to address the relevant national emergency – the escalating violence and displacement in the West Bank that imperils a two-state solution. Such a finding is more than sufficient to satisfy any applicable scrutiny. Plaintiffs have made no plausible allegations that their expressive activity is curtailed, and the restrictions on monetary contributions to designated organizations are plainly constitutional.

    5.    <u>EO 14115 is Not Overbroad</u>. Plaintiffs argue that EO 14115 is overbroad. Compl. at 55 ¶¶ 162-66. The overbreadth doctrine permits a court "to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied," but the challenger must demonstrate that the rule or statute "prohibits a substantial

---

[9] *See also Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1135 (9th Cir. 2000) (the Government "may certainly regulate contributions to organizations performing unlawful or harmful activities, even though such contributions may also express the donor's feelings about the recipient"); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1245 (D.C. Cir. 2003) (similar); *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1150 (9th Cir. 2009) (upholding IEEPA prohibitions on same theory); *United States v. Mirza*, CR No. H-06-421, 2010 WL 1427220, at *2 (S.D. Tex. Apr. 7, 2010) (similar), *aff'd*, 454 F. App'x 249 (5th Cir. 2011); *see also Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land I*"), 219 F. Supp. 2d 57, 69 (D.D.C. 2002) (rejecting First Amendment challenges to OFAC's designation of Holy Land Foundation and resulting prohibition on its "humanitarian donations"), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 35 (D.D.C. 2012) (finding material support prohibition meets intermediate scrutiny), *appeal dismissed*, 2012 WL 3243996 (D.C. Cir. 2012).

amount of protected speech" relative to its "plainly legitimate sweep," *United States v. Hansen*, 599 U.S. 762, 769-70 (2023).   "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep."  *Id.* at 770; *see also Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).  An overbreadth claimant bears the burden of showing, "from the text of [the law] and from actual fact," that substantial overbreadth exists.  *Virginia v. Hicks,* 539 U.S. 113, 122, (2003).   "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."  *Id.* at 124.

The first step is generally to assess the law's scope, and then to decide which of the laws' applications violate the First Amendment, and to measure them against the rest.  *NetChoice*, 144 S. Ct. at 2398.  Plaintiffs' complaint, however, is somewhat unclear as to what law they are challenging.  The Complaint specifically disclaims any challenge to sanctions imposed for certain violent acts, Compl. at 2 ¶ 2, and does not seem to raise any challenge against the authority for sanctions for "material support," or other derivative designations, but the Prayer for Relief seeks to enjoin any enforcement of the EO, *id.* at 66.  To the extent the challenge is to the entirety of the EO, the overbreadth challenge necessarily fails because Plaintiffs have specifically admitted that substantial applications of the EO are constitutional.  Plaintiffs not having articulated any reason those applications are even arguably invalid, facial invalidation of the entire EO is unwarranted.

Even if Plaintiffs limit their facial challenge to Section 1(a)(i)(A) (regarding actions threatening peace, security, or stability), it fails.  Construing the Order reasonably, Section 1(a)(i)(A) does not reach pure speech or advocacy.  *See supra* pp. 31-33.  It is certainly not specifically directed at speech or advocacy, much less any particular viewpoint.  *Cf. Hicks*, 539 U.S. at 124.  And because it applies only to "foreign persons," the vast majority of the people potentially subject to sanctions under this section lack constitutional rights at all.  *See* EO 14115 § 1(a) (applying to "foreign persons"); *see Agency for Int'l Dev.*, 591 U.S. at 433 (holding that noncitizens outside the U.S. lack constitutional rights).  Moreover,

Plaintiffs do not challenge the specific applications of this section to date, *see* State Decl. ¶¶ 7-12, App.0016-18; OFAC Decl. ¶¶ 17-18, App.0009-10, and provide no reason to believe that future designations based on the stated examples in this Section ("directing, enacting, implementing, enforcing, or failing to enforce policies") would be problematic under the First Amendment. Plaintiffs have not plausibly identified any constitutionally protected activity that would be subject to sanction, but even they did find some non-fanciful unconstitutional application of this section, it would not substantially outweigh the legitimate applications. Accordingly, their allegations fall far short of their high burden of "demonstrat[ing] a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (citation omitted); *see also L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999) (the overbreadth doctrine is a "last resort," and its limited function is further diminished as the regulated expression "moves from 'pure speech' toward conduct"). Plaintiffs have not plausibly alleged overbreadth, and courts have rejected overbreadth challenges to IEEPA-based sanctions. *See, e.g.*, *Kadi*, 42 F. Supp. 3d at 35; *Glob. Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 806 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

In short, Plaintiffs have not plausibly alleged that EO 14115 regulates or prohibits protected speech. The Court should dismiss Count II.

**B.**      ***The Court Should Dismiss Plaintiffs' RFRA Claim (Count I).***

Plaintiffs' Religious Freedom Restoration Act ("RFRA") claim mischaracterizes EO 14115. The EO addresses concerns of violence and instability, and does not target or even relate to religious views, religious expression, or religious exercise.

Under the Religious Freedom Restoration Act, "the Federal Government may not . . . substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). Courts in this Circuit apply the same "substantial burden" inquiry under

39

RFRA and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"). *See, e.g.*, *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022). The statute makes an exception when the Government satisfies the compelling interest test—and "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000bb-1(b)).

Plaintiffs fail the first inquiry here because they cannot show that a religious *exercise* has been *substantially burdened*. RFRA requires a "religious exercise," and defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). "Religious exercise necessarily involves an action or practice." *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (finding that government collection of plaintiff's DNA did not affect any religious exercise of the plaintiff, even assuming he had a sincere religious objection); *see also Bowen v. Roy*, 476 U.S. 693 (1986).

Here, the Complaint alleges that Plaintiffs Isley, Deutsch, Ben Chaim and Abramowitz "hold sincere religious beliefs that the Jewish People have a right and obligation to live in Judea and Samaria," Compl. at 52 ¶ 148, but beliefs alone, even if sincerely held, are not a "religious exercise;" nor are beliefs within the scope of EO 14115. The Complaint further alleges that EO 14115 "renders sanctionable any activity that threatens peace stability and security in the West Bank", (a reference to Section 1(a)(i)(A) of the EO), and claims that the sanctionable activity includes "advocating for their religious beliefs," *id.*, a manifestly inaccurate claim. Plaintiff Isley further alleges that he is prevented "from furthering his religious beliefs" because EO 14115 "prohibit[s] contributions to blocked individuals" and "disallow[s] blocked individuals from entering the United States," *id.* at 52 ¶ 149, (although he fails to identify any SDNs he wishes to support financially or invite to the United States). As a result, he claims that as a legal matter, they "cannot share and discuss their religious beliefs regarding Jewish settlement." *Id.* None of the activities highlighted by Plaintiffs is described as a

"religious exercise," only as a way to "further" their religious beliefs.  In short, Plaintiffs characterize U.S. foreign policy as contrary to their religious beliefs, and wish to frustrate U.S. foreign policy in general, but they do not allege, much less prove, that EO 14115 burdens a particular religious exercise.

But even if "advocacy" or "monetary contributions" were religious exercises, those activities are not substantially burdened by EO 14115.  To demonstrate a substantial burden, Plaintiffs "must show that the challenged action 'truly pressures the adherent to significantly modify [their] religious behavior and significantly violate [their] religious beliefs.'" *Brown v. Collier,* 929 F.3d 218, 229 (5th Cir. 2019), as revised (July 5, 2019) (quoting *Garner v. Kennedy*, 713 F.3d 237, 241 (5th Cir. 2013)).  "A violation is *significant* in this regard when it either 'influences the adherent to act in a way that violates his religious beliefs' or 'forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.'" *Turner v. Collier*, Civ. A, No. 4:19-cv-04124, 2022 WL 4734828, at *7 (S.D. Tex. Sept. 30, 2022) (quoting *Adkin v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).

Plaintiffs have not plausibly alleged that they are forced into such a choice with respect to any of the purported "religious exercises."  To the extent Plaintiffs are arguing that "advocacy" is the religious exercise at issue, they are incorrect, as a legal matter, that the EO makes "advocacy" sanctionable in general or subject to penalties.  *See supra* pp. 31-33.

Similarly, Plaintiffs cannot claim that their religious exercises are burdened by the immigration restriction on non-citizen SDNs where they have not identified any noncitizen whom they have been unable to invite.  If those entry restrictions are reviewable at all, they readily meet the applicable standard.  *See supra* pp. 34-35.  In any event, only Plaintiff Isley brings this claim and resides in the United States, and he has not identified a single instance in which an invited or desired speaker was unable to come, nor explained how any particular religious exercise of his is burdened.  He has made no plausible claim that specifically inviting a sanctioned individual is part of his religious exercise, having never done so before or after the issuance of EO 14115.

41

To the extent Plaintiffs are arguing that "monetary contributions" to further their belief in settlement of the West Bank are the "religious exercise" at issue, they have not identified a burden on that exercise. While Plaintiff Deutsch claims to have provided support to a designated foreign entity, Tzav 9, designated in response to specific violent acts that Plaintiffs concede occurred, he does not plausibly claim that his contributions to settlements are a religious exercise at all, nor that the EO has impeded his ability to make such contributions in general. None of the other Plaintiffs bringing this claim have identified any SDN to whom they have ever contributed money as part of a religious exercise, and thus have not alleged that their purported religious practice is burdened.

In any event, even if Plaintiffs had identified a religious exercise that was substantially burdened, such a burden would be justified under any applicable scrutiny. *See supra* pp. 33-34. Restrictions on contributions to violent foreign extremist organizations that imperil U.S. interests and foreign policy overseas are routinely upheld. *Id.; see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 167 (D.C. Cir. 2003) (rejecting RFRA challenge to terrorism-related sanctions).

### C.  The Court Should Dismiss Plaintiffs' Free Exercise Claim (Count III).

Plaintiffs argue that EO 14115 interferes with their "free exercise" of religion in a variety of ways, but each argument fails. Under the Free Exercise Clause, the government "may not compel affirmation of religious belief," "punish the expression of religious doctrines it believes to be false," "impose special disabilities on the basis of religious views or religious status," or "lend its power to one or the other side in controversies over religious authority or dogma." *Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990). But the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879. Thus, "laws incidentally burdening religious practice are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Phila., Pennsylvania*, 593 U.S. 522, 533 (2021). The "Government fails to act neutrally when it proceeds

42

in a manner intolerant of religious beliefs or restricts practices because of their religious nature," and a law is "not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct." *Id.* at 533. Moreover, "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

Neither the sanctions nor the prohibitions announced in E.O. 14115 discriminate on the basis of religious belief, punish religious expression or otherwise run afoul of the Free Exercise jurisprudence. *See* EO 14115; State Decl. ¶ 13, App.0018-19; OFAC Decl. ¶ 20, App.0011. And in fact, courts have rejected "free exercise" challenges to IEEPA-based sanctions regimes and sanctions enforcement in the past, even when explicitly religious conduct was at issue. *See, e.g., IARA*, 477 F.3d at 737; *Holy Land Found*, 333 F.3d at 167; *United States v. Islamic Am. Relief Agency*, No. 07-00087-CR-W-NKL, 2009 WL 4016478, at *1 (W.D. Mo. Nov. 18, 2009); *United States v. Dhafir*, No. 5:03-CR-64, 2003 WL 27383007, at *4 (N.D.N.Y. July 3, 2003). And both the sanctions regime and the resulting prohibitions are a facially neutral and generally applicable law that readily passes muster under free exercise jurisprudence. *See* Compl. at 60 ¶ 183 (conceding that EO is facially neutral); EO 14115 (containing no reference to religious beliefs or practices); Part III.D, *infra* (analyzing equal protection allegations). Plaintiffs' demand for a judicially-created religious exemption from generally applicable sanctions rules would cripple U.S. sanctions in parts of the world where sanctioned behavior (including support for terrorism) is motivated in part by claims to deeply rooted religious conviction.

Plaintiffs argue that EO 14115 is not "generally applicable" and "facially neutral" under *Fulton* for two reasons: (1) "because it vests complete discretion in the Secretaries of State and the Treasury to determine what constitutes a sanctionable violation" and (2) because it "was intended to target a particular subset of religious belief; namely, to target Jewish individuals and those who hold to the religious belief that Jews have a right to settle in Judea and Samaria." Compl. at 57 ¶¶ 172-74. Both arguments fail. "Complete discretion" is clearly inaccurate. The President acted within his

43

Congressional authority to declare an emergency and impose sanctions, and the President further delegated discrete authority to the Secretaries of State and the Treasury, who must make specific determinations under the articulated standard.  And that determination is subject to judicial review under the APA.  *See, e.g.*, *Chichakli v. Szubin*, 546 F.3d 315 (5th Cir. 2008) (reviewing sanctions determination under APA); *IARA*, 477 F.3d at 732 (same); *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 110 (D.D.C. 2022) (reviewing sanctions determination under APA, including determination that a particular individual "actively obstructed, or pose[s] a significant risk of actively obstructing," the Dayton Accords).  Agency discretion is not unfettered.  Nor have Plaintiffs presented any evidence that the EO was intended to target a particular religious belief – on its face and in every public statement, the EO targets actions, not beliefs.  *See also infra* Part III.D (equal protection); State Decl. ¶ 8, App.0017 (designation of Palestinian organization Lions Den).

If Plaintiffs were correct and the challenged regulation were not "facially neutral" or "generally applicable", the Court then "asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."  *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).  This is, of course, the same analysis conducted above with respect to RFRA, and Plaintiffs' challenge fails here for the largely the same reasons.  Plaintiffs make slightly different allegations in the Free Exercise Count with respect to "burden," but these massaged allegations do not change the outcome.

For example, Isley alleges that he is "prevented from contributing to blocked persons and/or having blocked persons enter the United States to discuss and advocate these religious ideas."  Compl. at 56 ¶ 169.  He does not plausibly allege that he is prevented from discussing or advocating ideas, *see supra* pp. 31-33 (speech not subject to sanctions), or that contributing to or inviting blocked persons is a religious exercise, given that he has never apparently actually done so nor sought a license to do so.  And if the entry restrictions on noncitizens are reviewable at all, they readily satisfy the applicable standard.  *See supra* pp. 34-35.

Plaintiffs Deutsch, Ben Chaim and Abramowitz claim that they are "precluded from engaging in actions to advance their fundamental religious belief that the Land of Israel, especially Judea and Samaria, has been promised by God to the Jewish People in perpetuity" and that "EO 14115 prescribes quasi-criminal sanctions on Plaintiffs Deutsch and Abramowitz because of their deeply rooted religious convictions." Compl. at 56-57 ¶ 170.  Of course, none of these Plaintiffs are currently sanctioned, and no one has been sanctioned as a result of their religious convictions.  Moreover, EO 14115 does not target – or even relate to – religious beliefs or religious exercise.  EO 14115 is focused on extremist violence and instability in the West Bank.  The motivations and beliefs of people engaged in violent extremism in the West Bank are not the focus of the Order – they could be motivated by any of a number of religions, or just plain avarice, bigotry, fear, or ambition, or some combination thereof.  If the actions of foreign persons disrupt or threaten the peace – for example by physically disrupting the delivery of humanitarian aid, attacking aid workers, and destroying property – they can be subject to sanctions, without regard to their religious motivation.

The Complaint further alleges that "[b]ecause of their deeply rooted religious convictions, Plaintiffs Deutsch and Abramowitz are prohibited from working with American partners, such as Mr. Isley, to advance Jewish interests in a nonviolent manner." Compl. at 57 ¶ 171 (emphasis omitted).  Neither Deutsch nor Abramowitz are currently subject to sanctions; accordingly, U.S. persons are not prohibited from working with them.  Even if they were sanctioned in the future, it could not be because of their "religious convictions," and in any event, "working . . . to advance Jewish interests" is not a religious practice that is burdened.  *Id.*  The First Amendment surely does not require the United States to let individual citizens work to "advance Jewish interests" through violent or destabilizing conduct, at the risk of further regional destabilization that threatens both Israel and the United States.  They do not have a First Amendment right to fund violent foreign extremists.

Plaintiff Ben Chaim claims he is prevented from supporting his wife's sincere religious belief that Israel has a Jewish religious right to defend itself from existential threats such as Hamas.  *Id.*  In

45

addition to the problems raised above with this implausible allegation lacking any connection to the EO, *see supra* pp. 43-44, he appears to be asserting interference with *his wife's* religious belief, not his own. Reut Ben Haim is a noncitizen outside the United States who cannot assert a violation of her free exercise rights; nor can Plaintiff Yosef Ben Chaim do so on her behalf. *See supra* p.31n. 7.

Accordingly, Plaintiffs have not plausibly alleged a violation of the Free Exercise Clause, and this Count should be dismissed. *See IARA*, 477 F.3d at 737; *Holy Land Found*, 333 F.3d at 167.

### D.  The Court Should Dismiss Plaintiffs' Equal Protection Claim (Count IV).

Plaintiffs' claim under the Equal Protection guarantee of the Fifth Amendment fares no better. An equal protection violation can be shown where: "(1) a law or policy explicitly classifies on the basis of [a protected characteristic]; (2) a facially neutral law or policy is applied differently on the basis of [a protected characteristic]; or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a . . . discriminatory impact." *Lewis v. Ascension Par. School Bd.*, 72 F. Supp. 3d 648, 663 (M.D. La. 2014), *aff'd*, 662 F.3d 343 (5th Cir. 2011). Where the claimed differential treatment is based on a facially neutral law or policy, plaintiff must allege facts, from which a court can reasonably infer, the "the existence of purposeful discrimination" motivating the action that caused the complained-of injury. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Washington v. Davis*, 426 U.S. 229, 239 (1976) (requiring proof of discriminatory animus even when facially neutral statute has a "racially disproportionate impact"). A showing of disparate impact is insufficient to allege the necessary discriminatory intent. *See Kovac v. Wray*, 363 F. Supp. 3d 721, 760 (N.D. Tex. 2019); *see also Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

Plaintiffs concede that the EO is facially neutral, Compl. at 60 ¶ 183, but claim that the EO violates the right of equal protection because the EO is "targeted at the Jewish People and their religious beliefs," *id.* at 59 ¶ 181. But this is plainly wrong, and plaintiffs fail to plead non-conclusory facts suggesting a discriminatory animus.

46

First, Plaintiffs reference a National Security Council Background Press Call to suggest that the EO was "directed at the Jewish settler population, and no other." *Id.* at 22 ¶ 77.  But in that call, a senior official directly states,

> [T]his EO is non-discriminatory.  It applies to Israelis and Palestinians alike.  It applies to foreign nationals and those who are engaged in acts of violence on the West Bank and undermining stability there.  And of course, we continue to go after, through sanctions and other means, designated terrorist groups, whether Gaza, the West Bank, or throughout the region.

*See* https://perma.cc/2GEV-6AAE.  Although Plaintiffs' claim that Defendants have "made clear by its words" that "only Jewish people are at risk [of] being sanctioned under EO 14115," Compl. at 60 ¶ 183, their allegations do not comport with the documents on which they rely.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference.").

Second, Plaintiffs allege that the "content and structure of the EO is aimed at Jewish individuals and entities, not Palestinians or persons of any other national origin, religion, or ethnicity." Compl. at 59 ¶ 181.  Plaintiffs' conclusory argument is of no moment.  They concede that the EO is facially neutral, *see id.* at 60 ¶ 183, and nothing about the structure suggests otherwise.  *See generally* EO 14115.

Third, Plaintiffs allege that "the only individuals who have been placed on the EO's sanction list are Jews, even though there are thousands of Palestinians who have engaged in terrorist attacks on Jewish civilians."  Compl. at 59 ¶ 181; *see also id.* at 60 ¶ 185 (conclusory allegation that "no such penalties are imposed on non-Jewish U.S. citizens in the West Bank who act in self-defense").  In fact, the Secretary of State has designated a Palestinian organization under EO 14115.  State Decl. ¶ 8, App.0017. But even accepting these allegations as otherwise true, "[d]isparate impact alone cannot suffice to state an equal protection violation."  *Kovac*, 363 F. Supp. 3d at 760 (concluding that a

plaintiffs' allegation that "[a]lmost all publicly known instances of Americans being placed on the watch list [involve] Muslim[s] or persons who could be mistaken for Muslims" was insufficient to state an equal protection complaint); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017) (allegation that persons living in a town with a high Arab and Muslim population were disproportionately included on the terrorism watch list was insufficient to suggest intentional discrimination).  And Plaintiffs do not make any attempt at alleging facts which show that a group of similarly situated persons went unsanctioned, which could suggest that unequal treatment was the result of discriminatory animus. *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999); *Kovac*, 363 F. Supp. 3d at 760; *In re Navy Caplaincy*, 738 F.3d 425, 440 (D.C. Cir. 2013) (concluding that a "statistical significance" claim must parallel that of *Yick Wo* and requires the consideration of "potential confounding factors" accounting for disparities) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886))).

And in any event, a court cannot plausibly infer invidious discrimination where there is an "obvious alternative explanation" for a discrepancy.  *Iqbal*, 556 U.S. at 682.  In addition to the designation of Palestinian entity Lions' Den under EO 14115, the United States has, through other Executive Orders, sanctioned Palestinian entities and individuals for decades, including those who operate in the West Bank.  State Decl. ¶¶ 14-18, App.0019-20; OFAC Decl. ¶¶ 18-19, App.0010-11.  Under these circumstances, "discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (concluding that with the backdrop of the September 11th attacks, allegations that a disproportionate number of Arab Muslims were arrested could not plausibly suggest discrimination where the Director of the FBI's actions were "justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts").

Finally, Plaintiffs allege that the Alert issued by FinCEN addresses only "Israeli individuals

and entities with no reference to any other race."[10]  Compl. at 59 ¶ 182.  Although the Alert does address violence by Israelis, the notice affirms that "[t]he United States has consistently opposed actions that undermine peace, security, or stability in the West Bank, including attacks by Israeli violent extremist settlers against Palestinians, attacks by Palestinian violent extremists against Israelis, and other acts that unduly restrict civilians' access to essential services and basic necessities."  *See* FinCEN Alert, https://perma.cc/WY64-UBKH.  And it declares that the Government is continuing "to seek accountability and justice for all acts of violence against civilians in the West Bank, regardless of the perpetrator or the victim."  *Id.*  Far from showing a discriminatory animus, the FinCEN Alert provides guidance on the United states' work in combatting violence, regardless of the perpetrator.  *See id.*  It alone does not show a discriminatory intent.  *Tellabs, Inc.*, 551 U.S. at 322.

Given that the EO was facially neutral, and Plaintiffs have not alleged an intent to discriminate, Plaintiffs' equal protection claim only survives if it lacked a rational basis.[11]  *Washington*, 426 U.S. at 242.  Because Plaintiff does not make such an allegation, the Court should dismiss Plaintiffs' claim.  And even if they had, in matters touching on foreign policy, classifications based on nationality are typically upheld.  *Cf. Trump v. Hawaii*, 585 U.S. at 702 (entry restrictions based on national origin); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution."); *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979) (rejecting equal protection challenge to reporting requirements for Iranian students in the U.S. observing that

---

[10] For U.S. purposes, Israeli is a nationality, and not a race.

[11] Even if the Court were to conclude that strict scrutiny was the proper lens, Plaintiffs' claim would still fail.  Plaintiffs allege that the EO cannot survive strict scrutiny because "there was no compelling governmental interest to declare a national emergency" and the sanctions program was not necessary to further that interest.  Compl. at 61 ¶ 188. This argument directly challenges the national emergency and thus poses political questions, which are non-justiciable by this Court.  *See supra* Part II.

"[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive," and that such distinctions "must be upheld" so long as they "are not "wholly irrational"). Here it is the business of the Executive Branch, not the judiciary to determine when sanctions serve the goal of U.S. foreign policy.

### E.  The Court Should Dismiss the Due Process Vagueness Claim (Count V).

Plaintiffs Deutsch, Ben Chaim and Abramowitz argue that Section 1(a)(i)(A) is so vague as to violate the Fifth Amendment. Compl. at 62-63 ¶¶ 189-98. The void-for-vagueness doctrine is a due-process doctrine requiring that a law "give the person of ordinary intelligence a reasonable opportunity to know what is *prohibited*, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (emphasis added); *United States v. Lanier*, 520 U.S. 259, 266 (1997). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied*, 144 S. Ct. 348 (2023). So long, however, as a statute "give[s] clear notice [of] a reasonably ascertainable standard of conduct," it cannot be condemned as unconstitutionally vague. *United States v. Powell*, 423 U.S. 87, 92 (1975). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Humanitarian L. Project*, 561 U.S. at 19. "In a civil action, a law is void for vagueness only if it 'commands compliance in terms so vague and indefinite as really to be no rule or standard at all' or if it is 'substantially incomprehensible.'" *Phillips v. Collin Cmty. Coll. Dist.*, 701 F. Supp. 3d 525, 540 (E.D. Tex. 2023).

A "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013; *see also Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020). It bears repeating, then, that the vast majority of potential applications of this prong involve wholly foreign persons without constitutional protections and actions which are plainly covered by the text. *See supra* pp. 37-39. Accordingly, there are at least some circumstances where application of

the EO is constitutional.  Moreover, a party to whose conduct a rule clearly applies may not challenge that law for vagueness. *Parker v. Levy*, 417 U.S. 733, 756 (1974); *Humanitarian L. Project*, 561 U.S. at 18-19.  Here, none of the Plaintiffs have to date been deprived of a property or liberty interest as a result of the EO, but at least Plaintiffs Deutsch and Ben Chaim wish to transfer funds to a designated person without a license, and that conduct is plainly prohibited by Section 3 (prohibiting transfers to SDNs) and subject to sanctions under Section 1(a)(iii) (imposing sanctions on those determined to provide material support to an SDN).  *See, e.g.*, Compl. at 17 ¶ 57 (Deutsch's monetary support to Tsav 9); *id.* at 17 ¶ 58 (Ben Chaim's monetary support for Reut Ben Haim).  It is not entirely clear what conduct Abramowitz thinks might be proscribed, since neither "advocacy" nor "self-defense" is proscribed or subject to sanctions.  *See supra* pp. 19-20, 31-33.  Plaintiffs "cannot seek refuge in imaginary cases that straddle the boundary" between what is permitted and not when their own conduct is easy to categorize. *Humanitarian L. Project*, 561 U.S. at 22.

In any event, Plaintiffs are incorrect to state that EO 14115 "allows for sanction when anyone in any manner . . . harms 'peace, security, or stability in the West Bank."  Compl. at 62 ¶ 190.  But in fact there must be a factual determination by the Secretaries of State or the Treasury that the foreign person is "responsible for or complicit in, or . . . [has] directly or indirectly engaged or attempted to engage in . . . actions – including directing enacting, implementing, enforcing, or failing to enforce policies – that threaten the peace, security or stability of the West Bank."  EO 14115 § 1(a)(i)(A).  Accordingly, in order to impose sanctions, there must be a **foreign person**, the person must be **responsible for or complicit in, or have engaged** in certain kinds of **actions**, the agency must make factual determination that such actions are a **threat to peace, security, or stability**, and the determination is subject to both administrative reconsideration requiring a written decision, and judicial review under the APA.  The text even includes an example of the types of actions that threaten the peace, security, or stability to guide the agencies' judgment.  All of these requirements and procedures narrow the scope of the prong and prevent arbitrary enforcement.  To date, this sparingly-

51

used provision has been used to sanction six non-U.S. persons (without constitutional rights), four of whom are also subject to other prongs, and all of whom were determined to engage in or materially support violent and destructive acts that obviously threaten the peace.  The Complaint does not indicate that any of the foreign persons to which Plaintiffs claim ties have sought reconsideration before the agency;[12] nor have those foreign persons appeared in court to seek judicial review of their designations.[13]  Thus, there is no reason to think that reasonable people cannot discern the meaning of the terms or that it is subject to arbitrary enforcement.  *Cf. Roy*, 950 F.3d at 252 (terms like "boisterous" and "provocative" are sufficiently clear in a criminal ordinance because they are "familiar" concepts); *Phillips*, 701 F. Supp. 3d at 540 (upholding policy requiring employees to "exercise appropriate restraint").[14]  The Court should dismiss this claim.

### F.   The Court Should Dismiss the APA Claim (Count VI).

In Count VI, Plaintiffs assert that the President's issuance of EO 14115, and the agencies' implementation thereof, are in violation of the APA.  The APA allows for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  It is "well-

---

[12] Mount Hebron Fund has sought reconsideration; that request is pending.  OFAC Decl. ¶ 17, App.0010.

[13] Moreover, the text of an EO imposing targeted sanctions on foreign persons is not subject to the same scrutiny as criminal prohibitions.  *Cf. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982).  However, if "the law interferes with the right of free speech or association, a more stringent vagueness test should apply."  *Id.* at 499.  Ultimately, the "peace, security, or stability" prong is a purely civil authority – it potentially subjects the target to targeted economic sanctions by policymakers, but those determinations are subject to both administrative reconsideration and judicial review, not imprisonment.  And, as explained *supra*, it does not regulate speech.  Accordingly, it is subject to the most flexible standards for clarity.  *See, e.g., Kadi*, 42 F. Supp. 3d at 35 (applying civil standard to IEEPA sanctions).  But even under the somewhat more stringent standard applicable to the regulation of speech, the prong readily passes muster.

[14] Plaintiffs argue that the "arbitrary" enforcement of the EO contributes to the vagueness because some terrorists have not been sanctioned under this EO.  Compl. at 63 ¶¶ 197-98.  Plaintiffs' complaints about the agencies' exercise of enforcement discretion are not justiciable but they are also wrong and poorly reasoned.  The U.S. has in fact sanctioned numerous Palestinian terrorists, both under this EO and under authorities which substantially predated EO 14115.  *See also* Part III.D.

settled" that Presidential action is not subject to review under the APA. *Texas v. Biden*, 694 F. Supp. 3d 851, 870 (S.D. Tex. 2023), *appeal filed*, No. 23-40671 (5th Cir. Nov. 24, 2023); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018).

As an initial matter, because "[a]n executive order is a presidential action, not an agency action," Plaintiffs' challenges to EO 14115 under the APA are not reviewable. *Texas*, 694 F. Supp. 3d at 870 (holding the challenge to EO 14206 was not reviewable under the APA because the executive order "is presidential action immune from APA review"). Thus, Plaintiffs' claim that the President lacked authority to issue the EO, relied upon evidence which lacked veracity, and did not make appropriate findings are all non-cognizable under the APA, and must be dismissed. *See id.*

Plaintiffs' challenge to the implementation of the EO likewise fails. First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012). *But see Texas*, 694 F. Supp. 3d at 870-71(discussing the split in authority but declining to answer the question).

Even assuming the "implementation" of the EO could be challenged through the APA, however, the final agency action requirement—a jurisdictional requirement in the Fifth Circuit, *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)—necessitates a plaintiff to plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 899 (1990)*; Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). Instead of a circumscribed, discrete agency action, Plaintiffs mount a wholesale challenge to the

53

"implementation" of the EO.  *See* Compl. at 63-66 ¶¶ 143-55.  Plaintiffs allege that "Defendants' implementation of Section 1 of the EO," as demonstrated by "OFAC's determination of which entities to place on the SDN List," along with Defendants' fact-finding in "enforcing the EO" were all arbitrary and capricious.  *Id.* at 65-66 ¶¶ 153-54.  Through such a claim, Plaintiffs "have impermissibly attempted to demand a general judicial review" of Defendants' decisions.  *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000).  In fact, Plaintiffs' claim demands an impermissible general review of five agencies' operations.  *See* Compl. at 65-66 ¶¶ 153-54 (alleging that all "Defendants" acted arbitrarily).  The APA does not grant federal courts that power, and this Court should reject the invitation to ignore the "institutional limits on courts which constrain [their] review to narrow and concrete actual controversies."  *Sierra Club*, 228 F.3d at 566.  Finally, to the extent the general challenge to "enforcement" is a challenge to the agency's exercise of enforcement discretion, it is well-settled that the exercise of enforcement discretion is committed to agency discretion."  *See* 5 U.S.C. § 701(a)(2) (precluding review "agency action [that] is committed to agency discretion by law"); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *United States v. Texas*, 599 U.S. 670, 679 (2023).  The Court should dismiss the APA claim.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.


Dated: October 15, 2024                    Respectfully Submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director, Federal Programs Branch

                                           BRIGHAM J. BOWEN
                                           Assistant Branch Director

                                           */s/   Amy E. Powell*
                                           AMY POWELL

                                                   54

Senior Trial Counsel
DOROTHY CANEVARI
ALEXANDER N. ELY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, I electronically filed the foregoing Memorandum and all supporting materials with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Amy E. Powell
AMY E. POWELL
United States Department of Justice